## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

CASE NO.:

v.

ROYAL BENGAL LOGISTICS, INC., and
SANJAY SINGH,

                Defendants,

**UNDER SEAL**

SHEETAL SINGH and CONSTANTINA
CELICOURT,

                Relief Defendants.

FILED BY _____ D.C.

JUN 20 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

_____/

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF AND MEMORANDUM OF LAW

### I.  INTRODUCTION

The Securities and Exchange Commission (the "Commission" or "SEC") moves this Court for a Temporary Restraining Order, Asset Freeze, and other emergency relief pursuant to Rule 65 of the Federal Rules of Civil Procedure ("TRO Motion") and Local Rule 7.1 to prevent Defendants Royal Bengal Logistics, Inc. ("RBL") and Sanjay Singh ("Singh") (collectively, "Defendants") from continuing to defraud investors in connection with their fraudulent offer and sale of securities, and to prevent them from further misuse and misappropriation of investor funds.

Since at least August 2019 to the present (the "Relevant Period"), Defendants have operated a Ponzi scheme and affinity fraud targeting South Florida's Haitian-American community, offering high-yield investment programs purportedly generating 12.5% to 325% of

"guaranteed" returns. Defendants have raised approximately $112 million from more than 1,500 investors.

Touting the success of its business model, Defendants promised investors that their money would be used to grow RBL's operations and increase RBL's fleet of semi-trucks and trailers. Among other things, Defendants assured investors and prospective investors that their investment programs were safe, that RBL's business did not depend on investor funds because it generated up to $1,000,000 in revenue per month, and that they had a fleet of over 200 semi-trucks, and growing.

In truth, since August 2019, RBL has operated at a loss of over $18 million. Without sufficient revenue to pay returns owed to investors, Defendants used approximately $70 million of new investor funds to pay promised returns and redemptions to existing investors. In addition, during that period Singh misappropriated at least $14 million of investor funds for himself and others, including Relief Defendants (as defined below), who did not provide any legitimate services for those investor funds. Defendants also have diverted over $19 million to two brokerage accounts controlled by Singh, who engaged in highly speculative equities trading on margin, ultimately losing more than $1 million of investor money in the process. As of February 2023, RBL's bank accounts have dwindled to approximately $2.1 million. RBL will be unable pay the interest and principal owed to hundreds of investors absent an influx of new investor money in perpetuation of the scheme.

Through their fraudulent conduct, Defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c); Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule l0b-5, 17 C.F.R. § 240.10b-5. Singh also, directly and indirectly, violated Exchange Act Section 10(b) and Rule 10b-5 thereunder as a

control person of RBL under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). To halt this ongoing offering fraud, protect investors, and preserve investor assets, the Commission seeks emergency relief, including preliminary injunctive relief, asset freezes, the appointment of a Receiver, and an order prohibiting the destruction of documents.

## II.   DEFENDANTS AND RELIEF DEFENDANTS

### A. Defendants

1.      Singh, age 43, is an individual residing in Coral Springs, Florida. Singh is the founder, president, and director of RBL,[1] and controls RBL's bank accounts,[2] brokerage accounts,[3] and all key aspects of RBL's business operations.[4] Singh has never been registered with the Commission.[5]

2.      RBL is a Florida for-profit corporation with its principal place of business in Coral Springs, Florida.[6] RBL was formed in June 2018 for the purpose of operating a trucking and logistics business.[7] RBL began raising funds from investors in 2019 purportedly to increase the size of its fleet of trucks and to grow its operations.[8] RBL's investment offerings have never been registered with the Commission.[9]

---

[1] Declaration of Ivette Goizueta-Mendes ("Exhibit A") ¶¶ 5(a), 9 (Attach. 1; Attach. 7 at p. 2:16-17).
[2] Declaration of Mark Dee ("Exhibit B") ¶ 9 (Table 1).
[3] *Id.*
[4] Ex. A ¶ 9 (Attach. 7 at pp. 2:16-23, 3:11 – 4:6, 5:23 – 6:13).
[5] *Id.* at ¶ 22.
[6] *Id.* at ¶ 5(a) (Attach. 1).
[7] *Id.* at ¶¶ 5(a), 9 (Attach. 1; Attach. 7 at p. 2:16-23).
[8] *Id.* at ¶ 11 (Attach. 9 at pp. 16:17 – 17:4, 26:25 – 27:6); Ex. B ¶12.
[9] Ex. A ¶ 22.

**B. Relief Defendants**

3.     Sheetal Singh ("Sheetal"), age 41, is an individual residing in Coral Springs, Florida. Sheetal is Singh's spouse.[10] RBL diverted approximately $7.5 million of investor funds to a bank account held jointly by Singh and Sheetal.[11]

4.     Constantina Celicourt ("Constantina"), age 39, is an individual residing in Coconut Creek, Florida. Constantina is the spouse[12] of RBL's Vice President of Business Development.[13] On June 6, 2022, Constantina used approximately $2.1 million of investor funds to purchase real property in Pompano Beach, Florida, titled in her name.[14]

## III.   VENUE

5.     This Court has personal jurisdiction over the Defendants, and venue lies in the Southern District of Florida because most of the transactions and acts constituting violations of the Securities Act and the Exchange Act occurred in this District.[15] Further, Singh resides in the District, and RBL—the company through which Singh defrauded investors—has its principal place of business in the District.[16]

## IV.   FACTUAL ALLEGATIONS

### A.  RBL's Investment Programs

6.     RBL is a transportation and logistics company, and is registered as a common carrier with the U.S. Department of Transportation.[17] Singh formed RBL in 2018, is RBL's president and director, and at all times material to the Complaint, has had signature authority over

---

[10] *Id*. at ¶ 9 (Attach. 7 at p. 2:24-25).
[11] Ex. B ¶ 17(a).
[12] Ex. A ¶¶ 8, 14(b) (Attachs. 6, 13).
[13] *Id*. at ¶ 9 (Attach. 7 at p. 5:15-17).
[14] Ex. B ¶19 (Attach. 3).
[15] Ex. A ¶ 5 (Attachs. 1-3); Ex. B ¶¶ 13-15, 19, 27-28.
[16] Ex. A ¶ 5 (Attach. 1).
[17] *Id*. at ¶¶ 8, 9 (Attach. 6; Attach. 7 at p. 2:16-23); Declaration of Scott Mulkey ("Exhibit C") ¶ 9.

