UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 23-61179-CIV-SINGHAL

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

ROYAL BENGAL LOGISTICS, INC., and
SANJAY SINGH,

     Defendants.

_____/

## RECEIVERS' INITIAL QUARTERLY STATUS REPORT FOR THE PERIOD FROM JUNE 21, 2023 UNTIL SEPTEMBER 30, 2023

Paul Lopez and Jennifer Wahba in their capacity as Receivers for Royal Bengal Logistics, Inc. (RBL), by their undersigned attorneys, file this initial quarterly Status Report as to their activities from June 21, 2023 through September 30, 2023 as follows:

### INTRODUCTION

The Receivers were appointed in their position by this Court on June 21, 2023 as a result of an Order Granting the Securities and Exchange Commission's (SEC) Motion. *See* [DE 11] (the "Receivership Order"). Pursuant to paragraphs 48 and 49 of the Receivership Order, the Receivers were directed to file this quarterly status report for the period ending September 30, 2023

While all Receivership proceedings involving Ponzi schemes are different, the situation involving RBL is unique due to several extraordinary factors. As noted in more detail below, beginning on February 1, 2023, management of RBL discontinued making entries in the company's QuickBooks financial software system. The absence of any financial information as to RBL's business activities beginning on February 1, 2023  has hampered the Receivers and the accounting professionals in the investigation as to the acts and conduct of those involved with RBL in

1

determining the true nature of the financial transactions involving the company. Furthermore, rather than utilizing a single investment vehicle to lure investors into depositing money with RBL, management devised multiple schemes for "investment opportunities" which include the following:

- Providing investments to RBL for the purchase of trucks in the investors' names (or corporate entity) to be then leased to RBL where the trucks were utilized by RBL in its money-losing trucking operation.  A significant percentage of the trucks were extremely old with excessive miles that were in various states of disrepair, none of which was properly disclosed to investors.

- Providing investments to RBL for the purchase of trucks to be then leased to RBL when no such trucks were ever purchased for the investors.

- Providing unsecured short-term loans to RBL for 90 days with high interest rates, some of which were in excess of 110% per annum in violation of Florida law.

- Providing unsecured long-term loans to at high interest rates, some of which were in excess of 110% per annum in violation of Florida law.

- Providing loans to RBL for the alleged investment in real estate acquisitions.

- Providing loans to RBL for the fabrication of trailers at the RBL Lubbock Texas facility.

- Providing loans or equity investments for a purported business operation in India.

While the Receivers, their legal professionals and their accounting professionals have worked diligently in order to be able to submit this initial quarterly status report that is complete, based upon the lack of financial recordkeeping by RBL and its management, the absence of candor of some of the RBL executives and employees, and the herculean task of reconstructing the financial records of RBL as noted below, the Receivers are unable at this time to provide all of the

information as required by paragraphs 48 and 49 of the Receivership Order. That said, the Receivers have been able to partially reconstruct significant key information regarding RBL's operations so that this Court can understand RBL's overall status at this point in time. Undoubtedly, as bank records are reconstructed in the coming months, RBL's finances will become clearer to the Receivers and to this Court.

### SUMMARY OF THE OPERATIONS OF THE RECEIVERS

**Selection of Counsel and Forensic Accountants for the Receivers**

Immediately following the Receivers' appointment, Charles M. Tatelbaum and the law firm of Tripp Scott, PA were appointed as counsel to the Receivers [DE.18].

The Receivers immediately solicited proposals from forensic accounting firms and then interviewed forensic accounting firms with experience in this area in order to be able to immediately assist the Receivers with the urgent accounting work needed for the Receivers to administer the estate. On the Motion of the Receivers, the Court authorized the employment of Kapila Mukamal (KM) as accountants for the Receivers [DE 18]. The Receivers selected KM because of their extensive experience in this area, and their willingness to lower their hourly rates to accommodate the situation.

**Determination if RBL Had a Going Concern Value**

The Receivers recognized that in these types of situations, the first order of priority for a receiver is to secure the business, take control of the assets and ascertain the viability of the business that has been placed into receivership. The viability analysis is critical in order to determine if the business activity should continue, if it should be modified in any way or if the business should be discontinued. In the RBL case, this task became more difficult because the Receivers were able to promptly determine that the management of RBL had discontinued making

3

entries in the financial books and records of RBL as of February 1, 2023, so the financial picture of RBL was very opaque. Even though RBL used the rudimentary software of QuickBooks to record and manage financial information, without current data from financial transaction entries for more than four months, it was a difficult task for the Receivers to make the prompt business judgment analysis they are required to do.

