UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 23-61179-CIV-DSL

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

ROYAL BENGAL LOGISTICS, INC., and
SANJAY SINGH,

        Defendants,

SHEETAL SINGH and CONSTANTINA
CELICOURT,

        Relief Defendants.
_____/

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
RESPONSE IN OPPOSITION TO DEFENDANT SANJAY SINGH'S
AMENDED MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff Securities and Exchange Commission (the "Commission") responds to the Amended Motion for Judgment on the Pleadings (the "Motion") (ECF No. 180), filed by *pro se* Defendant Sanjay Singh ("Singh"), and in opposition thereto, states:

## I. INTRODUCTION

In his Motion, Singh relies almost entirely on facts outside of the pleadings to argue that Defendant Royal Bengal Logistics, Inc.'s ("RBL") investment programs are not investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) or notes constituting securities under *Reves v. Ernst & Young*, 494 U.S. 56, 65, 67 (1990). By contesting the Commission's well-pleaded facts and arguing his own conflicting interpretation of RBL's investment programs, Singh merely emphasizes the existence of issues of material fact. As this

case is not appropriate for judgment on the pleadings, Singh's Motion should be denied.

## II. PROCEDURAL HISTORY

On June 20, 2023, the Commission brought an emergency action to enjoin RBL and Singh (collectively, "Defendants") from continuing to defraud investors through the sale of unregistered securities in violation of the anti-fraud and registration provisions of the federal securities laws. See Complaint (ECF No. 1).[1] As part of its emergency action, the Commission moved on an *ex parte* basis for a temporary restraining order (ECF No. 7) and the appointment of a receiver over RBL (ECF No. 5), among other relief, which the Court granted (ECF Nos. 10 and 11).

In granting the temporary restraining order (the "TRO"), the Court ordered Defendants to show cause, if any, why a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure should not be granted against the Defendants as requested by the Commission (the "Show Cause Hearing"). See TRO (ECF No. 10) at p. 6. Following a contested evidentiary Show Cause Hearing, at which Singh appeared and was represented by counsel, the Court entered a Preliminary Injunction against Singh (ECF No. 82).[2]

On July 27, 2023, Singh filed his Answer and Affirmative Defenses (ECF No. 58). As his Affirmative Defenses, Singh alleged: the investment contracts which are the subject of the Complaint are not securities (First Affirmative Defense); any disgorgement must not exceed a wrongdoer's net profits and must be awarded to the victims (Second Affirmative Defense); the Complaint fails to join necessary parties (Third Affirmative Defense); the Complaint fails to state

---

[1] The Commission brought claims against Defendants for violating Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)]; Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5, and against Singh for violating Exchange Act Section 10(b) and Rule 10b-5 thereunder as a control person of RBL under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a).
[2] The Co-Receivers consented to a preliminary injunction on behalf of RBL (ECF No. 68-1).

a claim upon which relief may be granted (Fourth Affirmative Defense); and a reservation of right to plead additional affirmative defenses (Fifth Affirmative Defense). *Id*. at pp 10-11.

Singh now brings his Motion for Judgment on the Pleadings claiming RBL's Investment Programs are not securities under the Securities Act and the Exchange Act, necessitating this response by the Commission.

### III. FACTUAL BACKGROUND AS ALLEGED IN THE COMPLAINT

As stated below, judgment on the pleadings is appropriate "when material facts are not in dispute and judgment can be rendered by looking at the substance of the pleadings and any judicially noticed facts." *Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1295 (11th Cir. 1998). As of the date of this filing, there are no judicially noticed facts before the Court. Therefore, the Court must accept the facts alleged in the Complaint as true and draw all inferences from those facts in the light most favorable to the nonmoving party, here the Commission. *See Bankers Ins. Co.*, 137 F.3d at 1295.

#### A. RBL's Investment Programs

RBL was a transportation and logistics company and was registered as a common carrier with the U.S. Department of Transportation. Compl. at ¶ 17. Singh purported to have transformed RBL into, what he described as, a reverse franchising model, whereby investors received passive income generated from RBL's trucking business. *Id*. at ¶ 18. RBL offered investors at least four investment programs, promising guaranteed returns ranging from 12.5% to as high as 325% depending on the program (collectively, "RBL's Investment Programs"). *Id*. at ¶ 19.

