## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:23-CV-61179-DSL

**SECURITIES AND EXCHANGE COMMISSION**,

Plaintiff.

**v.**

**SANJAY SINGH**, pro se,

Defendant,

_____/

## MOTION TO STRIKE PLAINTIFF'S COMPLAINT (ECF NO. 1) PARAGRAPH BY PARAGRAPH PURSUANT TO FED. R. CIV. P. 12(f), WITH MEMORANDUM OF LAW

COMES NOW Defendant, Sanjay Singh, pro se, and respectfully moves this Honorable Court to strike redundant, immaterial, impertinent, or scandalous matters from Plaintiff Securities and Exchange Commission's Complaint (ECF No. 1) pursuant to Federal Rule of Civil Procedure 12(f). In support, Defendant refers this Court to Exhibit F1A (Affidavit of Kevin McCoy) and Exhibit M1A (SEC Response to Motion for Sanctions, ECF No. 228), and submits this Memorandum of Law in support of the Motion:

FILED BY NA D.C.

SEP 03 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 12(f) authorizes the Court to strike from any pleading any matter that is "redundant, immaterial, impertinent, or scandalous." The Eleventh Circuit has upheld the use of Rule 12(f) where allegations are not only irrelevant but prejudicial. See *Pisani v. Manatee County*, 440 F. App'x 861, 863 (11th Cir. 2011). Pleadings that contain unsupported conclusions, speculative inferences, or inflammatory language are routinely struck. *See Holtz v. Harpagon Co., LLC*, 2007 WL 2479337, at *2 (N.D. Ga. 2007).*

Moreover, factual allegations that fail to state a plausible theory under the law, or that confuse issues with irrelevance or conjecture, should be dismissed as immaterial. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

## II. PARAGRAPH-BY-PARAGRAPH MOTION TO STRIKE AND LEGAL MEMORANDUM

**Paragraph 1:** *WHAT:* Allegation that SEC is acting to stop an ongoing fraudulent scheme. *WHY:* This is conclusory and lacks a factual predicate. *HOW:* The Court in *Iqbal*, 556 U.S. at 678, held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are not entitled to assumption of truth. McCoy's forensic analysis contradicts this foundational claim. *Strike as conclusory and immaterial.*

**Paragraph 2:** *WHAT:* Describes a Ponzi scheme and affinity fraud. *WHY:* The SEC pleads insolvency from inception without facts to support this, contradicting *Warfield v. Byron*, 436

F.3d 551 (5th Cir. 2006) and *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2014), which require

insolvency ab initio for a Ponzi presumption. *HOW:* McCoy and Receiver reports establish

solvency until at least January 2023. *Strike as misleading and legally deficient.*

**Paragraph 3:** *WHAT:* States RBL had 200 trucks and monthly revenues of $1 million. *WHY:*

SEC contradicts its own later admissions (ECF-228) which state RBL grew to 277 trucks, and

revenue approximated $710k/month. *HOW:* This paragraph should be struck for violating *Iqbal*

by asserting facially implausible facts. *Strike as materially false and prejudicial.*

**Paragraph 4:** *WHAT:* Asserts $18M loss and $70M in investor fund redemptions. *WHY:*

Contradicted by McCoy affidavit, which documents $10.5M in operating loss and only $1.5M in

non-operating disbursements. *HOW:* These exaggerations are scandalous and unsupported. *Strike*

*as materially misleading.*

**Paragraph 5:** *WHAT:* Alleges $14M misappropriation. *WHY:* No legal theory or evidence under

Rule 8 supports this sum. *HOW:* Courts reject claims lacking particularity, especially in fraud

(*See* Fed. R. Civ. P. 9(b); *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301

(11th Cir. 2002)). *Strike as scandalous and unfounded.*

**Paragraph 6:** *WHAT:* Accuses Defendants of failing to disclose misuse of funds. *WHY:* There is

no identified duty to disclose under *SEC v. Goble*, 682 F.3d 934 (11th Cir. 2012), which

confirms omissions are only actionable when a duty exists. *HOW:* Lacking legal underpinning

and material misstatement. *Strike.*

**Paragraph 7:** *WHAT:* Asserts need for constant new money to pay obligations. *WHY:* Financial records show RBL raised enough revenue and had assets. *HOW:* This perpetuates the false Ponzi narrative contradicted by forensic evidence. *Strike as materially false.*

**Paragraph 8:** *WHAT:* Cites statutory violations. *WHY:* Legal conclusions without factual basis. *HOW:* See *Twombly*, 550 U.S. at 555. These are not supported by adequate factual development. *Strike.*

**Paragraph 9:** *WHAT:* Demands permanent injunction and bar. *WHY:* Based on conclusory allegations. *HOW:* Relief that rests on unsupported claims is impertinent. *Strike.*

**Paragraph 10:** *WHAT:* Describes Singh as controlling RBL. *WHY:* No objection to factual role, but misleading by implying registration obligation. *HOW:* Not a securities issuer. *Strike partial paragraph.*

**Paragraph 11:** *WHAT:* Refers to RBL's fundraising. *WHY:* Misstates nature of programs as investment offerings. *HOW:* Per *Reves v. Ernst & Young*, 494 U.S. 56 (1990), commercial loans and leases are not securities. *Strike as a misstatement of law.*

**Paragraph 12:** *WHAT:* $7.5M to Sheetal Singh. *WHY:* No Receiver report confirms this breach or supports the number. *HOW:* Speculative, scandalous, and prejudicial. *Strike.*

**Paragraph 13:** *WHAT:* 2.1M used to buy property titled to Constantina Celicourt. *WHY:* The property was returned to the estate. *HOW:* No fraudulent element present. *Strike as impertinent.*

**Paragraph 14:** *WHAT:* Jurisdictional assertion. *WHY:* No specific acts pled to satisfy statutory jurisdictional basis under 15 U.S.C. §78aa. *HOW:* Strike or require re-pleading with specificity.*

**Paragraphs 15–16:** *WHAT:* Generalized statements about investment fraud. *WHY:* Redundant and unsupported. *HOW:* Should be struck under Rule 12(f) as repetitive and conclusory.

