UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:23-cv-61179-LEIBOWITZ/STRAUSS

SECURITIES AND EXCHANGE
COMMISSION,

     *Plaintiff,*

*v.*

ROYAL BENGAL LOGISTICS, INC.,
*et al.*,

     *Defendants,*

SHEETAL SINGH and
CONSTANTINA CELICOURT,

     *Relief Defendants.*

_____/

## ORDER GRANTING SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR
## ON ALL COUNTS OF THE COMPLAINT

**THIS CAUSE** is before the Court upon the motion for summary judgment by Plaintiff

Securities and Exchange Commission (the "Commission") [ECF No. 424] (the "Motion"), filed on

January 21, 2026, against *pro se* Defendant Sanjay Singh ("Singh") and *pro se* Relief Defendant, Sheetal

Singh ("Sheetal"). Singh appearing *pro se* has responded in opposition [ECF Nos. 426, 427, 453, 454]

and the Commission has replied [ECF No. 433]. On February 27, 2026, the Court directed the

Commission to supplement the record with citations to the record that establish the RBL Investment

Programs, the subject of the instant Motion, are securities under the Securities Act of 1933 ("Securities

Act") and the Securities Exchange Act of 1934 ("Exchange Act"), allowing Singh thirty (30) days

thereafter to respond. [ECF No. 438 at 2]. The Commission has now supplemented the record as

directed [ECF No. 443], and Singh has filed his response [ECF No. 453]. The Court also ordered

Relief Defendant Sheetal to respond to the Motion no later than May 17, 2026 [ECF No. 457], which she has done [ECF No. 461].  The Commission has replied in turn [ECF No. 469].  Accordingly, upon due consideration of the Motion, the parties' papers (to include the supplemental filings), the relevant portions of the record, and the governing law, the Motion is due to be GRANTED for the reasons given below.

## I.    INTRODUCTION

In this civil action, the Commission alleges Singh violated several federal securities laws through his company, Royal Bengal Logistics, Inc. ("RBL"), by engaging in a *Ponzi* Scheme over a period of approximately four years, which scheme defrauded 1,500 investors of about $112 million. [*See generally* Compl., ECF No. 1].  Specifically, the Complaint asserts the following causes of action against Singh:  Count I (violations of Sections 5(a) and 5(c) of the Securities Act; Count II (violations of Section 17(a)(1) of the Securities Act); Count III (violations of Section 17(a)(2) of the Securities Act); Count IV (violations of Section 17(a)(3) of the Securities Act); Counts V, VI and VII (violations of Section 10(b) and Rule 10b-5 of the Exchange Act); and Counts VIII (violations of Section 20(a) of the Exchange Act).  [*Id.* at 14–18].  Count IX asserts an unjust enrichment claim against the Relief Defendants Sheetal and Constantina Celicourt.  [*Id.* at 18–19].  On June 10, 2024, an Order of Final Judgment as to Relief Defendant Constantina Celicourt was entered, making Sheetal the only Relief Defendant at summary judgment.  [*See* ECF No. 277].

In parallel criminal proceedings against Singh, a jury convicted Singh on all counts of the Indictment, including one count of conspiracy to commit wire fraud, 18 U.S.C. § 1349; wire fraud, 18 U.S.C. § 1343; and engaging in unlawful proceeds, 18 U.S.C. § 1957.  *United States v. Sanjay Singh,* No. 0:23-cr-60117-LEIBOWITZ (S.D. Fla.), Indictment, ECF No. 1 (June 15, 2023), Verdict, ECF No. 237 (Nov. 6, 2024).  At summary judgment, the Commission argues Singh's criminal conviction for wire fraud—coupled with this Court's own findings in this action that RBL's Investment Programs

constitute securities under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)—entitles the Commission to summary judgment on Counts II through VIII of the Complaint. [ECF No. 424; ECF No. 443]. As for Count I, the Commission points to Singh's stipulation he did not register the RBL securities he offered and sold using the Internet, U.S. Mail, and other forms of interstate commerce. [ECF No. 424 at 15]. Thus, the Commission argues entitlement to summary judgment on Count I of the Complaint. [*Id.*]. As for Count IX, the Commission maintains all elements of its unjust enrichment claim against Sheetal are undisputed, especially considering Sheetal's invocation of her Fifth Amendment rights in response to questions about her retaining investor funds obtained from RBL's *Ponzi* scheme. [*Id.* at 16]. The Commission, therefore, asks the Court to grant summary judgment against Sheetal on Count IX of the Complaint.

## II.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Grayson v. Warden, Comm'r, Ala. Dep't of Corr.*, 869 F.3d 1204, 1220 (11th Cir. 2017) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). "'The movant has the burden of showing that there are no genuine issues of fact.'" *Id.* at 1220 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)). Issues are genuine if there is sufficient evidence for a reasonable jury to return a verdict for either party. *Great Am. All. Ins. Co. v. Anderson,* 847 F.3d 1327, 1331 (11th Cir. 2017) (citing *Anderson,* 477 U.S. at 248). In a similar vein, "an issue is material if it may affect the outcome of the suit under governing law." *Id.* at 1331 (citing *Anderson,* 477 U.S. at 248). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice;

there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson,* 477 U.S. at 242). Thus, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, courts should deny summary judgment." *Penley v. Eslinger,* 605 F.3d 843, 848 (11th Cir. 2010).

In reviewing a motion for summary judgment, district courts must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Furcron v. Mail Ctrs. Plus, LLC,* 843 F.3d 1295, 1304 (11th Cir. 2016) (quoting *FindWhat Inv. Grp. v. FindWhat.com,* 658 F.3d 1282, 1307 (11th Cir. 2011)). District courts "'may not weigh conflicting evidence or make credibility determinations'" when reviewing a motion for summary judgment. *See Grayson,* 869 F.3d at 1220 (quoting *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *FindWhat,* 658 F.3d at 1307)). Thus, where the facts specifically averred by the non-moving party contradict facts specifically averred by the movant, the motion must be denied, assuming those facts involve a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

The moving party necessarily carries the burden of proof. *See Great Am.,* 847 F.3d at 1331. In meeting that burden, non-moving parties may rely on materials enumerated in Rule 56(c), meaning there are some materials that may be relied upon to avoid summary judgment even though they would not be admissible at trial. *See Owen v. Wille,* 117 F.3d 1235, 1236 (11th Cir. 1997) (quoting *Celotex,* 477 U.S. at 324). District courts must also consider any "specific facts" pleaded in a plaintiff's sworn complaint in opposition to summary judgment. *See* Fed. R. Civ. P. 56(e); *Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (first citing *Perry v. Thompson,* 786 F.2d 1093, 1095 (11th

4

Cir. 1986) (per curiam) ("Plaintiff alleged specific facts in his sworn complaint and they were required to be considered in their sworn form."); and then citing *Sammons v. Taylor,* 967 F.2d 1533, 1544 n.5 (11th Cir. 1992) ("[F]acts alleged in an inmate's sworn pleading are sufficient and … a separate affidavit is not necessary.")).