the company's bank accounts and finances, and control over all key aspects of RBL's business operations.[18]

7.       Singh purports to have transformed RBL into, what he describes as, a reverse franchising model, whereby investors receive passive income generated from RBL's trucking business.[19]

8.       Since no later than August 2019, RBL has offered investors at least four investment programs, promising guaranteed returns ranging from 12.5% to as high as 325% depending on the program (collectively, "RBL's Investment Programs").[20] RBL's Investment Programs are investment contracts and, therefore securities, within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.[21] As of the filing of this Complaint, Defendants continue to market RBL's Investment Programs and raise funds from investors.[22]

### (i) RBL's Short and Long Term Investment Programs

9.       RBL offers investors the opportunity to invest in RBL's business through two loan programs, a Short Term Investment Program (the "Short Term Program") and a Long Term Owner Financing Program (the "Long Term Program").[23] RBL represents to investors that investments in either loan program will be used in RBL's general business operations.[24]

10.      RBL's Short Term Program requires a minimum investment of $25,000, with a maximum investment of $200,000, for a period of 90 to 365 days depending upon the investment amount.[25] At the end of the loan period, RBL is obligated to repay investors their principal

---

[18] Ex. A ¶¶ 5, 9 (Attach. 1; Attach. 7 at pp. 2:16-23, 3:11 − 4:6, 5:23 − 6:13); Ex. B ¶ 9 (Table 1).
[19] Ex. A ¶¶ 9, 13 (Attach. 7 at pp. 2:3-6, 24:24 − 25:2; Attach. 11 at pp. 33:20 − 34:3); Ex. C ¶ 6.
[20] Ex. B ¶ 12; Declaration of Austin Steelman ("Exhibit D") ¶ 9 (Attachs. 1-2).
[21] Ex. D ¶ 9 (Attachs. 1-2).
[22] *Id*. at ¶ 5.
[23] *Id*. at ¶ 9 (Attach. 2 at pp. 30-32, 53-54).
[24] Ex. A ¶¶ 10, 11 (Attach. 8 at pp. 14:17 − 15:2; Attach. 9 at pp. 16:17 − 17:4);
[25] Ex. D ¶ 9 (Attach. 2 at p. 53).

investment plus interest ranging from 20-24% depending on the investment amount and term selected by the investor.[26]

11.     RBL's Long Term Program requires a minimum investment of $60,000, with a maximum of $250,000, for a 36-month term.[27] Under the Long Term Program, RBL is obligated to pay investors monthly payments based on an annual 12.5% interest rate.[28]

### (ii) RBL's Trailer Sponsorship Program

12.     The third investment program offered by RBL is its Trailer Sponsorship Program (the "Trailer Program").[29] The Trailer Program is a six-month program that offers investors the opportunity to sponsor the building and purchase of a tractor-trailer on behalf of RBL.[30]

13.     Under the Trailer Program, the minimum investment is $50,000, with a maximum investment of $200,000 for a period of 180 days.[31] RBL represents to investors that their funds are used to build trailers in India, which are then disassembled and shipped to the United States.[32] RBL claims that upon arriving in the U.S., the trailers are then reassembled and added to RBL's fleet or sold for a profit.[33] At the end of the period, RBL is obligated to repay investors their principal investment plus 30% interest.[34]

### (iii) RBL's Truck Program

14.     RBL's Equipment Management Investment Program (the "Truck Program") has a five-year term (the longest of RBL's Investment Programs) and offers the highest returns.[35] The

---

[26] *Id.*
[27] *Id.* at p. 54.
[28] *Id.*
[29] *Id.* at pp. 46-50.
[30] *Id.*
[31] *Id.* at (Attach. 1 at p. 15).
[32] Ex. A ¶ 11 (Attach. 9 at pp. 12:10 – 14:2).
[33] *Id.*
[34] *Id.*; Ex. D ¶ 9 (Attach. 1 at p. 15).
[35] Ex. A ¶ 11 (Attach. 9 at pp. 8:18 – 12:6); Ex. D ¶ 9 (Attach. 2 at pp. 33-45).

Truck Program requires a minimum investment of $55,000 that RBL purports to use toward the purchase of a semi-truck on behalf of the investor.[36]

15.     RBL explains to prospective investors that it takes all steps to purchase and operate the truck on behalf of the investor, including identifying and purchasing the truck, arranging financing for the investor to purchase the truck, assigning a driver, obtaining licensing, registration and insurance, and maintaining the truck.[37] Investors are required to make the investment through a new or existing corporation or limited liability company created by the investor, which RBL claims will be the legal owner of the truck.[38]

16.     Under the terms of the Truck Program, the investor agrees to lease the truck to RBL for a five-year term.[39] RBL pays the investor monthly lease payments in the amount of $3,000, beginning on the third month for 58 months.[40] At the end of the five-year term, an investor in the Truck Program would have received $174,000 in lease payments alone, representing a 216% return on investment.[41] The investor also purportedly owns the trucks outright, which the investor may keep, sell to RBL, or sell to a third party.[42]

17.     Investors may also invest $110,000 in the Truck Program for the purchase of two trucks.[43] As an incentive to invest in two trucks, RBL pays investors a $10,000 rebate 30 days after receipt of the investor's investment.[44] Under the two-truck option, RBL pays investors monthly lease payments in the amount of $6,000 for 58 months, after which an investor in the Truck

---

[36] *Id.*
[37] *Id.*
[38] Ex. A ¶ 11 (Attach. 9 at pp. 8:18 – 12:6, 21:18 – 22:6).
[39] Ex. A ¶ 11 (Attach. 9 at pp. 8:18 – 12:6); Ex. D ¶ 9 (Attach. 2 at pp. 33-45).
[40] *Id.*
[41] Assuming the truck is valued at approximately $55,000 when returned to the investor at the end of the five-year lease, the total return on investment is 316%.
[42] *Id.*
[43] Ex. A ¶ 11 (Attach. 9 at p. 19:18-25); Ex. D ¶ 9 (Attach. 1 at pp. 16-28).
[44] *Id.*