Within two days after the employment of KM, they were able to provide the Receivers information that demonstrated that the revenues solely from the trucking operations of RBL were not sufficient to meet its overhead expenses, and, in fact, the then-weekly payroll for RBL far exceeded the revenues from the trucking company operations. Thus, RBL was operating at a multi-million dollar deficit. Moreover, it was clear that without additional capital through legitimate channels (which were not available), RBL could not survive.

As a result of this information, and based upon the Receivers' observations and discussions with personnel located at the Coral Springs, Florida and Lubbock, Texas facilities, the Receivers made the decision to terminate the trucking operations and to focus on bringing the trucks located all over the country back to Florida and Texas.

**Initial Immediate Undertakings by the Receivers**

Following the Receivers making the decision to terminate the trucking operations, in order to carry out their fiduciary duties and to try to eventually maximize the greatest recovery for investors and creditors, the Receivers undertook a number of activities identified below in no order of significance.

The Receivers were required to arrange for the immediate employment of 24/7 security personnel at the Coral Springs facility and the Lubbock, Texas facility in order to preserve and

protect the assets, avoid any pilferage or damage, and make sure that only appropriate individuals had access to the facilities.

The Receivers determined that it was critically important that at least one of them be present during all normal business hours at the Coral Springs facility in order to be able to manage the business affairs of RBL and to be able to interact with employees and others on a face-to-face basis. Since the appointment of the Receivers in June 2023, Receivers (or another attorney from Tripp Scott on limited occasions), have been present at RBL during normal business hours every day.

The Receivers immediately identified through extensive interviews the key employees that the Receivers would need to retain and the non-essential employees to be furloughed/terminated. When the Receivers took over RBL's operations, RBL had over 215 employees and independent contractors; today, there are only 7 employees and independent contractors on payroll.

Within 48 hours of being appointed, the Receivers established an email address that could be used by investors, creditors and others in order to communicate with the Receivers and to obtain information concerning the Receivership. With respect to each email received by the Receivers, there was first an automatic response acknowledging the communication, and then a personal response by an attorney in the Receivers' law firm to each email received.

Within 72 hours of being appointed, the Receivers established a website that initially provided basic information concerning the Receivership estate and also included materials from the SEC's informational link that allowed investors to complete a questionnaire for the SEC. Because many of the investors were of Haitian descent, the information provided by the SEC for the website was in English, Haitian French and Haitian Creole.  As time has progressed, the

Receivers regularly update the website in order to provide investors, creditors and other parties in interest with up-to-date information concerning the Receivership estate and operations.

**Identifying and Obtaining Proceeds from RBL Accounts**

Through information provided by RBL employees and SEC's counsel, the Receivers identified what they believed to be the operating checking accounts for RBL. The Receivers were able to identify approximately $900,000 in available cash which, with some difficulty due to the reticence of the bank, they were able to have the funds made available to the Receivers when they assumed control over the RBL bank account.

Through counsel, the Receivers were required to file motions for show cause orders against Capital One Bank and TD Bank for the banks' failure to promptly turn over funds belonging to the Receivership estate and documents memorializing the pre-Receivership transactions involving RBL. As a result of the Court's entering show cause orders, both banking institutions eventually turned over to the Receivers the funds rightfully belonging to the estate.

Counsel for the Receivers has issued more than 20 subpoenas to banking and other financial institutions where it appears that RBL may have deposited funds over the last several years. The subpoenas sought copies of all financial transactions involving RBL and its affiliates and insiders so that the Receivers could not only determine if there were additional funds belonging to the estate, but also to assist in the reconstruction of the financial transactions involving RBL as well as its affiliates and insiders. As of the filing of this Initial Quarterly Report, counsel for the Receivers is continuing efforts to obtain full compliance with the subpoenas.

**Undertakings and Investigations by the Receivers**

Immediately after the appointment as Receivers, the Receivers determined the location of approximately 70 trucks that were in the process of completing deliveries in order to develop a

process and procedure to have the trucks returned empty to an appropriate storage facility and then arranging for the transportation of the truck drivers to get home after parking the vehicles at the storage facility. This involved working closely with the RBL fleet team members to track the trucks by VIN and GPS location.

The Receivers determined how RBL utilized document retention, email communications and other software applications.  It became apparent that RBL maintained no central server or other documents storage receptacle, and, thus, scores of independent email accounts needed to be protected and preserved in order to retain appropriate information. To that end, the Receivers engaged a third-party IT vendor to image and store the RBL computer hard drives of all employees at the Coral Springs facility.  The Receivers are in the process of reviewing the data on the hard drives for pertinent information to aid in the investigation.