RBL offered investors the opportunity to invest in RBL's business through two loan programs, a Short Term Investment Program (the "Short Term Program") and a Long Term Owner Financing Program (the "Long Term Program"). *Id*. at ¶ 20. RBL represented to investors that

investments in either loan program will be used in RBL's general business operations. *Id*. RBL's Short Term Program required a minimum investment of $25,000, with a maximum investment of $200,000, for a period of 90 to 365 days depending upon the investment amount. *Id*. at ¶ 18. At the end of the loan period, RBL was obligated to repay investors their principal investment plus interest ranging from 20-24% depending on the investment amount and term selected by the investor. *Id*. RBL's Long Term Program required a minimum investment of $60,000, with a maximum of $250,000, for a 36-month term. *Id*. at ¶ 22. Under the Long Term Program, RBL was obligated to pay investors monthly payments based on an annual 12.5% interest rate. *Id*.

The third investment program offered by RBL was its Trailer Sponsorship Program (the "Trailer Program"). *Id*. at ¶ 23. The Trailer Program was a six-month program that offered investors the opportunity to sponsor the building and purchase of a tractor-trailer on behalf of RBL. *Id*. Under the Trailer Program, the minimum investment was $50,000, with a maximum investment of $200,000 for a period of 180 days. *Id*. at ¶ 24. RBL represented to investors that their funds were being used to build trailers in India, which would then be disassembled and shipped to the United States. *Id*. RBL claimed that upon arriving in the U.S., the trailers were then reassembled and added to RBL's fleet or sold for a profit. *Id*. At the end of the period, RBL was obligated to repay investors their principal investment plus 30% interest. *Id*.

RBL's Equipment Management Investment Program (the "Truck Program") had a five-year term (the longest of RBL's Investment Programs) and offered the highest returns. *Id*. at ¶ 25. The Truck Program required a minimum investment of $55,000 that RBL purported to use toward the purchase of a semi-truck on behalf of the investor. *Id*. RBL explained to prospective investors that it took all of the steps to purchase and operate the truck on behalf of the investor, including identifying and purchasing the truck, arranging financing for the investor to purchase the truck,

assigning a driver, obtaining licensing, registration and insurance, and maintaining the truck. *Id*. at ¶ 26. Investors were required to make the investment through a new or existing corporation or limited liability company created by the investor, which RBL claimed would be the legal owner of the truck. *Id*.

Under the terms of the Truck Program, the investor agreed to lease the truck to RBL for a five-year term. *Id*. at ¶ 27. RBL paid the investor monthly lease payments in the amount of $3,000, beginning on the third month for 58 months. *Id*. At the end of the five-year term, an investor in the Truck Program would have received $174,000 in lease payments alone, representing a 216% return on investment. *Id*. The investor also purportedly would own the trucks outright, which the investor would be entitled to keep, sell to RBL, or sell to a third party.[3] *Id*.

B. **Defendants' Material Misrepresentations and Omissions**

Defendants solicited investors through sales agents, promotional videos, in-person investor presentations, investor conferences, and word-of-mouth. *Id*. at ¶ 32. Investors were provided with offering materials and a brochure, entitled "RBL Investor Plan," which described each of the four investment programs along with investment requirements and associated returns. *Id*. at ¶ 33. In one of RBL's promotional videos, "Driving American Dream," which was available to the public on YouTube, Singh claimed to have reversed the traditional business model to one in which RBL carries all of the risk on behalf of its investors: "The company['s] ambition is only one – to work

---

[3] Investors could also invest $110,000 in the Truck Program for the purchase of two trucks. *Id*. at ¶ 28. As an incentive to invest in two trucks, RBL paid investors a $10,000 rebate 30 days after receipt of the investor's investment. *Id*. Under the two-truck option, RBL paid investors monthly lease payments in the amount of $6,000 for 58 months, after which an investor in the Truck Program would own two trucks outright and would have received $358,000, representing a 225% return on investment. *Id*.

for our investor and to make the investor prosper. We take the risk. We take the liability. You enjoy the investment, and that is our business model." *Id*. at ¶ 34.

During a November 2022 RBL Investor Zoom video conference, which was also available to the public on YouTube, Singh claimed that RBL generated $650,000 in revenue per month and compared RBL to Apple and Tesla:

> … [T]he fundamental[s] of this business can be trusted. So let's move on from the point of view that [RBL] may last one day, two days – this is not Bitcoin. Our product is better than Apple. Our product is better than Tesla. You buy Apple, you buy Tesla, you start spending money. You buy [a] Royal Bengal contract, you start making money.