**Paragraph 17:** Descriptive only. No motion as to this paragraph.

**Paragraphs 18–22:** *WHAT:* Asserts passive investment framework. *WHY:* Agreements show active lease and ownership roles. *HOW:* Under *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195 (11th Cir. 1999), there must be reliance on the managerial efforts of others. That element is not present. *Strike for legal failure.*

**Paragraph 23:** *WHAT:* Mischaracterizes trailer loan as sponsorship investment. *WHY:* Agreement was a financing document. *HOW:* Misleading. *Strike.*

**Paragraphs 24–28:** *WHAT:* Describes truck ownership, profit calculation. *WHY:* SEC falsely alleges RBL owned trucks and promised profits. *HOW:* Agreements contradict this. *Strike as materially false.*

**Paragraph 29:** *WHAT:* Misapplies Howey test to allege investment contract. *WHY:* The Howey test requires pooling and reliance on others. No pooling exists. Ownership was retained by investor entities. *HOW: SEC v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005) and *Mutual Benefits*, 408 F.3d 737 confirm that individualized ownership negates the test. *Strike as frivolous and legally erroneous.*

**Paragraph 30:** *WHAT:* Alleges teaser program used to upsell investors. *WHY:* Mischaracterizes voluntary investor behavior and lacks evidence of inducement. *HOW:* As held in *SEC v. Carriba*

*Air, Inc.*, 681 F.2d 1318 (11th Cir. 1982), mere inducement without deception or omission does not give rise to liability. *Strike as speculative and prejudicial.*

**Paragraph 31:** *WHAT:* Emphasizes ethnic targeting and geography of investors. *WHY:* Irrelevant to the substantive securities allegations. *HOW:* This language is prejudicial and impertinent under Rule 12(f). See *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654 (7th Cir. 1992). *Strike as scandalous.*

**Paragraph 32–33:** *WHAT:* Describes marketing and offering materials. *WHY:* Does not establish any misstatement or omission. *HOW:* Absent a showing that the offering materials were false or misleading in a material way, this inclusion is immaterial. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988). *Strike.*

**Paragraphs 34–35:** *WHAT:* Quotes public promotional videos. *WHY:* Puffery, not actionable misstatements. *HOW:* Per *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211 (M.D. Fla. 2014), puffery is not material. *Strike as immaterial.*

**Paragraphs 36–37:** *WHAT:* Allegations based on undercover FBI interactions. *WHY:* Selectively quoted and taken out of context. *HOW:* Courts disfavor inflammatory allegations where full factual context is omitted. *See Iqbal*, 556 U.S. at 679. *Strike as prejudicial.*

**Paragraph 38:** *WHAT:* Claims misrepresentation of RBL's ability to pay returns. *WHY:* Contradicted by forensic accounting which shows substantial lease payments were made. *HOW:* Misleading and speculative. *Strike.*

**Paragraph 39:** *WHAT:* Claims investments were not secure. *WHY:* No evidence that any investor lost principal before receivership. *HOW:* Strike as unsupported and immaterial.\*

**Paragraphs 40–42:** *WHAT:* Allegations of commingling and cyclical payments. *WHY:* Mischaracterizes legitimate accounting procedures and lease operations. *HOW:* Per *Kapila v. TD Bank, N.A.*, 834 F.3d 1304 (11th Cir. 2016), use of investor funds alone is not sufficient to prove fraud. *Strike as misleading.*

**Paragraph 43:** *WHAT:* Based on Scott Mulkey's affidavit. *WHY:* Later filings (ECF-228) discredit key aspects of his testimony. *HOW:* Strike as unreliable and contradicted by subsequent sworn evidence.\*

**Paragraphs 44–46:** *WHAT:* Repeat misappropriation allegations. *WHY:* Refuted by McCoy affidavit, which shows no fraud or diversion consistent with SEC's amounts. *HOW:* Strike as scandalous repetition.\*

**Paragraphs 47–48:** *WHAT:* Ponzi characterization based on insolvency. *WHY:* McCoy and Receiver documents confirm solvency until at least mid-2023. *HOW:* Eleventh Circuit in *Wiand v. Lee* requires insolvency ab initio. *Strike as legally defective.*

**Paragraphs 49–50:** *WHAT:* Fund transfers to family members and realty companies. *WHY:* No showing of unlawful diversion or intent. *HOW:* Without breach or deceit, such transfers are not inherently fraudulent. *See United States v. Autori*, 212 F.3d 105 (2d Cir. 2000). *Strike.*

**Paragraphs 51–54:** *WHAT:* Claims of speculative equity trading. *WHY:* No connection to investor harm, and no contractual violation pled. *HOW:* SEC failed to show breach or duty. *Strike as immaterial.*

**Paragraph 55:** *WHAT:* Final generalization that no program permitted trading. *WHY:* Contracts attached as exhibits do not prohibit use of funds in investment accounts. *HOW:* Strike as conclusory and unsupported by cited instruments.*

## III. CONCLUSION

WHEREFORE, Defendant respectfully moves this Court to STRIKE the above-identified paragraphs in ECF No. 1 as redundant, immaterial, impertinent, or scandalous under Fed. R. Civ. P. 12(f), with prejudice.

Respectfully submitted,

/S/ Sanjay Singh

Defendant, Pro Se

**CERTIFICATE OF CONFERENCE:**

The defendant is in federal custody, defendant couldn't confer with the plaintiff for relief, however the plaintiff is aware of Defendant intention to file  Motion to Strike ECF-1 Since May 2024.

**CERTIFICATE OF SERVICE:**

I hearby certify that, I have filed this motion with the clerk of court and all parties will be notified via CM/ECF of the filling.