If, however, there is a conflict in the evidence, the non-moving party's evidence is to be believed and "all justifiable inferences," must be drawn in favor of the non-moving party, but only if the inferences are sufficiently supported by the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Penley v. Eslinger,* 605 F.3d 843, 848 (11th Cir. 2010). The record evidence must sufficiently demonstrate a disagreement between the parties to require submission to a jury and not be so "one-sided" that the moving party prevails as a matter of law. *Anderson,* 477 U.S. at 251–52; *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990).

## III.     SUMMARY JUDGMENT EVIDENCE

### A.  The SEC's Case

#### 1.   RBL's Investment Programs

Defendant Royal Bengal Logistics, Inc. ("RBL") was a transportation and logistics company registered as a common carrier with the U.S. Department of Transportation during the time period relevant to the Complaint. [*See* Commission's Statement of Material Facts ("SMF"), ECF No. 423 ¶ 3]. RBL and Singh are collectively referred to herein as the "Defendants." Singh purported to have transformed RBL into what he described as a reverse franchising model, whereby investors received passive income generated from RBL's trucking business. [*Id.* ¶ 6]. RBL offered investors at least four investment programs, promising guaranteed returns ranging from 12.5% to as high as 325% depending on the program (collectively, the "RBL's Investment Programs"). [*Id.* ¶ 7].

RBL offered investors the opportunity to invest in RBL's business through two loan programs, a Short-Term Investment Program (the "Short-Term Program") and a Long-Term Owner Financing

Program (the "Long-Term Program"). [*Id.* ¶ 8]. RBL represented to investors that investments in either loan program would be used in RBL's general business operations. [*Id.*]. RBL's Short-Term Program required a minimum investment of $25,000, with a maximum investment of $200,000, for a period of 90 to 365 days depending upon the investment amount. [*Id.* ¶ 9]. At the end of the loan period, RBL was obligated to repay investors their principal investment plus interest ranging from 20% to 24% depending on the investment amount and term selected by the investor. [*Id.*]. RBL's Long-Term Program required a minimum investment of $60,000, with a maximum of $250,000, for a 36-month term. [*Id.* ¶ 10]. Under the Long-Term Program, RBL was obligated to pay investors monthly payments based on an annual 12.5% interest rate. [*Id.*].

The third investment program offered by RBL was its Trailer Sponsorship Program (the "Trailer Program"). [*Id.* at 11]. The Trailer Program was a six-month program that offered investors the opportunity to sponsor the building and purchase of a tractor-trailer on behalf of RBL. [*Id.*]. Under the Trailer Program, the minimum investment was $50,000, with a maximum investment of $200,000 for a period of 180 days. [*Id.* ¶ 12]. RBL represented to investors that their funds were being used to build trailers in India, which would then be disassembled and shipped to the United States. [*Id.*]. RBL claimed that upon arrival in the States, the trailers would be reassembled and added to RBL's fleet or sold for a profit. [*Id.*]. At the end of the investment period, RBL was obligated to repay investors their principal investment plus 30% interest. [*Id.*].

The fourth investment program, RBL's Equipment Management Investment Program (the "Truck Program"), had a five-year term (the longest of RBL's Investment Programs) and offered the highest returns. [*Id.* ¶ 13]. The Truck Program required a minimum investment of $55,000 that RBL purported to use toward the purchase of a semi-truck on behalf of the investor. [*Id.*] RBL explained to prospective investors that it took all the steps to purchase and operate the truck on behalf of the investor, including identifying and purchasing the truck, arranging financing for the investor to

purchase the truck, assigning a driver, obtaining licensing, registration and insurance, and maintaining the truck. [*Id.* ¶ 14]. Investors were required to make the investment through a new or existing corporation or limited liability company created by the investor, which RBL claimed would be the legal owner of the truck. [*Id.* ¶ 15]. Under the terms of the Truck Program, the investor agreed to lease the truck to RBL for a five-year term. [*Id.* ¶ 16]. RBL paid the investor monthly lease payments in the amount of $3,000, beginning on the third month, for 58 months. [*Id.*]. At the end of the five-year term, an investor in the Truck Program would have received $174,000 in lease payments alone, representing a 216% return on investment. [*Id.*]. The investor would then own the truck outright, which the investor would be entitled to keep, sell to RBL, or sell to a third party. [*Id.*].

New RBL investors typically began by investing $25,000 in RBL's Short-Term Program, which appeared to be a program designed to lure investors into making larger investments over longer periods of time. [*Id.* ¶ 19]. After the three-month investment period, when investors were repaid their initial $25,000 investment plus $5,000 of "interest," many investors decided to roll their $30,000 principal and interest payment into RBL's Truck Program, which required an additional $25,000 investment and involved a five-year term. [*Id.*].

2. <u>RBL Investment Programs are Securities under *Howey*</u>

The unrebutted record evidence in this action establishes the RBL Investment Programs are securities under *Howey*. An investment contract constitutes a security under *Howey* if there is (1) and investment of money; (2) in a common enterprise; (3) based upon the expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Friendly Power Co., LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

a. *Investment of money*

As for the first prong's requiring an investment of money, "[a]ll that is required is that the investor give up some tangible and definable consideration." *SEC v. Unique Fin. Concepts, Inc.*, 119 F.