Program owns two trucks outright and will have received $358,000,[45] representing a 225% return on investment.[46]

18.     New investors typically begin by investing $25,000 in RBL's Short Term Program, which is an apparent teaser program designed to lure investors into making larger investments over longer periods of time.[47] After the three-month investment period, when investors are repaid their initial $25,000 investment plus $5,000 of "interest," many investors decide to roll their $30,000 principal and interest payment into RBL's Truck Program, which requires an additional $25,000 investment and a five-year term.[48]

19.     From August 2019 through February 2023, RBL raised $112 million from more than 1,500 investors, a majority of which are Haitian-American residing in South Florida, but also include residents from at least+ 17 other states, the District of Columbia, Haiti, Canada, and India.[49]

**B. Defendants' Material Misrepresentations and Omissions**

20.     Defendants solicit investors through sales agents, promotional videos, in-person investor presentations, investor conferences, and word-of-mouth.[50]

21.     Investors are provided with offering materials and a brochure, entitled "RBL Investor Plan," which describes each of the four investment programs along with investment requirements and associated returns.[51]

---

[45] *Id.*
[46] Assuming the combined value of the trucks is approximately $110,000 when returned to the investor at the end of the five-year lease, the total return on investment is 325%.
[47] Ex. A ¶¶ 11-12 (Attach. 9 at pp. 15:14 – 16:17; Attach. 10 at pp. 16:12-24, 33:1-5).
[48] *Id.*
[49] Ex. B. ¶¶ 13-14; Ex. C ¶ 4.
[50] Ex. A ¶¶ 6-13 (Attachs. 4-9; Attach.11 at p. 33:11-23); Ex. C ¶ 4; Ex. D ¶ 9 (Attachs. 1-2).
[51] Ex. D ¶ 9 (Attachs. 1-2).

22.     In one of RBL's promotional videos, "Driving American Dream," available to the public on YouTube,[52] Singh claims to have reversed the traditional business model to one in which RBL carries all of the risk on behalf of its investors: "The company['s] ambition is only one – to work for our investor and to make the investor prosper. We take the risk. We take the liability. You enjoy the investment, and that is our business model."[53]

23.     During a November 2022 RBL Investor Zoom video conference, also available to the public on YouTube,[54] Singh claimed that RBL generates $650,000 in revenue per month and compared RBL to Apple and Tesla:

> … [T]he fundamental[s] of this business can be trusted. So let's move on from the point of view that [RBL] may last one day, two days – this is not Bitcoin. Our product is better than Apple. Our product is better than Tesla. You buy Apple, you buy Tesla, you start spending money. You buy [a] Royal Bengal contract, you start making money.[55]

24.     In a March 2023 pitch to undercover FBI agents[56] posing as prospective investors at RBL's headquarters,[57] RBL's representatives emphasized that:

- Investments are 100% guaranteed;[58]

- RBL does not rely solely on investor funds to operate;[59]

- RBL has a fleet of 230 trucks and plans to purchase 60 more by July 2023;[60] and

- To date, no investor has ever missed receiving a payment.[61]

---

[52] https://youtu.be/oEqnyBB5-6Q
[53] Ex. A ¶ 9 (Attach. 7 at p. 27:12-15).
[54] https://youtu.be/t02PZhNIs5k
[55] Ex. A ¶ 10 (Attach. 8 at p. 17:5-13).
[56] All undercover activity and recordings referenced herein were done strictly at the direction and behest of law enforcement agencies and not the Commission.
[57] Ex. D ¶ 4.
[58] Ex. A. ¶¶ 11-12 (Attach. 9 at pp. 9:3-6, 13:19-20, 27:18-22; Attach 10 at pp. 11:6-8, 24:16-17, 25:9-20, 40:25 – 41:6, 44:13-20).
[59] Id. at ¶¶ 12-13 (Attach. 10 at p. 31:3-9; Attach. 11 at pp. 32:19 – 34:6).
[60] Id. at ¶¶12-13 (Attach. 10 at p. 48:18-21; Attach. 11 at p. 17:7-13).
[61] Id. at ¶13 (Attach. 11 at p. 37:14).

25.     During this same pitch, RBL's representatives claimed that RBL's trucking business generates over a million dollars in revenue per month—a notable increase from the $650,000 figure touted by Singh back in November 2022.[62]

26.     Defendants' representations about the success of RBL's trucking company, the safety and security of investor funds, the size of RBL's fleet, and RBL's ability to pay investor returns from the profitability of RBL's trucking enterprise are false.

27.     RBL's bank account records demonstrate that investments in RBL are anything but safe and secure.[63] Since at least August 2019, Defendants have been depositing and commingling investor funds raised through the four investment programs in RBL's operating accounts.[64]

28.     RBL uses commingled investor funds to pay its business expenses and, as further explained below, to make Ponzi-like "interest" and "lease" payments, and principal redemptions to investors under RBL's Investment Programs.[65] Account balances often have been reduced to a few hundred thousand dollars until new investor money is deposited allowing RBL to continue operating.[66] This cycle is then repeated.[67]

29.     Contrary to RBL's claims that it is generating $650,000 to $1,000,000 in monthly revenues, from August 2019 through February 2013, RBL operated at an approximate $18 million loss[68] and used investor funds to cover the shortfall.[69]

---

[62] Ex. A ¶ 13 (Attach. 11 at p. 34:1-3).
[63] Ex. A ¶¶ 15-20.
[64] Ex. B ¶ 14.
[65] Id. at ¶¶ 26-29.
[66] Id. at ¶ 28 (Table 4).
[67] Id. at ¶ 27-31.
[68] Excluding funds received from and paid to investors, during the Relevant Period, RBL's cash inflows associated with the operation of RBL's trucking business, approximately $13 million, were significantly less than cash outflows for expenses associated with the operation of RBL's trucking business, approximately $31.2 million. Ex. B ¶ 26.
[69] Id. at ¶ 26.