The Receivers and counsel undertook an investigation to determine the nature and extent of all insurance coverage on the assets of RBL.  Since the insurance records of RBL were not consolidated or coordinated, it was necessary for the Receivers to work immediately and diligently to try to collect all the necessary information to make sure that adequate insurance was in place with respect to all of the assets of the Receivership estate. Some insurance claims and police reports needed to be made for the trucks with unknown or totaled status. The Receivers learned that the casualty insurance policy covering the vehicles leased to RBL by the investors was scheduled to expire by its own terms on or about August 10, 2023. After exploring any opportunities for renewing the casualty insurance coverage, the Receivers determined that (a) it would be virtually impossible to find any insurance company willing to provide such insurance to a discontinued trucking operation, and (b) even if such insurance coverage could be obtained, it would be cost prohibitive.  Thus, the insurance coverage expired, but by that time, all of the trucks were "off the

road" and in secure storage facilities. For the limited number of trucks that needed to be moved after the lapse of insurance coverage, the Receivers obtained short-term insurance policies covering the specific drivers moving those trucks.

The Receivers and counsel for the Receivers also contacted each of the landlords where RBL had facilities in order to determine the nature and extent of all leased premises, the status of rent, and to make arrangements for the short term continuation of the occupancy by the Receivership estate. With respect to the office premises occupied by RBL on three different floors in Coral Springs, Florida, in an effort to save resources, the Receivers determined that they no longer needed the office space on the second and third floors. As a result, as of August 31, 2023, the Receivers surrendered the office space located on the second and third floors to the landlord and are operating only from the first floor suite, thereby saving several thousand dollars a month. After comparing quotes from several moving and storage companies, the Receivers have placed the office furniture and equipment from the vacated premises in storage to be sold at a later date, and those proceeds will benefit the Receivership estate.

The Receivers determined that RBL had utilized office space in Marietta, Georgia, although none of the remaining employees could explain the purpose of the utilization of such office space. The Receivers therefore terminated the lease in Georgia, and abandoned the limited office furniture and equipment to the landlord in lieu of future rent. Lastly, the Receivers have had ongoing communications with the landlord at the Lubbock, Texas facility in order to arrange for the termination of the lease at such time as the Receivers no longer need to utilize that facility.

The Receivers and their counsel undertook a review of existing service agreements and third-party vendor leases being utilized by RBL in order to determine which agreements could be canceled or terminated as a result of the cessation of business operations as a trucking company.

Counsel for the Receivers communicated with multiple counterparties and their legal counsel to the service agreements in order to effect the cancellation and termination of services no longer needed to conserve the Receivership's assets.

The Receivers learned that a number of the trucks comprising the vehicles leased to RBL had been left at truck stops or abandoned along the highway due to mechanical problems. The Receivers arranged on a case-by-case basis to dispatch the appropriate personnel to either repair the trucks at their location or to have the trucks towed to an appropriate storage facility where they would be appropriately secured. The Receivers determined that notwithstanding the stated obligation in the leases between the investors and RBL for RBL to keep the trucks in good working order and to maintain them, it would be cost prohibitive for the Receivers to repair the trucks that they found to be non-operative or in need of substantial repairs.  The Receivers only authorized repairs to be made in order to be able to transport vehicles to storage facilities.

The Receivers and their counsel began to examine the various agreements between RBL and the investors. This investigation disclosed that there were many investors who were promised that RBL would acquire vehicles titled in the investors' names and purchased with their investments and loans made with lenders, but no such purchases were made. This investigation also revealed that there were investors that simply loaned money to RBL with the expectation of receiving significant returns for making these loans.  During this investigation, the Receivers and their legal counsel determined that it appears that many of the loan transactions between RBL and counterparties may involve interest promised or being paid above the legal rate of interest allowed in the State of Florida. This investigation is ongoing by the Receivers and their professionals as more information is gathered by virtue of subpoenas and interviews with investors whose identities

9

were unknown due to the fact that their loan transactions were never memorialized in RBL's books and records.

**Locating Additional Lubbock, Texas Properties in the Name of RBL**

Through the continued extensive interviewing of employees, the Receivers discovered the existence of several additional properties that RBL purchased in Lubbock, Texas, with a collective value of greater than $1.3 million.  After an investigation, the Receivers determined that the acquisition of these properties had no legitimate business purpose for the operations of RBL, and that they should be liquidated.  The Receivers sought proposals from local realtors as well as nationwide auction companies in order to determine the best method to sell these properties. The Receivers filed a motion with this Court, and an Order was entered [DE 80] authorizing the Receivers to engage Stampler Auctions to sell the two properties. On September 7, 2023, an auction sale was held, at the 40+ acre ranch and house received a winning bid of $925,000, and the smaller house received a winning bid of $200,000. Additionally, the highest bid for the furniture was $2,500.  The purchase agreements have been signed, and the Receivers are awaiting a closing.  There are no financing contingencies to the closing.  Following the execution of the agreements to purchase the two properties, due to an unexpected severe storm, the purchasers discovered there was water intrusion in the ranch house on the larger property. According to the terms of the standard real estate agreement that was entered into, the remediation of the subsequent water damage may be the obligation of the Receivers as the sellers. The Receivers are currently working with water remediation experts and the auctioneer as well as cooperating with counsel for the purchasers in order to resolve the situation and close on the transaction.