*Id*. at ¶ 35.

In a March 2023 pitch to undercover FBI agents posing as prospective investors at RBL's headquarters, RBL's representatives emphasized that investments are 100% guaranteed; RBL does not rely solely on investor funds to operate; and to date, no investor has ever missed receiving a payment. *Id*. at ¶ 36.

Defendants' representations about the success of RBL's trucking company, the safety and security of investor funds, and RBL's ability to pay investor returns from the profitability of RBL's trucking enterprise were false. *Id*. at ¶ 38. RBL's bank account records demonstrate that investments in RBL were anything but safe and secure. *Id*. at ¶ 39. Since at least August 2019, Defendants had been depositing and commingling investor funds raised through the four investment programs in RBL's operating accounts. *Id*. RBL used commingled investor funds to pay its business expenses and, as further explained below, to make Ponzi-like "interest" and "lease" payments, and principal redemptions to investors under RBL's Investment Programs. *Id*. at ¶ 40. Account balances often had been reduced to a few hundred thousand dollars until new investor money was deposited allowing RBL to continue operating. *Id*. This cycle was then repeated. *Id*.

Contrary to RBL's claims that it was generating $650,000 to $1,000,000 in monthly revenues, from August 2019 through February 2023, RBL operated at an approximate $18 million loss and used investor funds to cover the shortfall. *Id*. at ¶ 41. Specifically, during that period, RBL generated approximately $13 million of revenues. *Id*. at ¶ 42. During this same period, RBL incurred approximately $31.2 million of expenses (not including interest payments, lease payments, or principal redemptions owed to investors under RBL's Investment Programs). *Id*. Therefore, at all times material to the Complaint, RBL could not have paid investors "interest" or "lease" payments from company revenue. *Id*. Instead, RBL had been paying investors "returns" and redemptions from a continuous stream of new investor money in a Ponzi-like fashion. *Id*.

### C.  **Defendants' Misuse and Misappropriation of Investor Funds**

During the Relevant Period, Defendants used investor funds to make Ponzi-like payments of "returns" and redemptions to investors, Singh misappropriated millions for himself and related parties, and diverted over $19 million to two brokerage accounts controlled by Singh, where he engaged in highly speculative equities trading on margin.[4] *Id*. at ¶ 45. None of this misconduct or use of funds was disclosed to investors. *Id*.

RBL represented to prospective investors that it was able to pay such extraordinary returns due to the rapid growth and success of its trucking business. *Id*. at ¶ 46. RBL's bank account records, however, reflect that from August 2019 through February 2023, RBL operated at an approximate $18 million loss and used investor funds to cover the shortfall. *Id*. RBL's bank account records further reflect that, in the absence of sufficient revenues, RBL had been conducting

---

[4] While not included in this Response, the Complaint details how Defendants diverted approximately $19.3 million of investor funds to two TD Ameritrade brokerage accounts, where Defendants engaged in highly speculative trading of equities on margin, losing over $1 million. See Compl. ¶¶ 51-55.

7

a Ponzi scheme to meet its obligations to investors. *Id*. at ¶ 47. In classic Ponzi-scheme fashion, RBL was paying returns owed to existing investors – either "interest" on the loan programs or "lease" payments under the Truck Program – with money raised from new investors. *Id*. RBL had also used new investor funds to pay redemptions to preexisting investors. *Id*. at ¶ 18.

In addition to operating as a Ponzi scheme, Defendants had misappropriated as much as $13.9 million of investor funds for themselves and related parties, including, but not limited to, $7.5 million of investor funds which were diverted to a bank account held jointly by Singh and his spouse, Sheetal Singh.[5] *Id* at 49. RBL also paid $2.1 million of investor funds to a realty company for real estate in Pompano Beach, Florida, purchased in the name of Constantina Celicourt,[6] who is the spouse of RBL's Vice President of Business Development. *Id*. at ¶ 50.