/S/SANJAY SINGH

FCI

COLEMAN LOW FEDERAL PRISON

B-2

PO BOX - 1031

COLEMAN - FL 33521

EXHIBIT M1A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 23-61179-CIV-DSL

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

ROYAL BENGAL LOGISTICS, INC., and
SANJAY SINGH,

        Defendants,

SHEETAL SINGH and CONSTANTINA
CELICOURT,

        Relief Defendants.

_____/

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
## RESPONSE IN OPPOSITION TO DEFENDANT SANJAY
## SINGH'S MOTION FOR SANCTIONS

Plaintiff Securities and Exchange Commission (the "Commission") responds in opposition

to *pro se* Defendant Sanjay Singh's Motion for Sanction Regarding Submission of False and

Misleading Statements, Pleading Frivolous Argument for Improper Purpose (ECF No. 210

("Motion for Sanctions" or "Mot.")), and states:

### I. INTRODUCTION

In June 2023, the Commission filed this emergency action against Defendants Royal

Bengal Logistics, Inc. ("RBL") and Sanjay Singh ("Singh") (collectively, the "Defendants") to

halt an ongoing Ponzi scheme and affinity fraud that raised at least $112 million from more than

1,500 investors.[1] As part of its emergency action, the Commission obtained a temporary restraining order (ECF No. 10 ("TRO")) and the appointment of a receiver over RBL on an *ex parte* basis (ECF No. 11), among other relief. Pursuant to the TRO, the Court ordered Singh to appear and show cause, if any, why a preliminary injunction should not be entered against him.

Consistent with the TRO, the parties appeared before U.S. District Judge Raag Singhal[2] for an evidentiary show cause hearing on August 14, 2023. Singh was present at the hearing and represented by counsel. As reflected in the transcript of the hearing, a copy of which is attached as **Exhibit A**,[3] the Commission presented competent substantial evidence to the Court in support of its TRO and request for a preliminary injunction. The Commission's evidence included video and audio recordings in which RBL's employees, including Singh, made misrepresentations and omissions of material fact to undercover FBI agents posing as potential investors, as well as proffered testimony of a Commission senior accountant regarding his analysis of RBL's bank account records, which demonstrated that Defendants had been operating a Ponzi scheme and misappropriating millions of dollars from their investors. In all, the Commission admitted 27 exhibits into evidence (ECF Nos. 76-1 through 76-27), and proffered the testimony of FBI Special Agent Austin Steelman, Commission Senior Accountant Mark Dee, and Commission Senior

---

[1] On or around the same time, Singh was arrested in connection with an indictment returned by a Grand Jury in the Southern District of Florida, having Case No. 23-601117-CR-DSL (the "Indictment"). In this parallel criminal case, Singh was charged with operating a Ponzi scheme, among other things. According to the Indictment: "RBL did not earn sufficient revenue from its trucking business to cover the costs of its operations, let alone the obligation to investors incurred through the investment programs. As a result, [Singh] and his co-conspirators used new investor funds to pay existing investors promised returns, as is typical in a Ponzi scheme." *Id.* at ¶ 7. The Indictment further alleged Singh "misappropriated millions of dollars of investor funds to pay for personal expenses …." *Id.* at ¶ 8.

[2] On March 8, 2024, this case was reassigned to U.S. District Judge David S. Leibowitz (ECF No. 190).

[3] The Commission cites to the transcript of the show cause hearing as "Tran." followed by the page and line numbers.

2

Paralegal Specialist Ivette Goizueta-Mendes.[4] A copy of the Commission's list of exhibits (ECF No. 72) offered at the hearing and admitted into evidence is attached as **Exhibit B**.

Singh refused to testify at the hearing and invoked his Fifth Amendment privilege; after which the Commission moved for and obtained an adverse inference to areas of inquiry central to Singh's role in the scheme. See Tran. $11:15 - 12:17$. Singh also stipulated that RBL's investment programs were not registered with the Commission, providing competent substantial evidence that he violated Section 5(a) and (c) of the Securities Act of 1933 ("Securities Act"). See *Id.* at 6:4-24.

Following the Commission's presentation, Singh's counsel did not call a single witness, offer any documentary evidence, or otherwise rebut the Commission's evidence. *Id.* at $14:16 - 16:2$. Accordingly, the Court found that the Commission "made a sufficient and proper showing in support of [its request for a preliminary injunction] by (i) presenting a *prima facie* case of securities laws violations by Singh; and (ii) showing a reasonable likelihood Singh will harm the investing public by continuing to violate the federal securities laws unless he is immediately restrained," and entered a preliminary injunction against Singh. (ECF No. 82 ("PI Order")).

Now, approximately eight months after the Court granted the Commission's request for a preliminary injunction, Singh moves for sanctions against the Commission and its attorneys under Rule 11 of the Federal Rules of Civil Procedure. Despite the overwhelming evidence already of record, Singh claims in a conclusory fashion that the entirety of the Commission's Complaint and related emergency filings contain false or misleading statements of material fact and law. See Mot. ¶ 26.

---

[4] Declarant Scott Mulkey, RBL's former Director of Fleet Operations, was not present at the hearing. Mr. Mulkey's declaration is attached as Exhibit C to the Commission's Emergency *Ex Parte* Motion for Temporary Restraining Order and Other Relief (ECF No. 7-1).

When deciding whether to impose sanctions under Rule 11, a district court must conduct a two-step inquiry, determining "(1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). As the Commission met the required showing and obtained a preliminary injunction against Singh on the same factual and legal allegations Singh now argues are subject to Rule 11, the Commission submits that the Court may deny Singh's Motion for Sanctions without further consideration, as the Court's entry of a preliminary injunction demonstrates the Commission's claims are not objectively frivolous. Moreover, in the time since the Court entered the preliminary injunction, the Court-appointed Receivers[5] have uncovered additional evidence of Singh's fraud further corroborating the Commission's allegations. For these reasons, as discussed in detail below, Singh cannot demonstrate that the Commission's claims are objectively frivolous, and his Motion for Sanctions should be denied.