Supp. 2d 1332, 1337 (S.D. Fla. 1998).  The Declaration of Mark Dee, Senior Accountant for the Commission, attested RBL raised at least $112 million from more than 1,500 investors from August 2019 through February 2023, and diverted $14 million of those funds to Singh, Sheetal, and their associates.  [ECF No. 423-1 ¶¶ 11–19].  Clearly, RBL investors gave up money (by the millions); therefore, *Howey*'s first prong is satisfied.

    b.  *Common enterprise and expectation of profits derived from others*

Dee further attested that RBL operated as a *Ponzi* scheme.  [*See* ECF 423-1 ¶¶ 26–31].  A *Ponzi* scheme, by its very nature, satisfies Howey's second and third prongs.[1]  *See Hays v. Adam*, 512 F. Supp. 2d 1330, 1337 (N.D. Ga. 2007) ("[T]he very natures of the *Ponzi* scheme meant that it was dependent on MBA attracting new investors to cover the payments from Outdoor Media to earlier investors.  Thus, the Defendants cannot dispute that the fortunes of the billboard purchasers were interwoven with and dependent upon the efforts and success of Outdoor Media and MBA.").  The fortunes of the investors in RBL's Investment Programs, which operated as a *Ponzi* scheme, were directly dependent to Singh's ability to attract new investors to cover payments to investors who had gone before.  Thus, *Howey*'s second and third prongs are also met here.

In sum, the unrebutted evidence at summary judgment is that the RBL Investment Programs constituted securities under the Securities Act and the Exchange Act.

    3.  <u>Defendants' Material Misrepresentations and Omissions</u>

---

[1]  The second prong—common enterprise—requires only a finding that the investors' fortunes are linked to the efforts of the promoter or third parties.  *Unique,* 196 F.3d at 199; *See SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005) (finding a common enterprise where 99% of investors leased back phones to a company operated by a promoter and were reliant on promoter to attract new investors to pay earlier ones).  The third prong asks "whether the efforts made by others are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *Unique*, 196 F.3d at 1201; *see Eberhardt v. Waters*, 901 F.2d 1578, 1581 (11th Cir. 1990) (considering that the average investor relied upon defendants for success).

Defendants solicited investors in the RBL Investment Programs through sales agents, promotional videos, in-person investor presentations, investor conferences, and word-of-mouth.  [*Id.* ¶ 21].  Investors were provided with offering materials and a brochure, entitled "RBL Investor Plan," which described each of the four investment programs discussed above, along with investment requirements and associated promised returns.  [*Id.* ¶ 22]. In one of RBL's promotional videos, "Driving American Dream," which was available to the public on YouTube, Singh claimed to have reversed the traditional business model to one in which RBL carried all of the risk on behalf of its investors:  "The company['s] ambition is only one – to work for our investor and to make the investor prosper.  We take the risk.  We take the liability.  You enjoy the investment, and that is our business model."  [*Id.* ¶ 23].  During a November 2022 RBL Investor Zoom video conference, which was also available to the public on YouTube, Singh claimed RBL generated $650,000 in revenue per month and compared RBL's Investment Programs to investing in Apple and Tesla:

> … [T]he fundamental[s] of this business can be trusted.  So let's move on from the point of view that [RBL] may last one day, two days – this is not Bitcoin. Our product is better than Apple.  Our product is better than Tesla.  You buy Apple, you buy Tesla, you start spending money.  You buy [a] Royal Bengal contract, you start making money.

[*Id.* ¶ 24].  In a March 2023 pitch to undercover FBI agents posing as prospective investors at RBL's headquarters, RBL's representatives emphasized that the investments were 100% guaranteed; RBL did not rely solely on investor funds to operate; and to date, no investor had ever missed receiving a payment. [*Id.* ¶ 25].

Defendants' representations about the success of RBL's trucking company, the safety and security of investor funds, and RBL's ability to pay investor returns from the profitability of RBL's trucking enterprise were entirely false.  [*Id.* ¶¶ 27-31].  RBL's bank account records from the relevant time frame demonstrate that investments in RBL were anything but safe and secure.  [*Id.* ¶ 27].  Since at least August 2019, Defendants had been depositing and commingling investor funds raised through

the four investment programs into RBL's operating accounts. [*Id.*]. Defendants then used commingled investor funds to pay RBL's business expenses and, as further explained below, to make *Ponzi*-like "interest" and "lease" payments as well as principal redemptions to investors under RBL's Investment Programs. [*Id.* ¶ 28].

Contrary to Defendants' claims that RBL was generating $650,000 to $1,000,000 in monthly revenues, from August 2019 through February 2023, RBL operated at an approximate $18 million loss and used investor funds to cover the shortfall. [*Id.* ¶ 29]. Specifically, during that period, RBL generated revenue of approximately $13 million. [*Id.* ¶ 30]. During this same period, RBL incurred expenses of approximately $31.2 million (not including interest payments, lease payments, or principal redemptions owed to investors under RBL's Investment Programs). [*Id.*]. Therefore, at all times material to the Complaint, RBL could not have paid investors "interest" or "lease" payments from company revenue. [*Id.*]. Instead, RBL had been paying investors "returns" and redemptions from a continuous stream of new investor money in a *Ponzi*-like fashion. [*Id.*].

4.   Defendants' Misuse and Misappropriation of Investor Funds

During the Relevant Period, RBL was paying returns owed to existing investors – either "interest" on the loan programs or "lease" payments under the Truck Program – with money raised from new investors. [*Id.* ¶ 34]. RBL also used new investor funds to pay redemptions to pre-existing investors. [*Id.*]. RBL's bank account records reflect that, from August 2019 through February 2023, RBL operated at an approximate $18 million loss and used investor funds to cover the shortfall. [*Id.* ¶ 33]. In addition to operating as a *Ponzi* scheme, Defendants misappropriated as much as $13.9 million of investor funds for themselves and related parties, including, but not limited to, transferring $7.5 million of investor funds to a bank account held jointly by Singh and his spouse, Sheetal. [*Id.* ¶ 36]. RBL also paid $2.1 million of investor funds to a realty company for real estate in Pompano Beach, Florida, purchased in the name of Relief Defendant Constantina Celicourt—the spouse of

10

RBL's Vice-President of Business Development. [*Id.* ¶ 37]. Defendants also diverted approximately $19.3 million of investor funds to two TD Ameritrade brokerage accounts, where Singh engaged in highly speculative trading of equities on margin, losing over $1 million. [*Id.* ¶ 38].

> 5.   The SEC Seeks Emergency Relief and Obtains Preliminary Injunction

On June 20, 2023, the Commission brought an emergency action to enjoin Defendants from continuing to defraud investors through the sale of unregistered securities in violation of the anti-fraud and registration provisions of the federal securities laws. [*See* Compl., ECF No. 1]. As part of its emergency action, the Commission moved on an *ex parte* basis for a temporary restraining order [ECF No. 7] and the appointment of a receiver over RBL [ECF No. 5], among other relief, which the Court granted [ECF Nos. 10 and 11]. In granting the temporary restraining order (the "TRO"), the Court ordered Defendants to show cause why a preliminary injunction ("PI") pursuant to Rule 65 of the Federal Rules of Civil Procedure should not be granted against the Defendants. [ECF No. 10 at 6].