30.     Specifically, during that time period, RBL generated approximately $13 million of revenues from what appears to be freight factoring.[70] Freight factoring allows a trucking company, such as RBL, to sell its invoices to a third party for immediate payment rather than having to wait 30, 60, or even 90 days for invoices to be paid by customers after the freight has been delivered. During this same period, RBL incurred approximately $31.2 million of expenses (not including interest payments, lease payments, or principal redemptions owed to investors under RBL's Investment Programs).[71] Therefore, at all times material to the Complaint, RBL could not have paid investors "interest" or "lease" payments from company revenue.[72] Instead, RBL has been paying investors "returns" and redemptions from a continuous stream of new investor money, in a Ponzi-like fashion.[73]

31.     In addition, RBL has grossly overstated the number of trucks it has purchased on behalf of investors in RBL's Truck Program.[74] The bulk of RBL's fleet is comprised of independent contractors who drive their *own* trucks for RBL, known in the industry as owner operators.[75] To inflate the number of trucks to prospective investors, Defendants misrepresent owner-operated trucks as their own.[76] Trucks actually purchased by RBL are approximately 10 to 20 years old and in poor condition.[77] Employees driving RBL-owned trucks regularly complain about breakdowns and issues with RBL paying for repairs.[78]

---

[70] *Id.*
[71] *Id.*
[72] *Id.* at ¶¶ 26-27.
[73] *Id.* at ¶ 29.
[74] Ex. A ¶ 12 (Attach. 10 at p. 48:16-21).
[75] Ex. C ¶ 11.
[76] *Id.*
[77] *Id.* ¶ 8.
[78] *Id.* ¶ 12.

32.     In addition to these misrepresentations, Defendants also failed to disclose that Singh misappropriated millions of investor funds for himself, his wife, and other related parties, and diverted millions for unauthorized and speculative securities trading.[79]

## C.   Defendants' Misuse and Misappropriation of Investor Funds

33.     During the Relevant Period, Defendants used investor funds to make Ponzi-like payments of "returns" and redemptions to investors, Singh misappropriated millions for himself and related parties, and diverted over $19 million to two brokerage accounts controlled by Singh, where he engaged in highly speculative equities trading on margin.[80] None of this misconduct or used of funds was, or is currently being, disclosed to investors.[81]

### (i) Defendants' Operation of a Ponzi Scheme

34.     RBL represents to prospective investors that it is able to pay such extraordinary returns due to the rapid growth and success of its trucking business.[82] RBL's bank account records, however, reflect that from August 2019 through February 2023, RBL operated at an approximate $18 million loss and used investor funds to cover the shortfall.[83]

35.     RBL's bank account records further reflect that, in the absence of sufficient revenues, RBL has been conducting a Ponzi scheme to meet its obligations to investors.[84] In classic Ponzi-scheme fashion, RBL is paying returns owed to existing investors – either "interest" on the loan programs or "lease" payments under the Truck Program – with money raised entirely from

---

[79] Ex. B ¶¶ 14-25.
[80] Id.
[81] Ex. A ¶¶ 6-13 (Attachs. 4-11).
[82] Id. at ¶ 10 (Attach. 8 at p. 17:1-23).
[83] Ex. B ¶ 26
[84] Id. at ¶¶ 27-31.

new investors.[85] RBL has also used new investor funds to pay redemptions to preexisting investors.[86]

36.     As of February 2022, RBL had approximately $2.1 million remaining in its bank accounts.[87] RBL will have insufficient funds to continue paying its investors absent a substantial influx of new investor money in furtherance of the scheme.[88]

### (ii) Defendants' Misappropriation of Investor Funds

37.     Since RBL signed up its first investor in or around August 2019, Defendants have misappropriated as much as $13.9 million[89] of investor funds for themselves and related parties, including:

      a.     $7.5 million of investor funds diverted to a bank account held jointly by Singh and his spouse, Sheetal;[90]

      b.     As much as $3.5 million of investor funds diverted to Cingar Transport, LLC, a company owned and controlled by RBL's Vice President of Credit and Acquisition;[91]

      c.     $432,500 of investor funds paid to one of Singh's relatives;[92] and

      d.     As much as $375,400 of investor funds diverted to North America Aerospace, LLC, a company owned and controlled by Singh.[93]

---

[85] *Id.*
[86] *Id.*
[87] *Id.* at ¶ 30.
[88] *Id.* at ¶ 31.
[89] *Id.* at ¶ 16.
[90] *Id.* at ¶ 17(a).
[91] *Id.* at ¶ 18.
[92] *Id.* at ¶ 17(c).
[93] *Id.* at ¶ 17(b).

38.     In addition, RBL paid $2.1 million of investor funds to a realty company for real estate in Pompano Beach, Florida, purchased in the name of Constantina Celicourt, who is the spouse of RBL's Vice President of Business Development.[94]

### (iii) Investor Funds Diverted for Unauthorized Securities Trading

39.     From March 2022 through January 2023, Defendants diverted approximately $19.3 million of investor funds to two TD Ameritrade brokerage accounts – one opened in the name of RBL (TD Account XXXX3647), the second opened in the name of Sigh personally (TD Account XXXX7115).[95] Defendants diverted approximately $17.3 million from RBL's operating account directly to RBL's TD Ameritrade Account.[96] Singh's personal TD Ameritrade account was funded with at least $2 million that was first diverted to the joint bank account held by Singh and Sheetal, then transferred to the brokerage account.[97] Singh had sole control over both accounts.[98]

40.     Singh engaged in highly speculative trading of equities on margin, losing over $1 million in the RBL TD Account.[99] Monthly statements from these brokerage accounts reflect a rapid and frequent turning over of equities.[100]

41.     For instance, RBL's TD Ameritrade account was opened in March 2022.[101] For the period of March 1, 2022 through December 31, 2022, RBL purchased $299 million in securities and sold $291 million in securities, with unrealized losses for this period totaling $1.06 million.[102] With respect to Singh's TD Ameritrade account, for the period of January 1, 2022 through

---

[94] *Id*. at ¶ 19.
[95] *Id*. at ¶¶ 20-22.
[96] *Id*.
[97] *Id*.
[98] *Id*. at ¶ 9 (Table 1).
[99] *Id*. at ¶ 23.
[100] *Id*.
[101] *Id*. at ¶ 23(a).
[102] *Id*.