#2698800v1-221271.0001

**Surrender of Vehicles to Investors/Owners**

Upon the Receivers' completed investigation revealing that the Receivership estate only had a leasehold interest in the vast majority of the vehicles utilized for the trucking business, the Receivers filed a Motion with this Court seeking the Court's authorization to allow the Receivers to surrender the vehicles to the title owners.  Once the Court entered [D.E.35] the order authorizing the surrender of the vehicles by the Receivers, the Receivers and counsel developed a unique procedure in order to facilitate the release of the vehicles to the owners in an orderly and appropriate manner, allowing the Receivers to document the surrender of the vehicles to the owners or their agents. To document the entitlement to the surrender of the vehicles, the Receivers established a unique email address and procedures that were posted on the Receivers' website and sent an email blast to all investors setting forth the procedures for the surrender of the vehicles. In so doing, the Receivers established an online appointment system so that the surrender of the vehicles could be orderly, and verified ownership by reviewing documents for each owner seeking to obtain the surrender of a vehicle in order to confirm the appropriate ownership rights.

The procedure established by the Receivers allows for owners/investors to arrange for the pickup of vehicles in an orderly manner by scheduling appointments at the Florida and Texas facilities for Tuesdays, Thursdays, Saturdays and Sundays. After communicating with many of the investors, it was determined that the weekend days for the pickup of trucks was needed in order to accommodate those investors who were either otherwise employed during the week, or were unable to obtain licensed drivers to pick up the vehicles on weekdays. Presently, the surrender of the vehicles is ongoing, and the Receivers hope to be able to have all of the vehicles surrendered to those choosing to retrieve them by the end of October 2023.

As an aside, the surrender of vehicles at the Lubbock, Texas facility is further complicated because the leased premises is an aircraft hangar and storage lot on a former U.S. Air Force base. Since the overall facility is still utilized for aircraft takeoffs and landings and the testing of equipment for the FAA, strict procedures had to be established and agreed upon between the landlord and the Receivers so that those retrieving vehicles would not interfere with or potentially cause accidents when removing vehicles adjoining active runways and taxiways.

**Securing the Funds of the Receivership Estate**

The Receivers determined that the funds in the account at the existing RBL banking relationship may not have been fully insured as they exceeded the $250,000 insured limit by the FDIC. The Receivers sought proposals from various banking institutions in South Florida, and did establish a new banking relationship which provides full insurance coverage for all Receivership funds, and, at the same time, earns interest on funds on deposit so as to be able to maximize the recovery for the estate.

Upon their appointment, the Receivers determined that RBL was utilizing several online payment systems in order to facilitate the payment for fuel, repairs and other charges by truck drivers throughout the country. The Receivers have continued to utilize those online payment systems on an as-needed basis in order to facilitate the payment of these expenses. Where the systems were no longer needed, the Receivers have taken the steps to have refunds made for unused deposits.

**Other Investigations into RBL Assets and Decisions by the Receivers**

**India Operations**

Upon their appointment, the Receivers learned that RBL had various business relationships with entities in India affiliated with the principals of RBL.  These affiliated entities appeared to

provide some form of "back office" services for RBL, as well as utilizing software to keep track of the location of leased vehicles. The Receivers also learned that RBL was paying a flat monthly fee to the affiliated entity in India. The Receivers discontinued all payments to the affiliated entity in India based upon (a) the lack of any documentation to support the payments, and (b) since the trucking operation was discontinued, there was no longer a need for the services that were being claimed to be provided. The Receivers are currently further investigating the relationship with the entities in India and transfers of assets that have been made to these entities.

**Manufacture of Sub-Standard Trailers**

The Receivers learned that RBL fabricated trailers at the Lubbock facility utilizing component parts that were shipped from India to the Port of Houston and then to the Lubbock facility. The Receivers and counsel have determined that the so-called fabrication of trailers by RBL should be discontinued since key personnel at RBL have explained that said trailers were of little to no value since they were not manufactured using United States regular specifications and were of sub-standard quality. Thus, the Receivers have halted any such further production in order to continue to save resources. Additionally, the Receivers have made the determination not to accept components being shipped from India to the Port of Houston since the demurrage charges and other charges would exceed the value of the components, and, at the same time, the Receivers would then be required to dispose of the components if they were delivered to the Lubbock facility.