### IV. ARGUMENT

#### A. Legal Standard

Judgment on the pleadings is proper when no issues of material fact exist, and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 12(c); *Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996). Essentially, judgment on the pleadings is appropriate "when material facts are not in dispute and judgment can be rendered by looking at the substance of the pleadings and any judicially noticed facts." *Bankers Ins. Co.*, 137 F.3d at 1295. A court must, therefore, accept the facts alleged in the complaint as true and draw all inferences from those facts in the light most favorable to the nonmoving party. *Id.*; *Tassinari v. Key West Water Tours, L.C.*, 480 F. Supp. 2d 1318, 1320 (S.D. Fla. 2007). Viewing the complaint in this manner, a court should grant

---

[5] Sheetal Singh is named in the Complaint as a Relief Defendant.
[6] Constantina Celicourt is named in the Complaint as a Relief Defendant.

judgment on the pleadings "only when the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002).

Despite this clear legal standard, Singh completely disregards the facts alleged in the Complaint and, instead, attaches and relies on documents (ECF No. 180-1) outside of the pleadings. Based on his own interpretation of RBL's Investment Programs, Singh argues the Truck and Trailer programs are not investment contracts under *W.J. Howey Co.*, 328 U.S. 293, and the Short and Long Term programs are not notes that constitute securities under *Reves v. Ernst & Young*, 494 U.S. 56.  However, the facts alleged in the Complaint—which must be accepted as true for purposes of Singh's Motion—easily meet the standards for an investment contract under *Howey* and note analysis under *Reves.*

### B. RBL's Investment Programs are Investment Contracts and Therefore Securities Under *Howey*

Singh argues that the Truck and Trailer programs are not investment contracts under *Howey*. Under the *Howey* test, an investment contract exists if there is: (i) an investment of money; (ii) in a common enterprise; (iii) based on the expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Friendly Power Co., LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

#### (i) First Prong - Investment of Money

With respect to the first prong of the *Howey* test, Singh argues that the Truck and Trailer programs are not investment contracts but "business plans" and "joint ventures," and cites to *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852–53 (1975) for the proposition that "when a purchaser is motivated by a desire to use or consume the item purchased … the securities laws do not apply." See Motion pp. 9-11. Singh claims that investors were not motivated by returns but by a desire to use or acquire a truck or trailer and "hence [RBL's] truck program doesn't

constitute **_Investment of Money_**." Singh also argues that investors had the right to the return of their investment at any time, and that "on many transactions RBL overpaid the investor in the interest of good faith business and RBL become [sic] the investor into lessors' enterprise and hence it implied as a business plan." See Motion p. 10-11. According to Singh, as investors incurred no risk of loss, there could be no investment of money. *Id*.

To support his arguments, Singh cites to the Investment Equipment Operating Lease Agreement and the Trailer Sponsorship Program agreement attached to the Motion, as well as his own characterization or explanation of the programs. To obtain a judgment on the pleadings, however, Singh cannot rely on facts or evidence outside of the pleadings and must rely on the facts as alleged in the Complaint. *Bankers Ins. Co.*, 137 F.3d at 1295.

Based on the facts as alleged in the Complaint, RBL's Investment Programs easily satisfy the first prong of the *Howey* test. Here, investors committed funds to participate in an investment opportunity. *See SEC v. Unique Fin. Concepts, Inc.,* 119 F. Supp. 2d 1332, 1337 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir. 1999) ("All that is required is that the investor give up some tangible and definable consideration."). Defendants marketed RBL's Investment Programs as an investment opportunity generating varying monthly returns, ranging from 12% to 325%, and raised $112 million from over 1,500 investors. This is all that is required to satisfy the first prong of the *Howey* test.

### *(ii) Second Prong – Common Enterprise*

Singh next argues that the Truck and Trailer programs do not satisfy the common enterprise prong of the *Howey* test because, again, these programs, according to Singh, were business plans and not the sale of equity, assets, or stock. See Motion p. 12. Singh claims that the investors' fortunes were not interwoven and dependent on the efforts of others, but dependent on the success

of the investor. *Id*. In support, Singh supplies his own explanation of the programs and the responsibilities of the investors. As with the first prong, Singh's argument fails because he relies on his own interpretation of the facts rather than address the Commission's allegations as pleaded. Moreover, these agreements actually support the Commission's position that these programs are investment contracts, as investors were promised specific returns with little or no investor involvement beyond making their investment.