## II. ARGUMENT

### A. Legal Standard

Federal Rule of Civil Procedure 11 authorizes a district court to impose sanctions against an attorney who files frivolous pleadings or motions. Fed. R. Civ. P. 11(b), (c). Rule 11 sanctions are warranted when a party files a pleading or motion that "(1) has no reasonable factual basis; (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) is filed in bad faith for an improper purpose." *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1314 (11th Cir. 2021) (internal quotation marks omitted). When deciding whether to impose sanctions under Rule 11, a district court must conduct

---

[5] The Court appointed Paul O. Lopez and Jennifer H. Wahba as Co-Receivers.

a two-step inquiry, determining "(1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous." *Baker*, 158 F.3d at 524. A factual claim is frivolous when it has no reasonable factual basis. *See id.* A legal claim is frivolous when it has no reasonable chance of succeeding. *See id.* When the attorney's evidence is "merely weak," but supports a claim under existing law after a reasonable inquiry, sanctions are unwarranted. *Id.* Sanctions are warranted, however, when the attorney exhibits "a deliberate indifference to obvious facts." *Id.* (internal quotation marks omitted).

## B.   The Court Already Determined the Commission Presented a *Prima Facie* Case Against Singh for Violations of the Securities Laws

Singh is claiming—without any evidence or relevant legal authority—that the Commission's Complaint (ECF No. 1), Emergency *Ex Parte* Motion for Temporary Restraining Order and Other Relief (ECF No. 7 ("TRO Motion"), and related Court filings[6] "were premised on knowingly false allegations," are "devoid of merit," and were filed by the Commission in an attempt to "extort Defendants with bad faith threats of massive, fabricated damages." Mot. ¶ 24. However, Singh already contested these factual and legal allegations unsuccessfully during an evidentiary show cause hearing in connection with the Commission's request for a preliminary injunction.

To obtain the preliminary injunction, the Commission was required to establish (1) a *prima facie* case showing Singh violated the securities laws, and (2) a reasonable likelihood he will repeat

---

[6] Singh argues in his Motion for Sanctions that the Commission made false and misleading statements of fact and law in its Complaint, Motion to File Under Seal (ECF No. 4), Motion for Leave to File its Emergency *Ex Parte* Motion for Temporary Restraining Order and Other Relief in Excess of the 20-Page Limit (ECF No. 6), TRO Motion, and Certification Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure (ECF No. 7-3). See Mot., p. 2.

the wrong. *SEC v. Shiner*, 268 F. Supp. 2d 1333, 1340 (S.D. Fla. 2003). As detailed in the PI Order,

the Court considered the following:

- the Commission's Complaint;

- the Commission's TRO Motion;

- Singh's failure to file a motion to dissolve the TRO in advance of the hearing pursuant to Rule 65(b)(4) of the Federal Rules of Civil Procedure;

- the Commission's proffer of its evidence in support of the TRO, and the availability of the Commission's witnesses for cross examination during the hearing;

- Exhibits 1-27 entered by the Court into evidence during the hearing;

- Singh's stipulation that RBL's investment programs were not registered with the Commission;

- Singh's Stipulation Regarding His Invocation of His Fifth Amendment Privilege (ECF No. 76-27 ("Stipulation")), and the corresponding adverse inference[7] drawn against Singh as to the areas of inquiry enumerated in the Stipulation;

- Singh's failure to offer any testimonial or documentary evidence during the hearing or otherwise rebut the Commission's evidence;

- the Receivers' Consent to the Preliminary Injunction and Other Relief on behalf of RBL (ECF No. 68); and

- the argument of counsel on behalf of the parties.

See Preliminary Injunction, pp. 1-2.

---

[7] Areas of inquiry included, but were not limited to: (i) RBL's business operations, including assets and liabilities; (ii) details regarding RBL's investment programs; (iii) written or oral representations made to investors about: the safety and/or profitability of RBL's investment programs; revenues generated by RBL's trucking and logistics business; the number of trucks in RBL's fleet; and the use of investor funds; (iii) details regarding the actual use of investor proceeds, including the commingling of investor funds and whether investor funds from new investors were used to pay returns or redemptions to other investors; (iv) whether investor funds were diverted to brokerage accounts for trading in equities; and (v) whether Singh transferred investor funds to himself or other insiders. See Stipulation.

By establishing a *prima facie* case showing Singh violated the securities laws on the same facts and law Singh is now claiming are subject to Rule 11 sanctions, the Commission already has established its claims are not objectively frivolous under *Baker*. Therefore, unless Singh has come forward with new facts or evidence (which he has not), the Court should deny his Motion for Sanctions without further consideration.

## C.   None of the Commission's Claims is Objectively Frivolous

While Singh argues that the entirety of the Commission's allegations against him are false or misleading (see Mot. ¶ 26), his Motion for Sanctions refers to specific allegations from the Commission's Complaint, TRO Motion, and related filings. As the first step in the Court's two-step analysis under *Baker*, the Commission will attempt to address most of Singh's claims to the extent it understands them, as well as cite to the specific evidence the Commission relied upon to support its allegations. As demonstrated below, none of the Commission's claims is objectively frivolous.

### 1.   Defendants were Operating a Ponzi Scheme

Singh claims the Commission's allegation that Defendants were operating a Ponzi scheme is false. See Mot. ¶¶ 1, 5, and 11(e). He also claims the Commission's related allegations that RBL's trucking and logistics business was operating at an $18 million loss and Defendants used $70 million of new investor funds to pay existing investor obligations are false. *Id.* at ¶¶ 2 and 7. These allegations are supported by the Declaration of Mark Dee, the Commission's Senior Accountant, which was attached to the TRO Motion as Exhibit B (ECF No. 7-1 ("Dee Declaration")) and proffered as testimony during the show cause hearing. See Tran. 13:10-17.