On July 27, 2023, Singh filed his Answer and Affirmative Defenses. [ECF No. 58]. Singh's Affirmative Defenses alleged: the investment contracts which are the subject of the Complaint are not securities (First Affirmative Defense); any disgorgement must not exceed a wrongdoer's net profits and must be awarded to the victims (Second Affirmative Defense); the Complaint fails to join necessary parties (Third Affirmative Defense); the Complaint fails to state a claim upon which relief may be granted (Fourth Affirmative Defense); and a reservation of right to plead additional affirmative defenses (Fifth Affirmative Defense). [*Id.* at 10-11].

Following an evidentiary hearing held on August 14, 2023, at which Singh appeared and was represented by counsel, the Court entered a preliminary injunction against Singh and RBL. [ECF No. 82]. In that Order, the Court found "the Commission has made a sufficient and proper showing in support of the relief granted herein by: (i) presenting a *prima facie* case of securities laws violations by

11

Singh; and (ii) showing a reasonable likelihood Singh will harm the investing public by continuing to violate the federal securities laws unless they are immediately restrained." [*Id.* at 2]. The evidence considered by the Court when making its PI ruling included the following: (1) the Commission's Complaint; (2) the Commission's Emergency *Ex-Parte* Motion for Temporary Restraining Order and Other Relief and Memorandum of law; (3) Singh's failure to file a motion to dissolve the TRO in advance of the hearing pursuant to Rule 65(b)(4) of the Federal Rules of Civil Procedure; (4) the Commission's proffer of its evidence in support of the TRO, and the availability of the Commission's witnesses for cross examination during the hearing; (5) Exhibits 1-27 entered by the Court into evidence during the hearing;[2] (6) *Singh's stipulation that RBL's investment programs were not registered with the Commission*; (7) Singh's Stipulation Regarding His Invocation of his Fifth Amendment Privilege, and the corresponding adverse inference drawn against Singh as to the areas of inquiry enumerated in the stipulation; (8) *Singh's failure to offer any testimonial or documentary evidence during the hearing or otherwise rebut the Commission's evidence*; (9) the Receivers' Consent to the Preliminary Injunction and Other Relief on behalf of RBL (DE [68]); and (10) the argument of counsel on behalf of the parties at the August 14, 2023, PI hearing. [*See* ECF No. 82 at 1–2 (italics added)]. Singh's Stipulation of Invocation of Fifth Amendment Rights stated generally as follows:

> DEFENDANT SINGH HEREBY STIPULATES that if called as a witness at the Show Cause Hearing, he will invoke the protections under the Fifth Amendment to the U.S. Constitution and refuse to answer any questions relating to the following areas of inquiry:
> 1. Singh's role as founder, president and director of RBL.
> 2. RBL's business operations, including RBL's trucking and logistics operations, factoring of revenue streams, assets and liabilities, revenues and business expenses.
> 3. Any details or other information regarding RBL's four investment programs offered to investors from June 2018 through the entry of the TRO, specifically,

---

[2]     Exhibits 1-27 include RBL corporate records, web captures of RBL promotional videos posted on YouTube, recorded RBL investor Zoom meeting (Nov. 2022), RBL bank records, sworn accountings by the Receivers' forensic accountants, and Sing's Stipulation of his Invocation of his Fifth Amendment rights. [*See* ECF No. 76-1 thru 76-27].

the short term and long term loan programs; the truck leasing program; and the trailer sponsorship program (collectively, the "RBL investment programs")….

4.  Details about the use of investor proceeds raised by RBL through its offer of the RBL investment programs…

5.  The role(s) of RBL's officers, directors, employees and agents.

6.  RBL's purchase of trucks on behalf of investors in the one- or two-truck leasing program…[and]

… Any and all efforts to register the RBL investment programs with the Securities and Exchange Commission, or Singh and/or RBL's efforts to comply with any exemption from registration.

[ECF No. 76-27].

## B.  The Criminal Case

Around the same time the Commission filed its Complaint requesting emergency relief, Singh was arrested and charged with conspiracy to commit wire fraud [18 U.S.C. § 1349], six counts of wire fraud [18 U.S.C. § 1343], and one count of engaging in transactions in unlawful proceeds [18 U.S.C. § 1957].   [ECF No. 423, SMF ¶¶ 44-45].  According to the Indictment, Singh and his co-conspirators were operating a *Ponzi* scheme through the sale of investments in RBL, including its truck program, which guaranteed returns exceeding 200%, its trailer manufacturing program, and other programs yielding guaranteed returns ranging from 20 to 40%.  [*Id.* ¶ 47].  The Indictment went on to allege that RBL did not earn sufficient revenue from its trucking business to cover the costs of its operations, let alone the obligation to investors incurred through its investment programs.  [*Id.* ¶ 48].  As a result, Singh and his co-conspirators used new investor funds to pay existing investors promised returns, as is typical in a *Ponzi* scheme.  [*Id.* ¶ 49].  The Indictment further alleged Singh made a number of material false and fraudulent statements and omissions to investors, including that: (a) promised investment returns were guaranteed; (b) RBL assumed the risks associated with trucking operations while investors received returns irrespective of those risks; (c) RBL paid more funds to investors than it took in from investors; (d) RBL was able to pay investors through its successful trucking business; (e) RBL used truck program investment principal, at least in part, to acquire a truck and trailer for the investor that RBL leased back from the investor to operate; (f) Singh omitted that RBL did not make

a profit from its trucking business; (g) Singh omitted that new RBL investor money was used to pay prior RBL investors; (h) Singh omitted that he used RBL investor money to pay personal expenses including mortgage payments on his home and home renovations; and (j) Singh omitted that he used RBL investor money to fund multiple brokerage accounts and to provide collateral for stock trades on margin. [*Id.* ¶ 50]. On November 6, 2024, following a five-week jury trial, the jury returned a verdict finding Singh guilty on all eight counts. [*Id.* ¶ 51].