December 31, 2022, Singh purchased $383 million in securities and sold $381 million in securities, with unrealized losses for this period totaling 15 dollars.[103]

42.     Trading in both accounts was so aggressive, TD Ameritrade warned Defendants against manipulative stock trading, and in January of 2023, TD Ameritrade force-closed both accounts.[104]

43.     None of RBL's Investment Programs permitted Defendants to trade stock using investor funds.[105]

## V.     **MEMORANDUM OF LAW**

### A.     **Standard for Obtaining a Temporary Restraining Order**

Section 20(b) of the Securities Act, 15 U.S.C. § 77t, and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), provide that in Commission actions the Court shall grant injunctive relief upon a proper showing. *SEC v. Shiner*, 268 F. Supp. 2d 1333, 1340 (S.D. Fla. 2003). This "proper showing" has been described as "a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations of the statutes involved." *SEC v. Gen. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 688 (D.D.C. 1991).

The Commission is entitled to a temporary restraining order if it establishes (1) a *prima facie* case showing the Defendants have violated the securities laws, and (2) a reasonable likelihood they will repeat the wrong. *Shiner*, 268 F. Supp. 2d at 1340. The Commission appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Lauer*, 03-80612-CIV-MARRA, 2008 WL

---

[103] *Id.* at 23(b).
[104] *Id.* at ¶¶ 24-25 (Attachs. 5-6).
[105] Ex. D ¶ 9 (Attachs. 1-2).

4372896, *24 (S.D. Fla. Sept. 24, 2008), *aff'd*, 478 Fed. Appx. 550 (11th Cir. 2012). The Commission, therefore, faces a lower burden than a private litigant when seeking an injunction, and need not meet the requirements for an injunction imposed by traditional equity jurisprudence. *Hecht Co. v. Bowles,* 321 U.S. 321, 331 (1944); *SEC v. J.W. Korth & Co.*, 991 F. Supp. 1468, 1472 (S.D. Fla. 1998). Unlike private litigants, the Commission need not demonstrate irreparable harm or the unavailability of an adequate remedy at law. *Hecht*, 321 U.S. at 331; *J.W. Korth*, 991 F. Supp. at 1473. Nor is it required to show a balance of equities in its favor. *SEC v. U.S. Pension Trust Corp.*, 07-22570-CIV-MARTINEZ, 2010 WL 3894082, *22 (S.D. Fla. Sept. 30, 2010) *aff'd sub nom.*; *SEC v. U.S. Pension Trust Corp.*, 444 Fed. Appx. 435 (11th Cir. 2011).

The Commission's evidence in this case warrants entry of the requested injunctive relief on all applicable grounds. The declarations, account records, and other exhibits attached to this motion demonstrate that Defendants are violating the anti-fraud and registration provisions of the federal securities laws, and will continue to violate them if the Court does not immediately restrain and enjoin them.

**B.      The SEC has Established *Prima Facie* Violations of the Securities Laws**

The Commission has met its burden of establishing a *prima facie* showing of violations of the antifraud and registration provisions of the securities laws as alleged in the Complaint and this motion. As an initial matter, the alleged violations all require that the investment in question be a "security" and that interstate commerce (or the mails) have been used.

**1.      RBL's Investment Programs are Investment Contracts and, Therefore, Securities Under *Howey***

RBL's Investment Programs constitute investment contracts and are, therefore, securities under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Under the *Howey* test, an investment contract exists if there is: (a) an investment of money; (b) in a common enterprise; (c) based on

the expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Friendly Power Co., LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

RBL's Investment Programs satisfy all three elements of the *Howey* test. First, investors committed funds to participate in an investment opportunity.[106] *See SEC v. Unique Fin. Concepts, Inc.*, 119 F. Supp. 2d 1332, 1337 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir. 1999) ("All that is required is that the investor give up some tangible and definable consideration."). Defendants marketed RBL's Investment Programs as an investment opportunity generating varying monthly returns, ranging from 12% to 325%, and raised $112 million from over 1,500 investors.[107]

*Howey*'s common enterprise prong may be satisfied by either vertical or horizontal commonality. Vertical commonality exists where "the fortunes of investors are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Unique*, 196 F.3d at 1199-1200 (internal quote omitted). Horizontal commonality exists where each investor's fortune is tied to the fortune of other investors by the pooling of interests or profits in the transaction. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

The Eleventh Circuit has held that "broad vertical commonality" is sufficient to satisfy *Howey*'s common enterprise element, finding it more "flexible" and less "stringent" than horizontal commonality. *Unique*, 196 F.3d at 1200 n.4. Broad vertical commonality requires only a finding that investors' fortunes are linked to the efforts of the promoter or third parties. *Id.*; *see also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005).

Here, broad vertical commonality exists for two independent reasons. First, the fortunes of investors are entirely dependent on the efforts of Defendants to generate sufficient revenue from

---

[106] Section IV.A.
[107] *Id.*

RBL's trucking business to meet monthly interest and lease payments, and principal redemptions owed to investors under RBL's Investment Programs. *See Unique*, 196 F.3d at 1199-1200 (finding commonality where defendant's clients "were not in a position to assume or maintain any substantial degree of control over their investment."). The role of investors here is limited to simply investing money into the RBL's business venture.[108] Second, Defendants operate RBL as a Ponzi scheme by using new investor contributions to pay prior investors their monthly interest and lease payments, and principal redemptions.[109] The very nature of the alleged Ponzi scheme means investors are dependent on Defendants to secure new investors to cover the guaranteed return payments. *See Hays v. Adam*, 512 F.Supp.2d. 1330, 1337 (N.D. Ga. 2007) ("[T]he very nature of the Ponzi scheme meant that it was dependent on MBA attracting newer investors to cover the payments from Outdoor Media to earlier investors. Thus, the defendants cannot dispute that "the fortunes of the billboard purchasers were interwoven with and dependent upon the efforts and success of Outdoor Media and MBA."); *see also ETS Payphones*, 408 F.3d at 732 (finding common enterprise where 99% of investors leased back phones to a company operated by promoter and were reliant on promoter to attract new investors to pay earlier ones).