As mentioned above, the Receivers continued to investigate those trailers that were owned by investors that had been fabricated in the Lubbock facility, the Receivers learned that those trailers were not built to appropriate specifications for use in the United States. Among other things, the trailers were not as wide as the tractors, and that disparity created a propensity for the trailers to wobble while on the road which created an accident hazard. Additionally, because the

#2698800v1-221271.0001

trailers were narrower than standard, loads needed to be concentrated in the middle of the trailer, which created a tipping over hazard while on the road. Furthermore, there had been reports that because of the apparent inferior materials used to fabricate the trailers, bottoms of the trailers fell out while on the road. As a result of all of this, the Receivers, on advice of counsel, made the decision to not release the RBL-fabricated trailers to those investors that owned them because of the severe safety hazards, and the Receivers will sell the trailers for parts and scrap and pay the proceeds to the respective owners.

### Use of Third-Party American Express Credit Card

Upon their appointment, the Receivers also learned that RBL was using an American Express credit card for alleged business expenses which account was in the name of an individual affiliated with the principals of RBL.  The Receivers determined that the American Express bill which was then currently due in the amount of approximately $150,000 contained some personal charges, and that the holder of the American Express account was effectively an accommodation obligor on the account. Although the account holder made demand upon the Receivers to pay the outstanding American Express bill prior to its due date, since the Receivers have been unable to verify or ascertain a legitimate basis for the obligation to reimburse the account holder for the American Express bill, and since the Receivers are further investigating other transfers and relationships with the American Express account holder, they have refused to make any payments to reimburse the account holder from RBL funds.

### Return of Leased Trailers

The Receivers and counsel were contacted by the attorney for Premier Trailer Leasing Company. The attorney for Premier claimed that RBL had leased scores of trailers from Premier, and that unless the Receivership was going to continue to pay the leasing charges, the trailers

14

should be returned. Counsel for the Receivers verified that the lease agreement with Premier was a true lease, and, as a result, arrangements were made for all of the trailers to be retrieved by representatives of Premier.

**Ninety-Day Transfer Analysis**

The Receivers asked their accounting professionals to provide them with a list of financial transfers made by RBL within the 90 days prior to the entry of the Receivership Order. This was done in order for the Receivers to make a determination as to whether substantial preferential transfers had been made by RBL that could be avoided if the Receivers commenced a Chapter 11 bankruptcy proceeding for RBL.  After full investigation, the Receivers and counsel determined that there was insufficient evidence of substantial non-insider preferential transfers that would justify the filing for Chapter 11 relief on an immediate basis. The Receivers are further investigating insider preferential transfers which can extend back to one year, as well as potential fraudulent transfers to insiders and others.

**Communication with Investors**

The Receivers have established a procedure to ensure that all telephone communications, telephone messages and email messages are responded to as promptly as possible, with all telephone messages received prior to the end of the business day being responded to before the end of that business day.

As noted above, the Receivers recognized the need for effective communication to RBL's investors and creditors, which was complicated by the fact that many of the investors and creditors were unsophisticated in business transactions, and unfamiliar with court proceedings. The Receivers immediately established a website (www.rblreceivers.com) that is updated on an almost weekly basis to provide information and current developments to everyone interested in the

#2698800v1-221271.0001

Receivership estate. Where appropriate, the Receivers include hyperlinks to court pleadings and important documents, and provide instructions for those interested in surrendering vehicles, having vehicles auctioned, and communicating with the Receivers.

When the Receivers determine that there is a new development that is significant or if it is necessary to advise the investors and creditors of a specific development, the Receivers arrange to have an email blast sent to all known investors and creditors. Because the books and records of RBL are incomplete as to the identities of the investors and creditors, the Receivers were made aware by several investors that they were not receiving email updates. As soon as the Receivers obtain information as to an additional investor who has not been receiving updates, the investor's contact information is uploaded into the Receivers' database.

As the Receivers continue to wind down the business operations of the trucking company and related activities, the Receivers have discharged former employees of RBL that are no longer needed for the Receivership estate's operations. This has had the effect of substantially reducing the ongoing payroll expense without compromising the ongoing winding down operations by the Receivers.

On a daily basis, numerous investors and creditors contact the Receivers and legal counsel by email, by telephone and in person at the Coral Springs office. The Receivers and legal counsel, while not providing legal advice to the investors and creditors, confer with each of them in order to assist them with their particular and unique issues, and further work to help to mitigate the losses they have sustained as a result of their investments and loans to RBL.  Legal counsel for the Receivers have communicated with secured lenders on the trucks for many of the investors in order to have the lenders forebear from taking action against the investors and the collateral and to try to minimize the hardship and impact on the investors.