Based on the facts as alleged in the Complaint, RBL's Investment Programs satisfy the second prong of the *Howey* test. *Howey*'s common enterprise prong may be satisfied by either vertical or horizontal commonality. Vertical commonality exists where "the fortunes of investors are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Unique*, 196 F.3d at 1199-1200 (internal quote omitted). Horizontal commonality exists where each investor's fortune is tied to the fortune of other investors by the pooling of interests or profits in the transaction. *Id.* at n.4.

The Eleventh Circuit has held that "broad vertical commonality" is sufficient to satisfy *Howey*'s common enterprise element, finding it more "flexible" and less "stringent" than horizontal commonality. *Id.* Broad vertical commonality requires only a finding that investors' fortunes are linked to the efforts of the promoter or third parties. *Id.* at 1199; *see also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005).

Here, broad vertical commonality exists for two independent reasons. First, the fortunes of investors are entirely dependent on the efforts of Defendants to generate sufficient revenue from RBL's trucking business to meet monthly interest and lease payments, and principal redemptions owed to investors under RBL's Investment Programs. *See Unique*, 196 F.3d at 1199-1200 (finding commonality where defendant's clients "were not in a position to assume or maintain any

substantial degree of control over their investment."). The role of investors here is limited to simply investing money into RBL's business venture.

Second, Defendants operated RBL as a Ponzi scheme by using new investor contributions to pay prior investors their monthly interest and lease payments, and principal redemptions. The very nature of a Ponzi scheme means investors are dependent on Defendants to secure new investors to cover the guaranteed return payments. *See Hays v. Adam*, 512 F. Supp. 2d. 1330, 1337 (N.D. Ga. 2007) ("[T]he very nature of the Ponzi scheme meant that it was dependent on MBA attracting newer investors to cover the payments from Outdoor Media to earlier investors. Thus, the defendants cannot dispute that "the fortunes of the billboard purchasers were interwoven with and dependent upon the efforts and success of Outdoor Media and MBA."); *see also ETS Payphones*, 408 F.3d at 732 (finding common enterprise where 99% of investors leased back phones to a company operated by promoter and were reliant on promoter to attract new investors to pay earlier ones).

### *(iii) Third Prong - Expectation of Profits*

Singh argues that the Truck and Trailer programs fail to satisfy the third prong of the *Howey* test, which requires an expectation of profits to be derived from the entrepreneurial or managerial efforts of others, by rehashing the arguments he made with respect to the first and second prongs. Specifically, Singh claims that the Truck and Trailer programs were not sold as profit-making investments but were items to be used or consumed, and that the investor had "all rights and decision-making power at any point to continue the relationship or terminate without penalty hence it constitutes substantial control and substantial risk." See Motion p. 14-15. As with the other prongs, Singh relies on his own interpretation of the investment programs rather than the facts alleged in the Complaint.

Based on the facts as alleged in the Complaint, the third *Howey* prong is met because investors were led to expect profits from the investor agreements based on the efforts of the Defendants. Since *Howey*, the law has been clarified that profits need not be derived *solely* from the efforts of others. Instead, the inquiry is "whether the efforts made by others are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Unique*, 196 F.3d at 1201. Here, investors expected a return on their investment based on Defendants' efforts identifying, securing, and purchasing trucks on their behalf, as well as to manage and operate a successful trucking and logistics business. Defendants marketed RBL's Investment Programs as investments in which RBL, rather than the investors, would do everything for the venture to succeed. RBL's operation as a Ponzi scheme provides another basis for satisfying this prong (as it does the second prong as discussed above). RBL paid investors their purported profits from new investors' funds. If Defendants did not find new investors, then RBL could no longer pay investors their "profits."

### C. The Short Term and Long Term Programs are Notes that Constitute Securities

With respect to the Short Term and Long Term programs, Singh argues that because these programs matured in less than nine months and meet the family resemblance test as a "participating entity" under *Reves*, these programs are not securities. Singh claims the "common goal was to purchase and sale of a minor asset or consumer good, to correct for the business cash-flow difficulties, or to advance some other commercial or consumer purpose, manage shortage of cash flow in business operation and use for commercial purpose." He then concludes, "Hence as a matter of law RBL Short term loans fails the test …." See Motion p. 18. With respect to the Long Term Program, specifically, Singh adds that it was not offered to a broad segment of the public. *Id*. at p. 20.