As detailed in his declaration, Mr. Dee performed a financial analysis of RBL's bank accounts and other financial records to identify sources and flow of funds in connection with

7

RBL's investment offerings. See Dee Declaration at ¶ 4. As part of his analysis, Mr. Dee

determined the cash inflows from RBL's trucking business were substantially less than RBL's

operating expenses, resulting in a net negative cash flow of $18.1 million during the analyzed

period.[8] *Id.* at ¶ 26. Because RBL's cash operating inflows were substantially less than its cash

operating outflows, transfers from RBL's accounts containing commingled investor funds

necessarily resulted in the use of investor funds to pay RBL's operating deficiencies and investor

obligations owed under RBL's investment programs. *Id.* at ¶ 27. According to Dee, Defendants

used at least $70 million of investor funds to make interest payments, monthly lease payments,

and principal redemption payments owed to investors under RBL's investment programs. *Id.* at ¶

27.

That Defendants were operating a Ponzi scheme was later further confirmed by the

Receivers and their forensic accounting firm, Kapila Mukamal ("KM")[9]. According to the

Receivers' Third Quarterly Status Report (ECF No. 214 ("Receivers' Third Status Report")):

> RBL's total trucking services income was $8.5 million, on average approximately
> $710,000 per month. Truck lease payments were $34.3 million, on average
> approximately $2.9 million per month, significantly higher than any revenue RBL
> was generating. RBL losses from trucking operations were $27 million, on average
> approximately $2.2 million in losses per month.

*Id.* at p. 16. The status report went on to state that RBL's investor liabilities as of December 31,

2022, were as high as $29.4 million, and there were no significant assets of value recorded on the

company's balance sheet to fund those liabilities. *Id.* According to the Receivers, "RBL could not

generally pay its operating expenses or mounting debt obligations in the ordinary course without

continuing to raise funds from investors." *Id.*

---

[8] The analyzed period as defined in Mr. Dee's declaration is August 12, 2019, through February 28, 2023. *Id.* at ¶ 9.
[9] KM and its principal Soneet Kapila specialize in the areas of insolvency and restructuring, Ponzi schemes, fraud investigation, insolvency taxation, and business valuation, among others.

8

## 2. Misappropriation and Misuse of Investor Funds

Next, Singh claims the Commission's allegation that Defendants misappropriated and misused at least $14 million is false. See Mot. ¶¶ 2, 2(f), 5 and 7. This allegation also is supported by the Commission's accountant's financial analysis. See Dee Declaration ¶¶ 16-19. As provided in Mr. Dee's declaration, RBL transferred $7.5 million to a joint account in the name of Singh and his spouse, Sheetal Singh[10]; $375,000 to North America Aerospace, LLC, a company owned and controlled by Singh; and $433,000 to Uday Singh, who is believed to be a relative of Singh residing in India. *Id.* In addition, RBL transferred $3.5 million to Cingar Transport, LLC, a company owned by RBL's Vice President, Barathi K. Chidambaram ("Chidambaram"). *Id.* at 17. With respect to Chidambaram, after filings its action, the Commission learned through witness interviews and company records that Chidambaram allowed RBL to use his American Express credit card for business-related expenses. While discovery is ongoing, at least some or most of the $3.5 million RBL paid to Cingar Transport, LLC, was paid to Chidambaram to reimburse him for business expenses charged to his credit card.

Mr. Dee's analysis also revealed that RBL transferred $2.1 million to Realty Land Title Company for the purchase of real property located in Pompano Beach, Florida. *Id.* at 19. Despite RBL paying the purchase price, the deed to the property was titled in the name of Constantina Celicourt[11]—who is the spouse of RBL's Vice President, Ricardi Celicourt—for no apparent legitimate purpose. *Id.* Following an action filed by the Receivers against Ms. Celicourt for

---

[10] Sheetal Singh is named in the Complaint as a Relief Defendant for the receipt of these funds to an account she owns jointly with Sanjay Singh.

[11] Constantina Celicourt is named in the Complaint as a Relief Defendant.

fraudulent transfer and constructive trust,[12] Ms. Celicourt transferred the property to the Receivership Estate for the benefit of defrauded investors.

While the Receivers' analysis remains ongoing, their status reports to the Court further confirm many of the Commission's allegations. For instance, the Receivers' Preliminary Status Report (ECF No. 69 ("Receivers' Preliminary Status Report")) reported they "uncovered facts to demonstrate that approximately $2.1 million was transferred by RBL to an insider ... to purchase vacant property located in Broward County, Florida...." *Id.* at p. 6. And payroll records revealed "extraordinary and unusual payments made to certain employees who appeared to be receiving commissions or bonuses based upon the procuring of investments for RBL." *Id.* Finally, the Receivers reported identifying "additional entities that may be deemed to be affiliated or connected with RBL, and to which transfers of funds were made," including North America Aerospace, LLC. *Id.* at p. 8.

### 3. The Truck Program

Singh also claims the Commission made a number of false statements with respect to RBL's Equipment Management Investment Program (the "Truck Program"). See Mot. ¶¶ 2(c), 2(d), 11(a), 11(b), and 11(f). Briefly, the Truck Program required a minimum investment of $55,000 that RBL purported to use toward the purchase of a semi-truck on behalf of the investor. The investor agreed to lease the truck to RBL for a five-year term in exchange for monthly lease payments, after which the investor purportedly owned the truck outright. Singh cites to portions of the Complaint and TRO Motion claiming the Commission falsely alleged that RBL would become the owner of the truck. See, e.g., Mot. at 2(c) ("In reality the owner of the truck was the

---

[12] *Paul O. Lopez and Jennifer H. Wahba, as Co-Receivers of the Estate of Royal Bengal Logistics, Inc. v. Constantina Celicourt a/k/a Constantina H. Voltaire*, Case No. CACE-23-015173 (Fla. 17th Cir. Ct. June 28, 2023).

lessor"). Singh and the Commission do not disagree on this fact. As alleged in the Complaint and

TRO Motion, based on the terms of the Truck Program and as represented by RBL to investors,

the investor (or her chosen entity) is the legal owner of the truck. The investor then becomes a

lessor by leasing the truck back to RBL. See Complaint ¶ 26 ("Investors are required to make the

investment through a new or existing corporation or limited liability company created by the

investor, which RBL claims will be the legal owner of the truck."); see also TRO Motion ¶ 15

(same).