In convicting Singh of wire fraud, the jury found the Government proved beyond a reasonable doubt (1) Singh knowingly devised or participated in a scheme to defraud investors by using false or fraudulent pretenses, representations, or promises; (2) those false pretenses, representations, or promises were material; (3) Singh acted with the intent to defraud; and (4) Singh transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud. [*See* ECF No. 235, *Singh,* No. 0:23-cr-60117-LEIBOWITZ (S.D. Fla.)]. Singh was also the "leader/organizer" of the *Ponzi* scheme and "controlled all aspect of the fraud scheme, including, most importantly, all the many bank accounts that received the victims' money." [ECF No. 279 at 2, *Singh,* No. 0:23-cr-60117-LEIBOWITZ (S.D. Fla.)].

## C.  The Singhs' Opposition to Summary Judgment

Singh and Sheetal (the "Singhs") are proceeding *pro se* in opposition to the Commission's Motion. The Court has carefully reviewed all of the Singhs' filings [ECF Nos. 426, 427, 453, 454, 461]. Construing the filings quite liberally, the Singhs argue summary judgment is not appropriate for a host of reasons summarized below, which cite to no evidence beyond (1) an affidavit filed in support of the Receivers' motion for partial summary judgment in a related state-court case brought by the Receivers against Richard Celicourt (husband of Relief Defendant Constantina Celicourt); and (2) an affidavit by Sheetal that is unsupported by competent evidence. The Singhs' filings, are thus, nothing

14

more than expressions of their views that the Government "got it wrong" in both the criminal and these civil proceedings. The Court summarizes each of the Singhs' filings below:

1. Sanjay Singh's Opposition Memorandum [ECF No. 426] sets forth Singh's alleged "Core Factual and Legal Disputes" as the "SEC Confuses the Legal Effect of the Criminal Conviction" since Sanjay Singh never pleaded guilty; the jury returned only a general verdict for wire fraud against Singh; no jury verdict or plea addressed securities fraud; Singh's conviction for wire fraud is not final pending appeal; and the jury's verdict did not resolve whether Singh's conduct was securities-related or connected to fiduciary duties. [*Id.* at 2–3]. Singh then recounts a list of alleged "Disputed Material Facts" such as (1) whether the Truck/Trailer Programs were securities that involved a common enterprise and profits derived by others; (2) whether RBL's promotional materials were "puffery or material"; (3) whether Singh owed fiduciary duties to RBL investors; (4) whether any RBL funds were "misused"; (4) whether transfers to Sheetal benefitted RBL or Singh; and (5) whether invoking the Fifth Amendment "eliminates fact disputes." [*Id.* at 6–7]. In support of his argument, Singh attached two (2) exhibits without explaining how they support denying the Commission's Motion: (1) Affidavit of forensic accountant Kevin McCoy filed in support of the Receivers' Motion for Partial Summary Judgment in *Lopez et al. v. Celicourt*, No. CACE-23-019816 (17th Jud. Cir., Broward Cnty., Fla. Dec. 18, 2023) [*See* ECF No. 426 at 11–16]; and (2) the Commission's opposition memorandum to Singh's Motion for Sanctions (Apr. 19, 2024) [*See id.* at 18–34].

2. Sanjay Singh's Supplemental Opposition Memorandum [ECF No. 427] simply rephrases and slightly expands the arguments made in the original memorandum, without citing to any record evidence that supports his assertions therein. [*Compare* ECF No. 427 *with* ECF No. 426].

3. Sanjay Singh's Memorandum of Law Pursuant to the Court's February 26, 2026, Order [ECF No. 453] argues that because the Commission cannot show that the RBL Investment Programs were securities, summary judgment is not appropriate. [*Id.* at 2–3; 5–10]. Singh further opines that

his criminal conviction for wire fraud is not a sufficient basis to find him civilly liable for securities fraud on collateral estoppel grounds as argued by the Commission.  [*Id.* at 3–5].

4.       Sanjay Singh's Statement of Disputed Material Facts [ECF No. 454] lists the following asserted disputes of fact: (1) whether the Truck, Trailer, and Loan agreement constitute securities under *Howey*; (2) whether "individualized contracts and dependence on investors CREDIT QUALIFICATION DEFEATS VERTICAL COMMONALITY"; (3) "whether profits were derived only from RBL's efforts… whether investor exercised control and participation…[and] whether profits arose from business operations rather than managerial efforts"; (4) whether "under Florida law, usury loan is not considered investment… [a] loan term for less than none months are exempt from securities laws…, [a] long term loan was [a] commercial loan to purchase [a] truck…, [and] whether [the] trailer sponsorship agreement f[e]ll within the Reves 'family resemblance' test doctrine"; (5) regarding the alleged *Ponzi* scheme, *i.e.,* "RBL did not pay 70 million from new investor to old investor… PBL paid investor from revenue… because money is fungible inference of Ponzi fails as matter of law"; (6) "whether investor repeated engagement and participation negates materiality… [and] whether written contracts contradict oral statements"; (7) regarding duty to disclose, "whether any fiduciary duty EXISTED… whether any omission based liability is legally viable; and (8) "whether RBL had legitimate business operation… [and] whether the Receivers Report [contradicts] the SEC theory."  [*Id.* at 1–3].

5.       Sheetal Singh's Opposition Memorandum [ECF No. 461] attempts to raise issues of disputed facts with respect to "whether funds were retained"; "whether the funds were used for legitimate expenses"; "the accuracy of the SEC's accounting"; and "the net amount, if any, subject to disgorgement."  [*Id.* at 7].  Sheetal filed an affidavit (Ex. 1) and hundreds of pages of bank statements (Ex. 2) in support of her arguments.  [*See* ECF No. 461 at 2; 11–14 (Ex. 1); 15–449 (Ex. 2)].  In the affidavit, Sheetal attests she held a joint bank account at Bank of America with Singh which was used

by Singh in connection with RBL's "legitimate business expenses" and operations.  [*Id.* at 11].  Sheetal further attests that other bank accounts in her name (Truist Bank, Morgan Stanley, and Charles Schwab) "were also used, at times, in connection with the operations or benefit of RBL."  [*Id.* at 12]. Finally, Sheetal avers:  "I did not retain the majority of these funds for personal enrichment," and the "net position, if calculated after accounting for expenditures and business-related use, would be approximately between $20,000 and $30,000, if any."  [*Id.* at 12–13].  As for the bank statements, Sheetal argues they demonstrate "continuous movement of funds in and out of the accounts"; "payments for operational expenses"; "lack of accumulation of large personal balances"; and "absence of retained profits consistent with SEC's $7.5 million claim."  [ECF No. 461 at 4].