The third *Howey* prong is met because investors were led to expect profits from the investor agreements based on the efforts of Defendants. Since *Howey*, the law has been clarified that profits need not be derived *solely* from the efforts of others. Instead, the inquiry is "whether the efforts made by others are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Unique*, 196 F.3d at 1201. Here, investors expected a return on their investment based on Defendants' efforts identifying, securing, and purchasing trucks on their behalf, as well as to manage and operate a successful trucking and logistics

---

[108] *Id.*
[109] Section IV.C(*i*).

business.[110] Defendants marketed RBL's Investment Programs as investments in which RBL, rather than the investors, would do everything for the venture to succeed. RBL's operation as a Ponzi scheme provides another basis for satisfying this prong (as it does the second as discussed above). RBL paid investors their purported profits from new investors' funds.[111] If Defendants did not find new investors, then RBL could no longer pay investors their "profits."

### 2. The Short Term and Long Term Programs are Notes that Constitute Securities

The Supreme Court has held that every note is presumed to be a security unless it bears a strong resemblance to a judicially created list of non-security notes or the note is of a type that should be added to the list. *Reves v. Ernst & Young*, 494 U.S. 56, 65, 67 (1990). A "note" has been defined as "a certificate that evidences a promise to pay a specified sum of principal and interest to the payee at a specified time...." *Sanderson v. Roethenmund*, 682 F. Supp. 205, 206 (S.D.N.Y.1988) (finding that international certificates of deposit are "notes" under the securities laws). That an instrument is not styled as a "note" is not dispositive. *See Fulton Bank v. McKittrick & Briggs Sec., Inc.*, 1990 WL 126179, at *4 (E.D. Pa. Aug. 27, 1990) ("although the instrument in question is labeled a 'certificate of participation,' it nonetheless bears all the earmarks of a note as that term is commonly understood."); *see also Holloway v. Peat, Marwick, Mitchell & Co.*, 879 F. 2d 772, 777 (10th Cir. 1989) (finding that passbook savings credit certificates and thrift certificates are "notes" under the securities laws), *rev'd on other grounds*, 494 U.S. 1014 (1990), *and reaff'd*, 900 F. 2d 1485 (10th Cir. 1990).

The Supreme Court has identified four factors to determine whether a note bears a "family resemblance" to notes that have been determined not to be securities: (1) the motivation of the

---

[110] Section IV.A.
[111] Section IV.C(*i*).

parties for entering the transaction; (2) the plan of distribution of the instrument and whether there is common trading for speculation or investment; (3) the reasonable expectations of investors; and (4) whether there are risk-reducing factors that would make application of the securities laws unnecessary. *Reves*, 494 U.S at 66-67.

Applying these factors, the RBL's Short and Long Term programs, although not described as "notes," are indeed notes that constitute securities. As to the first *Reves* factor, the instrument is likely to be security if the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the instrument is expected to generate. Here, Defendants represented to investors that money invested in RBL's Short and Long Term programs would be used for RBL's business, generally, and to grow its trucking and logistics enterprise.[112] In turn, investors invested in the Short and Long Term programs with the expectation of earning profits in the form of interest payments.

The second *Reves* factor looks to whether RBL's Investment Programs were "offered or sold to a broad segment of the public," and as such involved "common trading." *Id.* at 66. Here, Defendants sold RBL's Investment Programs to more than 1,500 investors residing in numerous states and offered them to the general public.[113]

The third *Reves* factor examines the reasonable expectations of the investing public. *Id.* The Supreme Court has "consistently identified the fundamental essence of a 'security' to be its character as an 'investment.'" *Id.* at 68-69. In this case, there can be no doubt that investors viewed these programs as securities. Investors expected to receive interest and lease payments, plus the return of their principal, from a company using investor money to fund its business activities.

---

[112] Section IV.A(*i*).
[113] Section IV.A ¶19.

The final *Reves* factor asks whether some factor, such as the existence of another regulatory scheme, reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary. Here, no other regulatory scheme exists that would obviate the need to invoke the federal securities laws.

Accordingly, all of the *Reves* factors militate in favor of finding that the Short and Long Term programs are notes that constitute securities.[114]

### 3.      Defendants are Using Interstate Commerce

The interstate commerce requirement is satisfied by RBL's sale of its investment programs to individuals in several states and their use of the Internet to solicit investors. *SEC v. Spinosa*, 2014 WL 2938487, *4 (S.D. Fla. June 30, 2014) (use of Internet satisfied interstate commerce requirement).

### 4.      Defendants are Violating Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act

Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5(a)-(c) of the Exchange Act prohibit essentially the same type of conduct. *U.S. v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979); *Unique*, 119 F. Supp. 2d at 1339. The language of these provisions is "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019). In *Lorenzo*, the Supreme Court recognized that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection.

---

[114] There is an exemption from Section 5 of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act (but not Section 17 of the Securities Act) for certain notes with a maturity of less than nine months. This exemption is unavailable to Defendants because, among other reasons, RBL's Short and Long Term programs are investments rather than commercial in character. *See SEC v. 1 Global Capital, LLC*, No. 18-cv-61991, 2019 WL 1670799, *7-8 (S.D. Fla. Feb. 8, 2019); *SEC v. Smart*, No. 2:09cv00224, 2011 WL 2297659, *13 (D. Utah June 8, 2011) (exemption applies only to "high quality instruments issued to fund current operations and sold only to highly sophisticated investors") (citation and quotation omitted), *aff'd* 678 F.3d 850 (10th Cir. 2012).

Section 17(a) of the Securities Act makes it unlawful in the "offer or sale" of securities to: (a) "employ any device, scheme, or artifice to defraud;" (b) "obtain money or property by means of any untrue statement of a material fact or any [material] omission;" or (c) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1)-(3). A showing of scienter is required under Section 17(a)(1), but Sections 17(a)(2) and (a)(3) require only a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

Section 10(b) of the Exchange Act and Rule 10b-5 render it unlawful, "in connection with the purchase or sale" of securities, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement or omission of material fact; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. A showing of scienter is required under Section 10(b) and Rule 10b-5 thereunder. *SEC v. Corporate Relations Group*, No. 6:99-cv-1222, 2003 WL 25570113 at *7 (M.D. Fla. Mar. 28, 2003).

Unlike private securities actions, the SEC need not prove reliance or injury under Section 17(a), Section 10(b), or Rule 10b-5. *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012).