16

**RBL Insurance Claims and Pending Litigation**

Prior to the cessation of the trucking business by the Receivers appointment, a number of the vehicles being operated by RBL were involved in collisions and accidents. The Receivers determined that there were several active lawsuits pending against RBL at the time of the Receivers' appointment, and legal actions were also commenced against RBL after the entry of the Receivership Order.  With respect to all of the litigation, legal counsel for the Receivers has notified the parties to the litigation of the mandatory automatic stay imposed by the Receivership Order, and in many instances, notices of stay have been filed in the litigation proceedings.  Legal counsel for the Receivers has established a procedure in order to deal with the multitude of claims being made against the insurance coverage that had been maintained by RBL.  Where appropriate, legal counsel for the Receivers has negotiated and agreed to adjusted settlements, and authorized the Receivership estate to pay the deductible amount in order to facilitate the settlement and resolution of the claims where there was liability on the part of RBL.

**The Short-Term Loan Investment Scheme**

As a result of communications with investors and creditors, the Receivers learned that beginning in late May 2023 or early June 2023, RBL management and employees solicited and entered into short-term loan arrangements, most of which were for 90 days, whereby RBL borrowed hundreds of thousands of dollars from unsuspecting creditors promising to pay an unusually high rate of interest when the loan matured. The Receivers learned of these loans when the investors contacted the Receivers as their loans came due in late August and September 2023. Each of these investors was then advised of the Receivership Order and proceedings, and their information added to the Receivers' database. Presently, the extent of these "11th hour" unsecured

#2698800v1-221271.0001

loans has not been fully determined by the Receivers due to the continued lack of complete information.

## A DESCRIPTION OF LIQUIDATED AND UNLIQUIDATED CLAIMS HELD BY THE RECEIVERSHIP ESTATE

### Transfer to Insiders

The Receivers uncovered facts to demonstrate that approximately $2.1 million was transferred by RBL to Constantina Celicourt an insider or relative connected with an insider of RBL within weeks before the appointment of the Receivers. The Receivers and counsel made contact with the attorney for the recipient of the $2.1 million. It was learned that the $2.1 million was utilized to purchase vacant property located in Broward County, Florida, which was placed in the name of the recipient. The Receivers, through counsel, filed an immediate fraudulent transfer action in the Circuit Court for Broward County, also placing a *lis pendens* on the acquired property. The Receivers and their counsel have agreed to a settlement where the real property is re-conveyed to the Receivership estate utilizing a mechanism to curtail the payment of documentary stamps and transfer taxes. The prior owner of the vacant parcel of land had initiated a re-platting of the property in order to increase its value. Legal counsel for the Receivers worked with the contractor that had been engaged to complete the re-platting, so that it will be completed prior to the recording of the deed conveying the property to RBL.  The re-platting was completed, and the deed was recorded on September 29, 2023 transferring the property back to RBL.

### Continued Investigations and Additional Fraudulent Transferees

The Receivers and legal counsel have conducted an investigation as to multiple other suspected unusual or fraudulent transfers made by management of RBL prior to the appointment of the Receivers. The Receivers have made demands upon the recipients, and, through counsel, the Receivers are negotiating settlements with the recipients of the transfers.

#2698800v1-221271.0001

The Receivers examined the payroll records of RBL, which revealed that there were extraordinary and unusual payments made to certain employees who appeared to be receiving commissions or bonuses based upon the procuring of investments for RBL. The Receivers and counsel for the Receivers have made a demand upon the recipients of these unusual and extraordinary payments for the return of such payments. The extraordinary and unusual payments identified to date exceed $1 million.

The Receivers have instituted litigation against former RBL employees Ricardi Celicourt and against Brisly Guillaume, both of whom received bonuses which were apparently tied to commissions or other performance in connection with the solicitation of investments and loans in RBL. The Receivers' counsel is in contact with these employees' counsel and the Receivers will be seeking to recover the return of those bonuses and payments transferred to these individuals.

**Additional Potential Insiders and/or Affiliated Entities**

In reviewing the records of RBL, the Receivers have been able to identify additional entities that may be deemed to be affiliated or connected with RBL, and to which transfers of funds were made. As an example, North America Aerospace, LLC (NAA), which is listed in the records of the Secretary of State of Florida with Sanjay Singh as the CEO, was the recipient of substantial financial transfers. As a result of the Receivers' investigations and with the assistance of their accounting professionals, the Receivers gained sufficient evidence to file a motion with this Court to have the RBL Receivers appointed Receivers for NAA. On September 12, 2023, this Court entered an order appointing Paul Lopez and Jennifer Wahba as Receivers for NAA [DE 60]. In accordance with their authority as Receivers, the Receivers, through legal counsel, contacted the attorney for Sanjay Singh and provided the attorney with a document production request and a request for information concerning the business activities, financial affairs and acts of conduct of

NAA to be supplied to the Receivers as mandated by the order appointing Receivers for NAA. Mr. Singh's counsel relayed that Mr. Singh is asserting his Fifth Amendment privilege with respect to providing information to the Receivers about NAA's operations. The Receivers are in the process of drafting and filing a motion to compel Mr. Singh to provide the requested information about NAA.