As alleged in the Complaint, the Short Term and Long Term Programs are notes that constitute securities under *Reves*. The Supreme Court has held that every note is presumed to be a security unless it bears a strong resemblance to a judicially created list of non-security notes or the note is of a type that should be added to the list. *See Reves*, 494 U.S. at 65, 67. A "note" has been defined as "a certificate that evidences a promise to pay a specified sum of principal and interest to the payee at a specified time...." *Sanderson v. Roethenmund*, 682 F. Supp. 205, 206 (S.D.N.Y.1988) (finding that international certificates of deposit are "notes" under the securities laws). That an instrument is not styled as a "note" is not dispositive. *See Fulton Bank v. McKittrick & Briggs Sec., Inc.*, 1990 WL 126179, at *4 (E.D. Pa. Aug. 27, 1990) ("although the instrument in question is labeled a 'certificate of participation,' it nonetheless bears all the earmarks of a note as that term is commonly understood."); *see also Holloway v. Peat, Marwick, Mitchell & Co.*, 879 F. 2d 772, 777 (10th Cir. 1989) (finding that passbook savings credit certificates and thrift certificates are "notes" under the securities laws), *rev'd on other grounds*, 494 U.S. 1014 (1990), *and reaff'd*, 900 F. 2d 1485 (10th Cir. 1990).

The Supreme Court has identified four factors to determine whether a note bears a "family resemblance" to notes that have been determined not to be securities: (1) the motivation of the parties for entering the transaction; (2) the plan of distribution of the instrument and whether there is common trading for speculation or investment; (3) the reasonable expectations of investors; and (4) whether there are risk-reducing factors that would make application of the securities laws unnecessary. *Reves*, 494 U.S at 66-67.

Applying these factors, the RBL's Short and Long Term programs, although not described as "notes," are indeed notes that constitute securities. As to the first *Reves* factor, the instrument is likely to be security if the seller's purpose is to raise money for the general use of a business

enterprise or to finance substantial investments and the buyer is interested primarily in the profit the instrument is expected to generate. Here, Defendants represented to investors that money invested in RBL's Short and Long Term programs would be used for RBL's business, generally, and to grow its trucking and logistics enterprise. In turn, investors invested in the Short and Long Term programs with the expectation of earning profits in the form of interest payments.

The second *Reves* factor looks to whether RBL's Investment Programs were "offered or sold to a broad segment of the public," and as such involved "common trading." *Id*. at 66. Here, Defendants sold RBL's Investment Programs to more than 1,500 investors residing in numerous states and offered them to the general public.

The third *Reves* factor examines the reasonable expectations of the investing public. *Id*. The Supreme Court has "consistently identified the fundamental essence of a 'security' to be its character as an 'investment.'" *Id*. at 68-69. In this case, there can be no doubt that investors viewed these programs as securities. Investors expected to receive interest and lease payments, plus the return of their principal, from a company using investor money to fund its business activities.

The final *Reves* factor asks whether some factor, such as the existence of another regulatory scheme, reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary. Here, no other regulatory scheme exists that would obviate the need to invoke the federal securities laws.

Accordingly, all of the *Reves* factors militate in favor of finding that the Short and Long Term programs are notes that constitute securities.[7]

---

[7] There is an exemption from Section 5 of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act (but not Section 17 of the Securities Act) for certain notes with a maturity of less than nine months. This exemption is unavailable to Defendants because, among other reasons, RBL's Short and Long Term programs are investments rather than commercial in character. *See SEC v. 1 Global Capital, LLC*, No. 18-cv-61991, 2019 WL 1670799, *7-8 (S.D. Fla. Feb. 8, 2019);

## V. CONCLUSION

None of Singh's arguments attempts to meaningfully address the Commission's allegations but instead Singh relies almost entirely on his own interpretation of RBL's Investment Programs and documents outside of the pleadings. Singh's conflicting narrative demonstrates that issues of material fact exist and his request for judgment on the pleadings should be denied.

Dated: March 26, 2024                    Respectfully submitted,

                                                    *s/ Russell R. O'Brien*
Russell R. O'Brien
Trial Counsel
Florida Bar No. 084542
Direct Dial: (305) 982-6341
Email: obrienru@sec.gov

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131

---

*SEC v. Smart*, No. 2:09cv00224, 2011 WL 2297659, *13 (D. Utah June 8, 2011) (exemption applies only to "high quality instruments issued to fund current operations and sold only to highly sophisticated investors") (citation and quotation omitted), *aff'd* 678 F.3d 850 (10th Cir. 2012).