Next, Singh argues that the Commission's allegations about the number of trucks

purchased on behalf of investors and their condition are false. Specifically, the Commission

alleged in paragraph 43 of the Complaint and paragraph 31 of the TRO Motion:

> … RBL has grossly overstated the number of trucks it has purchased on behalf of
> investors in RBL's Truck Program. The bulk of RBL's fleet is comprised of
> independent contractors who drive their *own* trucks for RBL, known in the industry
> as owner operators. To inflate the number of trucks to prospective investors,
> Defendants misrepresent owner-operated trucks as their own. Trucks actually
> purchased by RBL are approximately 10 to 20 years old and in poor condition.
> Employees driving RBL-owned trucks regularly complain about breakdowns and
> issues with RBL paying for repairs.

*Id.* (emphasis in original).

For these allegations, the Commission relied upon the declaration of RBL's former

Director of Fleet Management, Scott Mulkey, which was attached to the TRO Motion as Exhibit

C (ECF No. 7-1). According to Mr. Mulkey:

> As Director of Fleet Management, I observed that Royal Bengal had approximately
> 38 trucks, with only 15 to 20 … in working condition. All of the trucks Royal
> Bengal purchased were in used condition, approximately 10-20 years old, with a
> value of $20,000 to $50,000. Trucks were constantly breaking down and in
> disrepair.

*Id.* at ¶ 8. Mr. Mulkey also "often saw investors coming into Royal Bengal's office to complain

about not having received their trucks under the investment program," and stated that "[w]hen [he]

11

first started working for Royal Bengal, its drivers were independent contractors, but later Royal
Bengal designated these drivers as employees." *Id.* at ¶ 10-11.

From the last day of Mr. Mulkey's employment in late July 2021 (*id.* at 17) until the date
the Court appointed the Receivers over RBL,[13] the number of trucks in RBL's fleet increased from
38 to approximately 277, but this remained far too few to accommodate the number of investors
enrolled in the Truck Program.[14] Based on the Receivers' current estimates, approximately 777
investors enrolled in the Truck Program and should have received a truck, but only 193 trucks
were purchased on behalf of investors.[15]

The Receivers also further confirmed the Commission's allegations regarding the condition
of the trucks, many having been left at truck stops and abandoned along highways due to
mechanical problems:

> The Receivers learned that a number of the trucks comprising the vehicles leased
> to RBL had been left at truck stops or abandoned along the highway due to
> mechanical problems. The Receivers arranged on a case-by-case basis to dispatch
> the appropriate personnel to either repair the trucks at their location or to have the
> trucks towed to an appropriate storage facility where they would be appropriately
> secured. Essentially every day since the Receivership, the Receivers have been
> making payments to repair trucks before being secured in either Lubbock or
> Florida.

Receivers' Preliminary Status Report, p. 6. In their Third Status Report, the Receivers added that

a "significant percentage of the trucks were extremely old with excessive miles that were in various

states of disrepair, none of which was properly disclosed to investors." *Id.* at p. 2.

---

[13] See June 21, 2023 Order Granting Plaintiff Securities and Exchange Commission's Emergency
Motion for Appointment of Receiver (ECF No. 11).

[14] Due to the increase of trucks purchased on behalf of investors, the bulk of RBL's fleet at the
time of the filing of the Complaint did not consist of owner operators but investor-owned trucks
operated by RBL.

[15] The remaining 84 trucks in RBL's fleet were owner operators (not owned by investors),
nonoperational, or were otherwise unaccounted for.

12

### 4.   Proceeding on an Emergency *Ex Parte* Basis

Singh argues that it was improper for the Commission to file its action as an emergency without notice to Defendants, and without providing him and RBL's general counsel with a Wells notice. See Mot., pp. 3-4. According to Singh, the mere fact that the Commission filed its action without first seeking information from Singh or RBL's general counsel is evidence the Commission's action is frivolous and was initiated for an improper purpose. See Mot. at pp. 3-4.

The Court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A)   specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B)   the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65. *Ex parte* temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." *Ogangi Corp. v. Anzola*, No. 19-23118-CIV, 2019 WL 7643428, at *2 (S.D. Fla. July 30, 2019) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974)).

Given the nature of the fraud as well as Singh's frequent travels and ties to India, which included transfers totaling nearly $2 million of investor funds to an Indian company known as Black Lion, the Commission filed its request for emergency relief *ex parte* to preserve the status quo and prevent Singh and his associates from further dissipating investor assets. Almost immediately upon service of the Court's Asset Freeze Order (see TRO, pp. 6-8) on banks and financial institutions known by the Commission to be in possession of Defendants' assets, the

13

Commission moved the Court to unseal its Complaint, TRO Motion, and related filings (ECF No. 12), and served them on the Defendants. See Returns of Service (ECF Nos. 20-21).

A Wells notice is the formal notification the Commission, in its discretion, may provide to an individual or entity, typically at the conclusion of the investigation, notifying them that the Commission's staff has made a preliminary determination to recommend an enforcement action. See 17 C.F.R. § 202.5(c) (referring to the Wells notice as permissive). The Wells notice also informs the recipient of the specific charges that are contemplated, the potential forum for the action, the remedies the staff preliminarily plans to recommend seeking in the action, and of the opportunity to make a submission to the Commission responding to the staff's recommendation.