## IV.    DISCUSSION

The Commission seeks summary judgment on Counts II through VIII against Singh based on collateral estoppel due to his criminal conviction for wire fraud and the unrebutted record evidence in this case that the RBL Investments Programs are securities.  [ECF No. 424 at 8–12; ECF No. 443]. In addition, the Commission argues it is entitled to judgment as a matter of law on Counts I through VIII against Singh, because the evidence presented at the hearing on its motion for a preliminary injunction is uncontested.  [ECF No. 424 at 12–15].  Finally, the Commission moves for summary judgment against Relief Defendant Sheetal on Count IX (unjust enrichment), on the grounds that the elements of the claim are not disputed and Sheetal's invocation of her Fifth Amendment privilege permits the Court to draw an adverse inference against her on this claim.  [*Id.* at 16].

Viewing the evidence in the light most favorable to Singh and Sheetal and as discussed below, the Commission is entitled to summary judgment on all Counts of the Complaint.

A.    **The Commission is entitled to summary judgment against Singh on Counts II-VIII.**

1.   Securities fraud elements are established.

Counts II through VIII of the Complaint allege Singh violated Section 17(a) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, and Section 20(a) of the Exchange Act. [Compl., ECF No. 1 at 14–18]. Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act prohibit essentially the same type of conduct. *See U.S. v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979); *See also SEC v. Unique Fin. Concepts, Inc.*, 119 F. Supp. 2d 1332, 1339 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir. 1999). The language of these provisions is "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 78–79 (2019). In *Lorenzo*, the Supreme Court recognized that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection. Section 17(a) of the Securities Act makes it unlawful in the "offer or sale" of securities to: (a) "employ any device, scheme, or artifice to defraud;" (b) "obtain money or property by means of any untrue statement of a material fact or any [material] omission;" or (c) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." *Id.* at 80 (citing 15 U.S.C. § 77q(a)(1)-(3)). A showing of scienter is required under Section 17(a)(1), but Sections 17(a)(2) and (a)(3) require only a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

Section 10(b) of the Exchange Act and Rule 10b-5 render it unlawful, "in connection with the purchase or sale" of securities, to: "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). A showing of scienter is required

18

under Section 10(b) and Rule 10b-5 thereunder. *SEC v. Corporate Relations Group*, No. 6:99-cv-1222, 2003 WL 25570113 at *7 (M.D. Fla. Mar. 28, 2003) (citations omitted).

The jury's conviction of Singh for wire fraud aligns with all but one of the elements required under Sections 17(a), Section 10(b), and Rule 10b-5—that the RBL Investments constituted securities. That determination, however, is unrebutted on this record, as discussed above. [*See also* ECF No. 443 at 5–11 (citing record evidence from Singh's civil and criminal cases showing RBL's Investment Programs satisfy *Howey*'s test)].

To prevail on its Section 20(a) claim, the Commission must prove that (1) RBL committed a violation of Section 10(b) of the Exchange Act and Rule 10b-5; (2) Singh had the power to control the general business affairs of RBL; and (3) Singh had the power to directly or indirectly control or influence the specific corporate policy which resulted in Singh's violation. *See Curry v. TD Ameritrade, Inc.*, 662 F. App'x 769, 772 (11th Cir. 2016) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (quotation omitted)). That Singh was a "control person" who violated Section 20(a) of the Exchange Act cannot be disputed given his role as RBL's founder and operator of the RBL *Ponzi* scheme.

Looking at the undisputed record established in Singh's criminal case and in this civil action, Singh is collaterally estopped from disputing facts already established in prior proceedings when opposing the Commission's motion for summary judgment on Counts II through VIII of the Complaint.

2.   Collateral Estoppel

Collateral estoppel—also called "issue preclusion"—prevents parties from relitigating issues that were already decided in a previous action. *See Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998); *see also Martinez v. Mkt. Traders Inst., Inc.*, No. 17-11956, 2018 WL 6431534, at *2 (11th Cir. Dec. 6, 2018) (per curiam) ("Issue preclusion—or "collateral estoppel"—precludes a litigant

from relitigating an issue that was actually litigated in an earlier action to a final judgment between the same parties, provided that the issue in both proceedings is in fact the same.") (citing *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015)).  The doctrine applies to issues previously litigated in both civil and criminal matters.  *See United States v. Jean-Baptiste*, 395 F.3d 1190, 1194 (11th Cir. 2005) ("Collateral estoppel bars a defendant who is convicted in a criminal trial from contesting this conviction in a subsequent civil action with respect to issues necessarily decided in the criminal trial.") (citations omitted).  As a result, "prior criminal convictions may work an estoppel in favor of the government in subsequent civil proceedings."  *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568-69 (1951); *S.E.C. v. Bilzerian*, 153 F.3d 1278, 1282-83 (11th Cir. 1998) (finding that a defendant convicted of securities fraud was collaterally estopped from contesting previously litigated issues in a later civil action brought by the Securities and Exchange Commission); *In re Raiford*, 695 F.2d 521, 524 (11th Cir. 1983) (holding that a prior criminal bankruptcy conviction collaterally estopped debtor from relitigating the issues in a later civil proceeding under a separate statute); *Refined Sugars, Inc. v. S. Commodity Corp.*, 709 F. Supp. 1117, 1122 (S.D. Fla. 1988) (granting plaintiff's motion for summary judgment as to fraud and theft in a civil action due to defendant's prior criminal conviction resulting from the same fraudulent scheme).

The party relying on collateral estoppel must show that the following four elements are met: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the issue determined was a critical and necessary part of the judgment in the prior action; and (4) the non-moving party had a full and fair opportunity to litigate the issue in the prior proceeding.  *See Pleming*, 142 F.3d at 1359; *see also CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003) (same).