### a)   *Defendants' Misrepresentations and Omissions*

Defendants obtained at least $112 million from investors by making material misrepresentations and omissions of material facts to investors. In offering documents, marketing materials, investor presentations, and other communications, Defendants told investors and prospective investors that, in exchange for investing in RBL's Investment Programs, RBL would pay "guaranteed" returns generated from RBL's wildly successful trucking and logistics

business—in one presentation comparing RBL to Apple and Tesla, and at various times representing that RBL generated as much as $1 million in revenue per month.[115] Defendants assured investors that RBL's Investment Programs were safe and that investor funds would be used to grow RBL's business, including through the purchase semi-trucks and trailers to expand RBL's fleet.[116] In reality, RBL's business was unable to generate sufficient revenue to meet its operating expenses, let alone pay investors.[117] Instead, RBL relied upon a continuous flow of new investor funds to pay obligations to its existing investors in a classic Ponzi-scheme fashion.[118]

Defendants also never told investors that they would use investor money to trade equities or enrich themselves, and specifically, Singh, Singh's family members, and RBL insiders.

### b) *The Misrepresentations and Omissions were Material*

A false statement or omission must be material for a defendant to be liable for it. The test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citation omitted). In other words, information is material if a reasonable investor would consider it significant to making an investment decision. *Basic v. Levinson*, 485 U.S. 224, 230 (1988).

"Misrepresentations regarding the use of investors' funds are material." *SEC v. LottoNet Operating Corp.*, 2017 WL 6949289, *13 (S.D. Fla. Mar. 31, 2017) (report and recommendation), *adopted* 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017); *SEC v. Smart*, 678 F.3d.850, 857 (10th Cir. 2012) (the fact money was not being used as represented would be material to a reasonable investor). False statements or omissions concerning a Ponzi scheme are material. *SEC v. Credit*

---

[115] Section IV.B.
[116] *Id.*
[117] *Id.*
[118] Section IV.C.

*Bancorp, Ltd.*, 195 F. Supp. 2d 475, 492 (S.D.N.Y. 2002). Misappropriation of funds by the issuer's principal are material. *U.S. v. Lochmiller*, 521 Fed. Appx. 687, 691-92 (10th Cir. Apr. 15, 2013) (upholding conspiracy to commit securities fraud conviction because, among other things, defendant made material misrepresentations when he told investors he would use money for low-income housing but instead used it for personal gain) (citing *Lottonet*, 2017 WL 6949289, *13). The payment of commissions to sales agents is material as a matter of law. *SEC v. Alliance Leasing Corp.*, 2000 WL 35612001 at *8-9 (S.D. Cal. 2000), aff'd 28 Fed. Appx. 648, 652 (9th Cir. 2002) ("[T]he 30% commissions were 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality.'") (quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *see Lottonet*, 2017 WL 6949289, *14 ("Any reasonable investor would want to know that Defendants were not, as Defendants represented, spending investor funds to develop the Company, but were instead using 35 percent of investors' money to pay sales agents for soliciting their investments.").

### c) *Defendants' Scheme to Defraud*

Defendants perpetuated their scheme to defraud investors through their material misstatements and omissions discussed above. *See Lorenzo*, 139 S. Ct. at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

Singh's manipulation of the relevant bank accounts also allowed Defendants to advance their scheme. Singh controlled RBL's bank accounts and, in doing so, used new investor funds to pay existing investors so Defendants could perpetuate the scheme.[119] In addition, Singh

---

[119] Section IV.C(*i*).

misappropriated investor funds through various transfers to himself, his relatives and related entities, and to company insiders.[120]  Moreover, Singh misused investor funds by diverting millions of dollars of investor funds for unauthorized securities trading.[121] *SEC v. Zanford*, 535 U.S. 813, 821-22 (2002) (misappropriation of client's securities for personal use states a claim for scheme to defraud).

### d) *Defendants' Acted with Scienter*

Scienter is a state of mind embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Commission may establish scienter for violations of Section 17(a)(1) of the Securities Act and Rule 10b-5 of the Exchange Act by "a showing of knowing misconduct or severe recklessness." *SEC v. Monterosso*, 756 F.3d 1326, 1335 (11th Cir. 2014) (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982)). As noted above, Section 17(a)(2) and (3) of the Securities Act require a showing of negligence.

Singh knew or was reckless in not knowing that the representations to investors were false because, having control over RBL's bank accounts and overall finances, Singh knew that RBL was not generating sufficient revenue but was suffering significant losses almost since its inception.[122]  Singh, therefore, also knew that RBL's trucking and logistic business failed to generate sufficient revenue to pay investor returns. Instead, through his control of RBL's bank accounts, he steered investor funds to pay principal, interest payments, and lease payments owed to existing investors under RBL's Investment Programs, misappropriated investor funds for his own benefit, and misused investor funds for equities trading.[123]  Singh's scienter can be imputed to RBL. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096 n.16 (2d Cir. 1972); *In re Sunbeam*

---

[120] Section IV.C*(ii)*.
[121] Section IV.C*(iii)*.
[122] Sections II.A, IV.A.
[123] Section IV.C.

*Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999) (finding that the scienter of corporate officers is properly imputed to the corporation).

### 5.      Defendants are Violating Section 5 of the Securities Act

Sections 5(a) and Section 5(c) of the Securities Act require that every offer and sale of securities must be either registered or validly exempted from registration. To establish a *prima facie* case for a Section 5 violation, the Commission must prove that the defendant, directly or indirectly, (a) offered or sold a security; (b) using interstate commerce; while (c) no registration statement was filed or in effect as to the transaction. *SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004). The Commission is not required to prove scienter. *Id.* Once the Commission has established a *prima facie* case, the burden of proof shifts to the defendant to show that an exemption or safe harbor from registration is available for the offer or sale of the security. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

Defendants are violating this provision because RBL's Investment Programs are not registered and no exemption from registration is in effect.[124] The exemptions from registration pursuant to Section 4(a)(2) of the Securities Act and Rules 504, 505, and 506(b) of Regulation D thereunder were unavailable to RBL for the sale of its securities because of the general solicitation by Defendants through their website and YouTube channel, where they advertised RBL's business and investors' ability to make money through their investments with RBL.[125] Rule 504 was also unavailable because more than $5 million of securities were sold in a 12-month period in the offering.[126]

---

[124] Section II.A.
[125] Section IV.B.
[126] Section IV.A.