### North America Aerospace, LLC

As noted above, on September 12, 2023, Paul Lopez and Jennifer Wahba were also appointed as Receivers for NAA.  Based on information that has been gathered from interviews, the Receivers believe that NAA may have an ownership interest in a charter or discount airline in India, as well as other possible assets and investments. The Receivers will conduct such discovery as is necessary in order to determine the extent of the assets of NAA that can be recovered and liquidated. Based upon the current information available to the Receivers, they also anticipate filing a motion to pierce the corporate veil of NAA to the end and effect that the recoveries from the liquidation of the NAA assets and bank accounts can be used to satisfy the claims of investors and creditors of RBL.

The preliminary review of the banking transactions of NAA indicate that NAA may have effected fraudulent transfers to insiders and third parties. As a result of this preliminary review, the Receivers filed a motion to appoint receivers for NAA [DE 88], and on September 12, 2023, this Court entered an order appointing Paul Lopez and Jennifer Wahba as receivers for NAA [DE 90].  In accordance with the terms of the NAA receivership order, the receivers will file a separate quarterly status report for the NAA receivership.

**Other Claims**

**Former General Counsel/CEO**

After an investigation by the Receivers and their legal counsel, they formed a belief that the former in-house general legal counsel for RBL was not only negligent in her duties as legal counsel but also breached her fiduciary duty as legal counsel in permitting not only the Ponzi scheme to continue on an ongoing basis, but also to allow RBL to continue in a manner such as it did in continuing to lose money, and to improperly operate its business. The Receivers learned that this attorney did not have nor does she currently have professional liability insurance to cover any negligence claims. The Receivers have made a demand on the attorney for the payment of the sum that they believe is reasonable under the circumstances to recompense RBL for the attorney's negligence.  The attorney did not accept the Receivers' settlement offer by the deadline; thus, the Receivers will be filing the appropriate lawsuit against her.

**RBL's Prior Accounting Firm**

The Receivers also believe that the former professional accounting firm utilized not only by RBL but also by Sanjay Singh and his wife was negligent in rendering accounting services to RBL.  The Receivers have placed the accounting firm on notice of the Receivers' intention to make a claim for negligence and other possible causes of action. The Receivers and their legal counsel are continuing to investigate the acts and conduct of the former accounting firm for RBL in order to formulate a demand for recompense. In the event that the accounting firm will not voluntarily settle the claim once it is presented, the Receivers are prepared to initiate litigation against the accounting firm.  At this time, it is premature for the Receivers to be able to quantify any such claim against the accounting firm.

#2698800v1-221271.0001

**Evaluation of Potential Claims Against Financial Institutions**

The Receivers, their legal counsel and their accounting professionals are in the process of evaluating the nature and extent of any acts of commission or omission by banking and other financial institutions doing business with RBL and its principals. To the extent that the Receivers are able to discover any appropriate causes of action to bring against these banking and financial institutions, they will do so. At this time, it is premature to determine the nature and extent of any such causes of action.

Because so much time has been consumed by the Receivers and their professionals in dealing with the operational and urgent issues in connection with the institution of the Receivership proceedings, the Receivers and their professionals have determined to defer the analysis of other claims that may be brought against insiders, affiliates and other parties in connection with the prior operation and transactions involving RBL.  The Receivers are also evaluating the propriety and practicality of performing an analysis of those investors that had a net benefit from payments they received by way of the return of principal and interest in order to determine if there would be a legal basis in seeking a recovery of such net benefits in accordance with case law developed in other Ponzi scheme cases.

### A DESCRIPTION OF ALL KNOWN RECEIVERSHIP PROPERTY, INCLUDING APPROXIMATE OR ACTUAL VALUATIONS, ANTICIPATED OR PROPOSED DISPOSITIONS, AND REASONS FOR RETAINING ASSETS WHERE NO DISPOSITION IS INTENDED

The following is a description of all known Receivership property, including approximate or actual valuations, anticipated or proposed dispositions and reasons for retaining assets were no disposition is intended:

1.   The unimproved parcels of land located in Broward County, Florida, that were transferred to the Receivership estate by Constantina Celicourt as part of the resolution of the fraudulent

transfer litigation brought against her. The Receivers intend to obtain information as to how best to sell the property whether by private listing or public auction. The Receivers intend to sell the property when it is practical to do so and when it will bring the highest value. The Receivers hoped to sell the property before the 2023 deadline for taxes become due. The approximate valuation of the combined lots of unimproved property is $2.1 million.