There is no statutory right to receive a Wells notice, and Singh has cited no authority providing otherwise. The Commission has a responsibility to protect the public interest and often is called upon to act under circumstances which require immediate action if the interests of investors or the public interest are to be protected. See SEC Enforcement Manuel, p. 20. (internal citations omitted).[16] To determine whether or when to provide a Wells notice, the Commission may consider, for example:

- Whether immediate enforcement action is necessary for the protection of investors. If prompt enforcement action is necessary to protect investors, providing a Wells notice and waiting for a submission may not be practical (for example, a recommendation to file an emergency action requesting a temporary restraining order and asset freeze to stop an ongoing fraud).

- Whether providing a Wells notice may alert potential defendants to a possible asset freeze or otherwise put at risk investor funds that the recommendation is intended to protect.

- Whether there is a parallel criminal investigation that may be adversely affected by providing a Wells notice

---

[16] https://www.sec.gov/divisions/enforce/enforcementmanual.pdf

14

*Id.* at p. 20.

Each of the above factors were present at the time the Commission filed its action against the Defendants. As part of its emergency action, the Commission moved for a temporary restraining order and asset freeze to stop Defendants from continuing to operate a Ponzi scheme and affinity fraud. Also, providing a Wells notice would have alerted Defendants to the Commission's investigation and put investor funds at risk. And there was a covert parallel criminal investigation that may have been adversely affected had the Commission provided Defendants with a Wells notice.

### 5.      Case Law Cited is Applicable to RBL's Investment Programs and the Commission's Request for a Temporary Restraining Order

Finally, Singh claims, again, without any supporting facts or legal analysis, that the Commission presented inapplicable case law to the Court in support of its TRO Motion, including *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946); *SEC v. Friendly Power Co., LLC*, 49 F. Supp. 2d 1363, (S.D. Fla. 1999); and *Revak v. SEC Realty Corp.,* 18 F.3d 81 (2d Cir. 1994).

In *W.J. Howey Co.,* the U.S. Supreme Court established the test for determining whether an investment contract exists, now known as the "*Howey* test." The Commission cited to *W.J. Howey Co.* and applied the *Howey* test in its TRO Motion to establish that RBL's investment programs are investment contracts and, therefore, securities subject to federal securities laws. See TRO Motion at pp. 16-19. Relatedly, the Commission cited *Friendly Power Co.* because it is an opinion issued from a court in the Southern District of Florida, where this case is located, applying the *Howey* test. *Id.* The Commission cited *Revak* because it provides a detailed explanation of horizontal commonality, which may be used to satisfy the second prong of the *Howey* test (the common enterprise prong), and to contrast horizontal commonality with broad vertical commonality, which also may be used to satisfy the second prong of the *Howey* test in this Circuit.

15

To the extent Singh is claiming the Commission relied on *Revak* to argue horizontal commonality is applicable, the Commission argued that broad vertical commonality existed here based on *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1200, n.4 (11th Cir. 1999) ("Unlike the more stringent concept of horizontal commonality, utilized by the Second, Third, Sixth, and Seventh Circuits, *see, e.g., Stenger v. R.H. Love Galleries*, 741 F.2d 144, 146 (7th Cir.1984), this flexible standard does not require investor funds to be pooled nor does it require profits to be shared on a pro rata basis); see also TRO Motion, pp. 17-18.

**D.      The Undersigned is Not Aware of any Frivolous Claims**

The second step in the two-step inquiry when deciding whether to impose sanctions under Rule 11 is "whether the person who signed the pleadings should have been aware the Commission's claims were frivolous." *Baker*, 158 F.3d at 524. As none of the Commission's claims is objectively frivolous, the Court may dispense with step two and deny Singh's Motion for Sanctions.

## III.  CONCLUSION

For all of the foregoing reasons, the Commission respectfully requests the Court enter an Order denying Singh's Motion for Sanctions.

Dated: April 19, 2024          Respectfully submitted,

*s/ Russell R. O'Brien*
Russell R. O'Brien
Trial Counsel
Florida Bar No. 084542
Direct Dial: (305) 982-6341
Email: obrienru@sec.gov

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131

# EXHIBIT F1A

# Appendix - A

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

PAUL O. LOPEZ AND
JENNIFER H. WAHBA                          CASE NO.:CACE 23-019816
as Receivers for the estate of
ROYAL BENGAL LOGISTICS, INC.,

      Plaintiff,

v.

RICARDI CELICOURT,
Individually

      Defendant.

_____/

## AFFIDAVIT OF KEVIN MCCOY IN SUPPORT OF
## RECEIVERS' MOTION FOR PARTIAL SUMMARY JUDGMENT

STATE OF FLORIDA      )
                    ) ss:
COUNTY OF PALM BEACH    )

    BEFORE ME, the undersigned authority, personally appeared Kevin McCoy, who was sworn and states:

    1.    My name is Kevin McCoy.  I am submitting this affidavit in support of Receivers' Motion for Partial Summary Judgment in the above-styled lawsuit.

    2.    I am over the age of 18, am competent to furnish this affidavit, and do so based on my personal knowledge of the statements made herein.

    3.    I am a partner at KapilaMukamal, LLP ("KM"), which specializes in insolvency, turnaround, forensic and investigative consulting, expert witness, matrimonial forensics and litigation support services.

    4.    My areas of expertise include forensic accounting and investigation, financial transactions litigation, complex commercial litigation, and insolvency advising.

1

#2723098v1-221271.0001

**Exhibit D**

5. I have worked with fiduciaries in conjunction with the Federal Bureau of Investigation (FBI), Securities and Exchange Commission (SEC), the Federal Trade Commission (FTC), and the United States Attorney's Office.

6. I am a Certified Public Accountant (CPA), Certified Insolvency and Restructuring Advisor (CIRA), and Certified Fraud Examiner (CFE), a Certified Insolvency and Restructuring Advisor (CIRA), affiliated with the Association of Insolvency and Restructuring Advisors (AIRA). I am also affiliated with the National Association of Federal Equity Receivers (NAFER), Association of Certified Fraud Examiners (ACFE), and the Florida Institute of Certified Public Accountants (FICPA).