Here, the Court finds that the Commission has established each of the required elements.

a. <u>The issues at stake are identical.</u>

For the first element, Singh contends his criminal convictions for conspiracy to commit wire fraud, wire fraud, and engaging in unlawful proceeds, were not convictions for federal securities fraud so the issues at stake in his criminal proceedings are not identical to those litigated in this action. [*See* ECF Nos. 426 at 3–4; 427 at 4–5]. However, courts in this Circuit and others have found that a criminal conspiracy conviction is preclusive when committing the underlying act was a necessary element to the verdict—including in the context of securities fraud. *See S.E.C. v. Langford*, No. 2:08-cv-761-AKK, 2011 WL 13228240, at *5 (N.D. Ala. Aug. 8, 2011) (finding collateral estoppel applied to civil securities fraud counts based on criminal conviction of conspiracy to commit bribery, mail fraud, and wire fraud); *see also S.E.C. v. Bravata*, 3 F. Supp. 3d 638, 657 (E.D. Mich. 2014) ("Convictions for mail fraud, wire fraud, securities fraud, and conspiracy to commit securities fraud suffice to establish claims for securities fraud based on the same facts in a related civil action." (citing cases)).

In line with those decisions, and after reviewing the record in both cases against Singh, including the civil complaint, the transcript and evidence from the PI evidentiary hearing, the criminal indictment, the jury instructions, and the jury verdict, the Court finds that the issues at stake are identical. Securities fraud requires evidence Singh made "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citing *Aaron*, 446 U.S. at 695). In the criminal case, the jury was charged that, to find Singh committed wire fraud, the Government had to prove beyond a reasonable doubt that:

> (1) the Defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises; (2) the false pretenses, representations, or promises were about a material fact; (3) the Defendant acted with the intent to defraud; and (4) the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

21

*Singh,* Case No. 0:23-cr-60117-LEIBOWITZ, Jury Charge, ECF No. 235 (Nov. 7, 2024).

The jury did not find that the fraudulent statements were made "in connection with the purchase or sale of securities." However, "for collateral estoppel to apply, the civil claims need not arise under the same statutory provisions under which a party was convicted." *S.E.C. v. Amerindo Inv. Advisors, Inc.,* No. 05-cv-5231, 2013 WL 1385013, at *3 (S.D.N.Y. Mar. 11, 2013) (Sullivan, J.) (citations omitted). It is sufficient if the factual allegations underlying the convictions establish that the defendant also violated the civil claims. *Id.* (citations omitted). The unrebutted evidence in this case is that the RBL Investment Programs were indeed securities as contemplated by *Howey.* Thus, the issues at stake in the criminal case are identical to the issues litigated here.

b. Remaining elements for collateral estoppel

The remaining elements for collateral estoppel are also met. All of the issues were fully litigated over a five-week jury trial, which resulted in a jury verdict of guilty against Singh on all counts. Thus, the jury resolved the disputed factual issues regarding Singh's conduct and intent as well as the fraudulent nature of RBL's *Ponzi* scheme. And due to the similarity between wire fraud (18 U.S.C. § 1343) and the securities fraud violations alleged in the Complaint, the factual issues in both proceedings are the same and the factual issues were critical and necessary to support a conviction under 18 U.S.C. § 1343. *See e.g., S.E.C. v. C.J.'s Fin.,* No. 10-13083, 2012 WL 3600239 (E.D. Mich. July 30, 2012), *report and recommendation adopted,* 2012 WL 3597644 (E.D. Mich. Aug. 21, 2013) (finding factual issues essentially the same for wire fraud and antifraud provisions of the securities laws and "necessary" to support a conviction under 18 U.S.C. § 1343). Finally and perhaps most importantly for present purposes, Singh had a full and fair opportunity to litigate these issues in the criminal case. Singh was represented by counsel of the PI hearing; Singh was represented by excellent Assistant Federal Defenders at his criminal trial; Singh had the right to present evidence and cross-examine

22

witnesses; and the Government at Singh's criminal trial was held to the highest burden of proof—beyond a reasonable doubt.

Notably, Singh's appeal of his criminal conviction does not prevent the application of the doctrine of collateral estoppel. *See Lara-Unzueta v. Monica*, No. 03 C 6083, 2004 WL 856570, at *5 (N.D. Ill. Apr. 20, 2004); *SEC v. Blackwell*, 477 F. Supp. 2d 891, 901 (S.D. Ohio 2007) (citations omitted). The established rule in federal courts is that a final judgment retains all of its *res judicata* consequences pending decision of the appeal. *Jaffree v. Wallace*, 837 F.2d 1462, 1466–69 (11th Cir. 1988) (quoting 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4433, at 308 (1981 & Supp. 1987)).

Accordingly, all of the elements of collateral estoppel are satisfied such that the Commission is entitled to summary judgment against Singh on Counts II through VIII of the Complaint.

**B.       The Commission is entitled to summary judgment against Singh on Count I.**

Count I of the Complaint charges Singh with violating Section 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]. [Compl., ECF No. 1 ¶¶ 56–59]. Under Section 5(a), it is unlawful for any person, directly or indirectly, to sell securities through the use of any means or instrumentalities of transportation or communication in interstate commerce or of the mails unless the transaction is the subject of an effective registration statement. *See* 15 U.S.C. § 77e(a). Section 5(c) provides a similar prohibition for offers to sell a security unless a registration statement has been filed. *See* 15 U.S.C. § 77e(c). A *prima facie* case for violations of Section 5 is established by showing that: (1) the defendant directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect. *SEC v. Calvo*, 378 F.3d 1211, 1214–15 (11th Cir. 2004). To demonstrate that a defendant sold securities, the SEC must prove that the defendant was a "necessary participant" or "substantial factor" in the illicit sale. *Id.* "Once participation in an unregistered sale has been shown, the petitioners have the burden of proving

23

an exemption to the registration requirements." *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 807 (11th Cir. 2015) (citation and internal quotation marks omitted).

During the PI Hearing, Singh stipulated that no registration statement was in effect for RBL's securities that were offered to RBL Investors. [*See* H'ring Tr., ECF No. 79 at 6:12-23]. Further, it is undisputed that RBL and Singh offered and sold securities to more than 1,500 investors in various states in a general solicitation using the Internet, U.S. mail, and other forms of interstate commerce. [Dee Decl., ECF No. 423-1 ¶¶ 11–31]. Finally, Singh has not demonstrated that RBL is entitled to an exemption from the registration requirement (nor can he). As there are no disputed issues of material fact that Singh violated Section 5 of the Securities Act, summary judgment is due to be entered against Singh on Count I of the Complaint.