The intrastate offering exemptions of 3(a)(11), Rule 147, and Rule 147A are likewise not available because Defendants sold the securities in several states.[127] Furthermore, the exemption under Rule 506(c) is unavailable because there is no indication that Defendants took reasonable steps to verify that investors were accredited. This exemption from registration requires both that "all purchasers of securities sold [pursuant to this exemption] …are accredited investors" and, separately, that issuers "take reasonable steps to verify that the purchasers of the securities are accredited investors." Rule 506(c) of Regulation D, 17 C.F.R. § 230.506(c). As a result, and as the Commission explicitly indicated in its adoption of Rule 506(c), the exemption is not satisfied if reasonable steps to verify are not taken, even if all investors happen to be accredited. *See Eliminating the Prohibition Against General Solicitation and General Advertising in Rule 506 and Rule 144A*, Rel. No. 33-9415, at 26 and n.101 (Jul. 10, 2013) (adopting release) (explaining that the two requirements are separate and independent and that treating them as such will avoid diminishing the incentive for issuers to undertake the reasonable verification steps envisioned by the statute).

No other exemption from registration was available for RBL's Investment Programs.

## C.   An *Ex Parte* Temporary Restraining Order in Necessary

Based on the facts and law set forth above, the Commission has met its burden of showing: (1) there is *prima facie* evidence the Defendants are violating the securities laws; and (2) there is a reasonable likelihood they will continue to violate the law unless the Court immediately issues an *ex parte* temporary restraining order against Defendants. As the accompanying Certification Under Rule 65 explains in detail, the Commission has concerns the Defendants will dissipate investor assets if notice is provided. Defendants have already misappropriated millions for

---

[127] *Id.*

personal use and misused millions more of the money they have raised from investors. Given that the fraud is ongoing and Defendants continue to raise money from new investors, the Commission respectfully requests that the Court enter the attached proposed order granting this temporary restraining order and entering the asset freeze without notice to the Defendants to prevent them from further misappropriating investor funds. The Commission will serve the Defendants with the pleadings and orders expeditiously, and the attached proposed order requests that the Court set a show cause hearing at which time the Defendants can appear and argue why the Court should not enter a preliminary injunction and further extend the asset freeze.

**D.    An *Ex Parte* Total Asset Freeze is Appropriate**

The Court may order an asset freeze to ensure that a disgorgement award can be satisfied and to prevent further dissipation of investor funds. *ETS Payphones*, 408 F.3d at 734; *accord CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008). "The SEC's burden for showing the amount of assets subject to disgorgement (and therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains is required.  Exactitude is not . . . ." *ETS Payphones*, 408 F.3d at 735 (citation, quotation, and alteration omitted); *accord FTC v. IAB Mktg. Assocs., LP.*, 746 F.3d 1228, 1234 (11th Cir. 2014). The Commission's burden to demonstrate the potential for dissipation of funds is even lighter. *See FTC v. IAB Mktg. Assocs., LP,* 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze.") (citing *ETS Payphones,* 408 F.3d at 734, and *SEC v. Lauer,* 445 F. Supp. 2d 1362, 1367, 1370 (S.D. Fla. 2006)); *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) ("[T]he SEC must demonstrate only . . . a concern that defendants will dissipate their assets . . . .").

A total asset freeze is warranted when the assets to be frozen are worth less than the likely disgorgement award. *See SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (unpublished) ("[I]f potential disgorgement is greater than the value of the defendant's assets, the district court can order a full asset freeze"); *ETS Payphones*, 408 F.3d at 735-36 (affirming order that "froze all of [defendant's] assets" when estimated disgorgement and value of frozen assets were comparable); *IAB Marketing*, 972 F. Supp. 2d at 1313 (denying defendants' motion to "unfreeze" funds for living expenses where "Defendants' monetary liability greatly exceeds the frozen funds"). Furthermore, Defendants should not be permitted to use ill-gotten gains they have received to pay attorney's fees or living expenses. *See FTC v. RCA Credit Services, LLC*, 2008 WL 5428039, *4 (M.D. Fla. Dec. 31, 2008) (defendants "may not use their victims' assets to hire counsel to help them retain the fruits of their violations"); *CFTC v. United Investors Group, Inc.*, 2005 WL 3747596, *1 n.1 (S.D. Fla. June 9, 2005) (refusing to except living expenses and counsel fees from asset freeze), *aff'd on other grounds sub nom. Levy*, 541 F.3d at 1102.

Here, the Commission has no information indicating that Defendants have assets in excess of the likely disgorgement award. Therefore, a total freeze is appropriate. If, in fact, Defendants have liquid assets in excess of the disgorgement amount, the freeze can be adjusted accordingly.

### E.     The Court Should Require Defendants to Provide Sworn Accountings

The Court should require Defendants to provide sworn accountings, which enable the Commission and the Court to determine the party's profits, the present location of proceeds, and the party's ability to repay. *See SEC v. Tannenbaum*, No. 99-CV-6050, 2007 WL 2089326, *4 (E.D.N.Y. July 19, 2007); *SEC v. Lybrand*, No. 00Civ.1387(SHS), 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000); *SEC v. Margolin*, No. 92 Civ 6307 (PKL), 1992 WL 279735, at *7 (S.D.N.Y. Sept. 30, 1992).

**F.**      **The Court Should Prohibit the Destruction of Records**

An Order against Defendants prohibiting the destruction of records is appropriate to prevent the destruction of documents before this Court can adjudicate the Commission's claims, and to ensure that whatever equitable relief might ultimately be appropriate is available. *Shiner*, 268 F. Supp. 2d at 1345-46.

**VI.**      **CONCLUSION**

For the forgoing reasons, the Court should grant the Commission's Emergency *Ex-Parte* Motion for Temporary Restraining Order and Other Relief and enter the accompanying proposed Order.

**LOCAL RULE 7.1(D) CERTIFICATION**

After reviewing the facts and researching applicable legal principles, I certify that this motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

Dated: June 20, 2023               Respectfully submitted,

Russell R. O'Brien
Trial Counsel
Florida Bar No. 084542
Direct Dial: (305) 982-6341
Email: obrienru@sec.gov

Attorney for Plaintiff
**SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131