2. The two residential parcels of land and homes located in the Lubbock, Texas area that were the subject of a public auction sale held on September 7, 2023. As noted above, the Receivers have entered into contracts with the purchaser, with no financing contingencies, to sell the larger parcel of land and home for $925,000, and the smaller parcel of land and home for $200,000. Additionally, the furniture was sold for $2,500. The Receivers anticipate closing on the sale of the properties in early October 2023.

3. The Receivers have located eight trucks that were titled in the name of RBL. The Receivers intend to auction the trucks in October 2023 at the same time investor-owned trucks are auctioned in Florida and Texas. At the Lubbock, Texas facility leased to RBL are components used for the fabrication of trailers as well as approximately 52 trucks that are not operative, and many of which have been previously cannibalized for parts. The Receivers intend to solicit bids for purchase of the inoperable trucks and the scrap material anticipated to be completed during October 2023. The Receivers are unable to determine the anticipated value of these assets, although the value is expected to be minimal.

4. At the Coral Springs office and a nearby storage facility, there is a collection of various office furniture and equipment. Once the Receivers no longer need to occupy the Coral Springs facility, they will arrange to receive bids for the purchase of the office furniture and equipment, and if no sufficient bids are received, the office furniture and equipment will be sold at auction.

#2698800v1-221271.0001

The Receivers are unable to determine the anticipated value of these assets, although the value is expected to be minimal. There is also some office furniture and equipment located at the Lubbock, Texas facility, and the Receivers will attempt to sell this limited amount of office furniture and equipment at a private sale. The Receivers are unable to determine the anticipated value of these assets, although the value is expected to be a couple thousand dollars. As part of these sales, the Receivers do not intend to sell the computer hardware until such time as the proceedings are about to be closed.

### A LIST OF ALL KNOWN CREDITORS WITH THEIR ADDRESSES AND THE AMOUNTS OF THEIR CLAIMS

The Receivers have filed a Motion with this Court [DE 94] seeking to defer providing a list of all known creditors with their addresses and the amount of their claims due to the fact that the books and records of RBL have not been able to provide the Receivers with an accurate and complete list of all such creditors. Upon the Receivers gaining such information that will permit them to complete such a list, it will be submitted with the next quarterly status report. On September 18, 2023, this Court entered an Order [DE 98] granting the Receivers' Motion to defer providing the list of creditors with this Status report.

**The Claims Filing Process**

In consultation with the counsel for the SEC, the Receivers and their legal counsel developed a user-friendly proof of claim form to be utilized by all investors and creditors of RBL. That claim form, when completed and returned to the Receivers, will permit the Receivers to memorialize and categorize all types of claims held by investors and creditors. The Receivers and their legal counsel have developed a unique spreadsheet format for the memorialization of the proofs of claim that are returned to the Receivers so that various types of information concerning

#2698800v1-221271.0001

the nature, extent and amounts of claims can be easily tracked by the Receivers as needed. The proof of claim forms were sent by email to all investors and creditors where the Receivers have email addresses on September 26, 2023. Additionally, a link to both of the proof of claim forms (English and Creole) has been posted on the Receivers' website. Due to the large number of investors who are from the Haitian community, which investors may not be familiar with legal proceedings, the Receivers have translated the proof of claim form and the instructions for submitting the proof of claim form into Haitian Creole to be made available by email and on the Receivers' website.  As of September 30, 2023. 620 proofs of claim had been submitted to the Receivers.

### A SCHEDULE OF ALL THE RECEIVER'S RECEIPTS AND DISBURSEMENTS (ATTACHED AS EXHIBIT A), WITH ONE COLUMN FOR THE QUARTERLY PERIOD COVERED AND A SECOND COLUMN FOR THE ENTIRE DURATION OF THE RECEIVERSHIP

**Conclusion**

The Receivers will continue to wind down the business operations of RBL so as to be able to vacate the leased premises as soon as possible.

The Receivers recognize the urgency of liquidating the assets of RBL and collecting all funds that have been transferred by RBL to others in order to be able to make a distribution to the investors and creditors as promptly as possible.

TRIPP SCOTT, P.A. *Counsel to the Receivers*
110 S.E. 6th Street, 15th Floor
Ft. Lauderdale, FL 33301
Phone: (954) 525-7500

By: */s/ Charles M. Tatelbaum*
**Charles M. Tatelbaum**
Florida Bar No. 177540

cmt@trippscott.com
**Corey D. Cohen**
Florida Bar No. 1024891
cdc@trippscott.com
hbb@trippscott.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 5th day of October, 2023, I electronically filed the foregoing document via this Court's CM/ECF system which provided a true copy to all those entitled to notice.

By: */s/ Charles M. Tatelbaum*
Charles M. Tatelbaum
Florida Bar No. 177540

26