7. On June 27, 2023, the United States District Court for the Southern District of Florida entered an Order granting Receivers' Motion to employ KM as forensic accountants to assist the Receivers in fulfilling their duties under the Order appointing the Receivers.

8. Since that date, I, along with other members of the KM team, have assisted the Receivers with the administration of the Receivership estate, and conducted a forensic analysis of the financial condition of Royal Bengal Logistics, Inc. ("RBL") including a business viability analysis, (in)solvency analysis and countless other related investigations as requested by the Receivers and their counsel that remain on-going at present.

9. I have reviewed, analyzed and investigated RBL's internal QuickBooks ("QB") files along with the company's tax returns and bank records.

10. To determine the nature of the transactions of the RBL bank records, I prepared a detailed reconstruction of the funds received and disbursed in RBL's financial accounts ("Bank Reconstruction") during the period from June 13, 2018 through June 30, 2023 (the "Relevant Period". The Bank Reconstruction encompassed 17 accounts and over 42,000 transactions. The

2

Bank Reconstruction remains a work in progress at present. I utilized data within the Bank Reconstruction to quantify and determine the source and use of funds received and disbursed during the Relevant Period.

### *Business Viability Analysis*

11.     KM was asked by the Receivers to determine whether RBL had the financial ability to remain as a going concern as its first and foremost task upon retention. Within two days of KM's retention, I obtained access to and reviewed and analyzed RBL's own internal QuicBooks financial records and determined RBL had insufficient revenues to meet its operating and financial obligations. I also determined:

  a.  RBL did not keep adequate accounting records after January 31, 2023, in QuickBooks. There were minimal transactions recorded after January 31, 2023, so that no reliable financial statements could be generated reflecting RBL's financial status at a given time after January 2023, five months before the Receivers' appointment on June 21, 2023.[1]

  b.  In 2022:

   i.  Total trucking services income was $8.5 million, on average approximately $710,000 per month.

   ii.  KM later learned that RBL was factoring its trucking revenue accounts receivable. This generally represents a distress in collections in the ordinary course. Therefore, not only was it paying interest on its investor loans, but RBL's revenues were discounted by factoring its receivables.

---

[1] KM or the Receivers found no evidence that RBL kept another set of books for the period after January 2023.

3

       iii.  Truck lease payments were $34.3 million, on average approximately $2.9 million per month, significantly more than any revenue RBL was generating.

       iv.  RBL losses from trucking operations were $27 million, on average approximately $2.2 million in losses per month.

       v.  There were significant cash flow deficits from trucking operations, averaging $2.2 million per month.

  c.  January 2023's losses from trucking operations were $5.8 million.

  d.  In summary, losses from RBL's trucking operations (and in total) were increasing, and the trucking revenue was insufficient to cover operating expenses and investor payments.

12.    Based on the review of RBL's own internal financial records at the initial outset of the case, KM determined that RBL was not financially viable as a going concern and the source of funds used to cover the significant operating losses were derived from investors.

### *Insolvency Analysis*

13.    KM also determined that RBL was insolvent as early as January 2022 through the appointment of the Receivers on June 21, 2023.

14.    Based on RBL's own internal financial records and KM's Bank Reconstruction:

  a.  RBL's investor liabilities as of December 31, 2022, were as high $29.4 million, and there were no significant assets of value recorded on the company's balance sheet to fund those liabilities.

  b.  RBL did not generate sufficient revenue to cover its operating expenses or fund its expanding investor liability obligations, without raising additional funds

4

from investors. For the period from March 2023 through June 2023 (four months), KM determined that RBL:

    i.  Received $2.8 million in trucking revenue and incurred $13.3 million in operating expenses for a net loss during the period of $10.5 million.

    ii.  Received $46.8 million from investors and disbursed $35.1 million to investors resulting in net funds received from investors during this time period of $11.6 million -- that was essentially used to fund operating losses and included net disbursements of $1.5 million for non-operating expenses including funds transferred to insiders.

15.    It is evident that RBL was insolvent from as early as January 2022, based on RBL's own internal financial records and KM's Bank Reconstruction that RBL:

    a.  Could not generally pay its operating expenses or mounting debt obligations in the ordinary course without continuing to raise funds from investors; and

    b.  Continued to incur investor liabilities that exceeded any assets available to fund those obligations, from as early as 2022 through the appointment of the Receivers on June 21, 2023.

FURTHER AFFIANT SAYETH NAUGHT.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

5

## VERIFICATION

SIGNATURE: _____

KEVIN MCCOY, OF KAPILA MUKAMAL

STATE OF FLORIDA      )
COUNTY OF PALM BEACH  )

The foregoing AFFIDAVIT was sworn to and subscribed before me on December 8th, 2023 by Kevin McCoy of Kapila Mukamal, who is personally known to me or who has produced valid and statutorily sufficient identification.

☑ Personally Known
☐ Identification Provided: _____

Notary Public, State of Florida

Printed Name: Jane Pacheco Silva
Commission Stamp:

> JANE PACHECO SILVA
> Commission # HH 361705
> Expires March 20, 2027

6

SHEETAL SINGH
(352) 421-1678
THE UPS STORE #3748
4613 N UNIVERSITY DR
CORAL SPRINGS  FL 33067-4602

LBS       1 OF 1
SHP WT: 1 LBS
DWT: 15.12.1
DATE: 02 SEP 2025

SHIP US DISTRICT COURT CLERK
TO:  STE 108
     299 E BROWARD BLVD

**FORT LAUDERDALE  FL 33301-1922**

## FL 333 0-02

## UPS 3 DAY SELECT          3
TRACKING #: 1Z 368 823 12 9187 6321

BILLING: P/P

REF #1: RP

MHPX004U10STS  ISH 13.00C ZZP 450 33.5U 00/2025

SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.                                   690425