### D. The Commission is entitled to summary judgment against Sheetal on Count IX.

Finally, Count IX of the Complaint asserts an unjust enrichment claim against Sheetal for funds she obtained through RBL's *Ponzi* scheme. [Compl., ECF No. 1 ¶¶ 80–82]. In Florida, an unjust enrichment claim has four elements: (1) a direct benefit has been conferred on the defendant, (2) the defendant had knowledge of the benefit, (3) the defendant accepted or retained the benefit, and (4) it would be inequitable under the circumstances for the defendant to retain the benefit without paying fair value for it. *See Hamilton v. Suntrust Mortg. Inc.*, No. 13-60749- CIV, 2014 WL 1285868, at *3 (S.D. Fla. Mar. 28, 2014) (citing *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 714 F.3d 1234, 1237 (11th Cir. 2013)) (other citation omitted).

It is undisputed Singh transferred approximately $7.5 million from RBL's operating accounts to a bank account held jointly in the name of Singh and Sheetal. [ECF No. 423, SMF ¶ 36(a)]. Sheetal was RBL's Director of Finance, signatory to at least one of RBL's operating accounts, and an owner of the joint account to which RBL investor funds were sent. [*Id.* ¶ 5.]. When asked about these transfers during her deposition, Sheetal invoked her privilege under the Fifth Amendment and refused

24

to answer any questions regarding the money she received over the course of the fraud.  [*Id.* ¶¶ 43-44].   The Court, therefore, draws an adverse inference from Sheetal's invocation of the Fifth Amendment regarding her being unjustly enriched from funds obtained through RBL's *Ponzi* scheme.  *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009) ("[I]n a civil suit … the court may draw adverse inferences against a party that invokes the Fifth Amendment.").

In opposition, Sheetal attests that the Singhs' joint bank account was used to pay RBL's business expenses; however, she points to no transaction to support this.  [See ECF No. 461 at 2; 11–14 (Ex. 1)].  Instead, Sheetal attaches hundreds of pages of bank statements without any explanation as to how those records support her assertion.  [*See id.* at 15–449 (Ex. 2)].

As the Commission correctly points out, Sheetal's conclusory affidavit cannot create a genuine issue of material fact when she fails to cite any transaction that supports her claim that the Singhs' joint bank account was used to pay RBL's business expenses.  [ECF No. 469 at 2–3 (citing *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (citing *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985)); *TTT Foods Holding Co. v. Namm*, No. 16-cv-81798-MIDDLEBROOKS, 2017 WL 2901329, at *8 (S.D. Fla. May 19, 2017) (finding that conclusory affidavit in support of justifying transfers did not create a genuine issue of fact); *Gossett v. Du– Ra–Kel Corp.*, 569 F.2d 869, 872 (5th Cir.1978) ("[O]ne who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial.")].  And the Commission is correct that "[c]ourts have consistently held that a nonmovant cannot defeat summary judgment by simply producing a large volume of documents without identifying any specific supporting information.  [ECF No. 469 at 3 (citing *Smith v. Young*, No. 4:11-cv-573-RH/CAS, 2013 WL 1729000, at *3 (N.D. Fla. March 6, 2013) (ruling a nonmovant's response to summary judgment consisting of "a large stack of just over 300 pages … and a separate two-page affidavit" insufficient because "it [did] not reference any source for the asserted statements)].

25

The Commission also points out that Sheetal's affidavit in support of her claim cannot be used at all when she has invoked her Fifth Amendment privilege during her deposition by the Commission. [ECF No. 469 at 5 (first citing Sheetal's Deposition, ECF No. 423-4 at 48:16-49:11; then citing caselaw holding that "[a] defendant may not convert her Fifth Amendment privilege from a shield during deposition to a sword at summary judgment")]. The Court agrees with the Commission that "Sheetal's affidavit is precisely the sort of tactics courts condemn—an attempt to introduce untested factual assertions after avoiding cross-examination and refusing to provide discovery." [ECF No. 469 at 5–6 (citing *SEC v. BIH Corp.*, No. 2:10-cv-577-JES-DNF, 2013 WL 6571472, at *2 (M.D. Fla. Dec. 13, 2013) ("Conversely, withdrawal [of the Fifth Amendment privilege] is not permitted if the litigant is trying to 'abuse, manipulate or gain an unfair strategic advantage over opposing parties.'") (quoting *Davis–Lynch, Inc. v. Moreno*, 667 F.3d 539, 547 (5th Cir. 2012)); *Evans v. Capps*, No. 7:15-cv-252-BO, 2018 WL 5291864, at *5 (E.D.N.C. Aug. 3, 2018) ("[C]ourts have found that a party may not simultaneously reap the benefits of asserting the Fifth Amendment, while also presenting unchallenged testimony to the court to defeat summary judgment."), *report and recommendation adopted*, No. 7:15-cv-252-BO, 2018 WL 4635025 (E.D.N.C. Sept. 27, 2018), *aff'd*, 765 F. App'x 44 (4th Cir. 2019))].

Because Sheetal invoked her Fifth Amendment protection on all material issues, this Court draws the adverse inferences allowed and disregards her affidavit entirely. Moreover, given that RBL investors were defrauded out of more than $112 million because of the *Ponzi s*cheme and are likely to receive a mere fraction of that amount through the receivership established in this case, it would be inequitable to allow Sheetal to retain the benefit of the investor funds received to her joint account with Singh. Accordingly, the Commission is entitled to summary judgment against Sheetal Singh as to Count IX of the Complaint.

## V.      CONCLUSION

In view of the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Plaintiff's Motion for Summary Judgment [**ECF No. 424**] is **GRANTED**.

2.  The Court grants judgment as a matter of law against Sanjay Singh and in favor of the Commission on Counts I, II, III, IV, V, VI, VII, and VIII of the Complaint [ECF No. 1].

3.  The Court grants judgment as a matter of law against Sheetal Singh and in favor of the Commission on Count IX of the Complaint [ECF No. 1].

4.  Final Judgments will be entered by separate order under Federal Rule of Civil Procedure 58(a).

5.  The Commission is directed to provide a MS Word version of proposed final judgments to be entered in this case to leibowitz@flsd.uscourts.gov **no later than June 30, 2026**.

6.  *The Clerk of Court* is DIRECTED to CLOSE this case.

7.  All deadlines are TERMINATED and any pending motions are DENIED AS MOOT.

8.  The jury trial scheduled to begin on Tuesday, September 8, 2026, is CANCELLED.

**DONE AND ORDERED** in the Southern District of Florida on May 20, 2026.

DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc: counsel of record
Sanjay Singh and Sheetal Singh, *pro se*

27